IN THE UNITED COURT OF FEDERAL CLAIMS

---

CLAYTA FORSGREN, et al.,

Plaintiffs,

vs. No. 04-1223L
Judge Margaret M. Sweeney

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF DAVID HARPER
Taken in behalf of Defendant

9:08 a.m., Tuesday
February 14, 2006

PURSUANT TO NOTICE, the deposition of DAVID HARPER was taken in accordance with the applicable Federal Rules of Civil Procedure at the offices of Bureau of Land Management, Pinedale Field Office, 432 East Mill Street, Pinedale, Wyoming, before Kathy J. Mullivan, a Registered Professional Reporter, and a Notary Public in and for the State of Wyoming.

COPY

Def.'s Ex. 2

making decisions based on what was best for the land as well as the public.

Q. Do you have any expertise in hydrology or hydrogeology?

A. No, I do not.

Q. Any expertise in soil science?

A. No.

Q. Do you have an expertise in geography?

A. Clarify that.

Q. When I -- what I mean is maybe topography and slopes and things like that, land features. Is there a science that deals with that?

A. Well, it would be hydrology, geology and soils, basically. You know, it would also involve some range science or forestry science, depending on what vegetative growth occurred on the surface of the land. So when -- when you deal with topographical evaluations, there really isn't one specific science that deals with that. That's why so often we would have to assemble an interdisciplinary team, evaluate proposals. We would look at slope and soil, vegetation, and mostly at the time we found we could mitigate the impacts by manipulating vegetative -- vegetation on the land, revegetation, soil amendments.

Q. Is it fair to say that your expertise is not in



the details of the various sciences on the team, but in administrative oversight and supervision?

A. That's correct.

Q. Thank you. After you came to Pinedale, was there a time when you met Richard A. Forsgren?

A. There was. I don't remember exactly when it was. It was before May 6, 1988. I don't recall if it was over the telephone or in person. I think it may have been in person, but I don't recall.

Q. Did you meet Mr. Forsgren in connection with your work at the BLM?

A. I believe that's correct. I think he came into the office and was explaining his circumstances up on Pine Creek and I believe I made an appointment with him to go up and investigate -- investigate that.

Q. Was this approximately in 1986 or 1987?

A. This was in 1988, I would guess.

Q. And what circumstances on Pine Creek did he describe for you?

A. What I believe he described was that he was having some water problems and he wanted permission -- actually, let me take that back. He wanted BLM to take action by building a ditch or a trench above his property to prevent water from running onto his property.

Q. And did you visit the property in question at



that time?

A. I did. I went up there at 4:30 in the afternoon on May 6th, as is shown on my Daytimer, that date, and I met with Dick and Clayta and I looked at the back of their property and I looked under their house and I went inside the house with them and we discussed the nature of the visit.

Q. And upon your inspection, what did you observe?

A. What I observed was that there were -- there was some wetness behind his property. I could not determine whether the wetness was from water above the hill or snowmelt. The snow goes off of this country late in the year, around here. We don't often get leaves on our trees until the end of May. And there were -- there was some soggy ground in the back on the flap, that could have easily been from snow melt off, I don't know.

Dick was claiming that water was coming down off the hill and effecting his house at the time, but I didn't see that. That was not the conclusions that I drew. He asked me to look under his house. As I recall there was a hole or a door in the back of the house towards the hillside on the east side and I looked in there. I didn't see anything that would indicate water damage to me. And I didn't notice any -- to the best of my recollection, I did not notice any wet under the house. I felt that Dick



wanted the BLM to dig a ditch to prevent water from coming onto his house, but I didn't see that as being an immediate threat, although I think Dick may have been looking down the line a little bit and playing his cards a little close to his chest.

There was some rumors back then of the town building a new dam on Fremont Lake, which was going to raise the lake 3 to 6 feet, and raising the water of the lake that much I think he felt may cause some increased watering of sites downhill from the lake, which was very possible. The lake had -- in the shoreline and the basic relationship between the hydrology and the geology had come to an equilibrium in the area from the dam that was built many, many years before, and I think Dick saw a potential imbalance occurring that -- that could cause him problems further down the line. And, personally, I think that he wasn't having a problem as much as he thought he was going to have a problem.

Q. Now, let's go back and go through what you just said --

A. Okay.

Q. -- and figure out a little bit more here. You said that you did not conclude that water was coming from adjacent property onto the Forsgren property; is that correct?



Def.'s Ex. 2

22

A. I could not come to that conclusion.
Q. Just based on your visual observations that day?
A. That's correct. What I did suggest to Dick was that he file right-of-way application that would allow him to put a ditch or a trench on the BLM property adjacent to his ground. We also discussed the possibility of him putting a similar facility on his property. And I felt, and I think he felt the same thing, there really wasn't adequate room to put that type of a facility on his own property. He did not -- he does not hold much of that hillside.
Q. Was a right-of-way application for a ditch on BLM property filed?
A. As I recall, I took up a right-of-way application form that he and Clayta could fill out and file, and I told him there would be processing fees that would go along with that. And as I recall, he did fill out that application and present it to me not many days afterwards, but did not pay any processing fees because his desire was to have the BLM take care of the problem. And he didn't feel that he should have to pay money for a problem that was created off of his property.
Q. Did he say that to you, that he did not want to pay the fees because he felt the BLM should pay?
A. I remember him expressing an opposition to

23

paying the fees. The conversation that centered around that opposition, I don't recall in that kind of detail.
Q. Now, you also said that you believed that he was looking at a -- or -- let me rephrase it. Let's strike that and I'll rephrase my question.
I believe you testified that Mr. Forsgren felt that a modification to the dam -- proposed modification would increase Fremont and cause problems on his property; is that correct?
A. As I recall, he expressed some concern of that possibility.
Q. And he expressed that concern to you?
A. As I recall, to the best of my recollection.
Q. And that was in 1988?
A. That was in 1988.
Q. Was the dam modified?
A. Yes.
Q. What year was that?
A. I do not recall.
Q. Did the level of Fremont Lake rise?
A. It did.
Q. Do you know what -- when that occurred?
A. No, shortly after the dam was constructed, it was a -- well, 3 to 6 feet may not sound significant. It was a significant increase in water. That lake is

24

10 miles long, has 27 miles of shoreline and it's 600 feet deep.
Q. Now, you also stated that the hydrology and geology had come to an equilibrium, referring to Fremont Lake. What is the basis for that conclusion?
A. The amount of years that the lake was at that level after the old dam had been built.
Q. Do you know how many years the lake had been at a constant level after the dam was built?
A. The first dam? No, I do not.
Q. You don't know when the first dam was built?
A. No, I do not.
Q. Is that the type of information you would have known in connection with your work for the BLM in 1988?
A. I believe I would have known that then. It shouldn't be hard to find out when it was built.
Q. And was the water level in Fremont Lake something that you would have been familiar with in connection with your work at the BLM in 1988?
A. No, I don't believe it would be something I would have known in connection with my work. Being an outdoors person, being a boater and fisherman, in all I've made myself familiar with aspects of that lake that affected my interest.
Q. So as a boater and fisherman you visited Fremont

25

Lake in the 1980s and became familiar with the lake level at that time?
A. Yeah. Actually lived on the shore of the lake for 30 days when I first moved here. The wife and I lived in a little one-room log cabin with two kids and a bathroom up the hill and it was interesting.
Q. That was in 1986?
A. Yes.
Q. And you visited the lake after that?
A. Oh, yes, many times.
Q. So when they -- the level of the lake increased, did that come to your attention in connection with your pursuit as a fisherman, boater?
A. It was a big interest in town. It was in the newspapers. There was a lot of controversy over it.
Q. Did you attend any meetings regarding the lake?
A. No, I don't think I did.
Q. Do you know whether meetings were held in connection to the modification to the dam and the effect on the lake?
A. I couldn't recall any specific dates.
Q. But meetings were held regarding that subject?
A. I would not be able to recall that with any accuracy.
MR. TRAUBEN: Why don't we take just a

short break and let me go over my notes and see whether I have any additional questions. I may have a few follow-up questions yet, I just want to take a short break now so we don't have to hold you captive while I go over my notes?

THE DEPONENT: Are we off the record now?

MR. TRAUBEN: We'll go off the record just a few minutes while I review my notes.

(Deposition proceedings recessed 10:01 a.m. to 10:03 p.m.)

MR. TRAUBEN: Go back on the record and I have a --

Q. (BY MR. TRAUBEN) Okay. Mr. Harper, if you would look at Exhibit 2, the photocopies of the Daytimer book. And referring to the second page for the entry on May 16, 1988, there's a notation here that states Letter to Dick Forsgren. Do you recall the subject matter of that letter?

A. To the best of my recollection, that would have been probably a letter either rejecting his application or sending it back because it was not perfected.

Q. And this is the application for right-of-way to construct a ditch?

A. That's correct.

Q. And it was not perfected why?

A. Because, to the best of my recollection, filing



fees were not filed.

Q. And you recall explaining to Mr. Forsgren previously that a filing fee was required?

A. To the best of my recollection, I do, yes.

Q. If you would turn to the third page of Exhibit 2, on the entry under June 21, 1988, beneath the section where it says, "To be done today," it states, "Send Jordan the okay, Forsgren brief okay," and I can't read the next writing, H-O-K-F it appears?

A. That was a Bland Hokf exchange proposal that was in Jackson. These are different actions.

Q. Different actions. So number 1 is send Jordan the Forsgren brief?

A. That's correct.

Q. And it says located, does that mean that task was completed?

A. It does.

Q. Who is Jordan.

A. Jordan was Bill Jordan. He was the lead realty specialist in the Rock Springs district office, which is the next office up in hierarchy from the Pinedale Resource Area office.

Q. And what was the -- do you recall the subject matter of that brief that you were submitting to Mr. Jordan?



A. It would have basically described to Bill what Dick and Clayta wanted, what I discovered out there, and would have discussed the right-of-way application.

Q. In other words, the brief to Mr. Jordan would have summarized the events that we discussed today regarding your visit to the Forsgren property, observing water on the property or wetness in the ground, and your suggestion for a ditch; is that fair to say?

A. I would say that probably is not fair to say. Bill Jordan, as the lead realty specialist, was more interested in administrative actions that were being taken. And so since, as I recall, a right-of-way application had been filed, he would have probably been more interested in the status of the file or the status of the application rather than the condition of the land.

Q. So you would be informing Mr. Jordan in the brief that the application was returned for failure to pay the filing fee?

A. Yes. Now, at this point in time I want to interject some information regarding the process of the applications. As I said earlier, when applications were processed, it required an interdisciplinary team being put together. In the initial scoping of this project, which we would have done here in the office, it would have required at the minimum an archaeologic evaluation and



a -- what amounted to a wetlands evaluation, but the Bureau hadn't progressed far enough to call it that yet. And so the individual that was looking at that was the wildlife biologist. And, as I recall, there was some opposition in the office, among the staff, to create any disturbance on that hillside on BLM because of the archaeologic and wetland issues. And so I -- I don't recall talking to Dick about this, but I would have -- I'm sure I would have had to have told him that because these issues were large, these were going to take a lot of time to work through.

And Dick wanted this done right away. He was concerned about potential problems, I believe. And that may have been part of the reason that he didn't want to pursue the application was because of these objections or issues that were being raised among the interdisciplinary team in the office that processed the application.

Q. Now --

A. Now, this --

Q. Sorry.

A. I don't recall this outright. I don't recall the details of this outright.

Q. I don't want you to speculate.

A. I'm not speculating, I'm --

Q. Let me ask you, then, you said that may have