UNITED STATES COURT OF FEDERAL CLAIMS

---

CLAYTA FORSGREN, et al.,

Plaintiffs,

vs. Case No. 04-1223 L

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF P. STANLEY MITCHEM
Taken in behalf of Plaintiffs

10:03 a.m., Tuesday
February 21, 2006

PURSUANT TO NOTICE, the deposition of P. STANLEY MITCHEM was taken in accordance with the applicable Federal Rules of Civil Procedure at the U.S. Attorney's Office, 100 East B Street, Suite 2211, Casper, Wyoming, before Randy A. Hatlestad, a Registered Merit Reporter and a Notary Public of the State of Wyoming.

COPY

Def.'s Ex. 7

A. Well, I have quite a few other jobs, yes.
Q. I gathered, since you said the civil suit was not related to the state geologist job. What other jobs do you hold?
A. I am a volunteer fire fighter, which, in some cases, I have gone out on federal fires for pay. I ranch, raise registered Angus cattle. I have a real estate license and sell real estate with my wife. That pretty well takes up most of my time.
Q. I imagine. Are you familiar with the Forsgren property at 99 Riverside Drive in Pinedale?
A. I'm not sure of the address, but I have been to the Forsgren property several times.
Q. And when was the first time you visited the property?
A. That was August 26th of 1993.
Q. And why did you visit the property at that time?
A. I had a request from our field office to investigate water problems there on the Forsgren property and see if there was anything that we could do to assist them with reducing their problems.
Q. Who requested that you visit?
A. I believe it was Daryle Bennett. Our normal requests come from the district conservationist. But



sometimes it could have been one of the engineers over there.
Q. And is Daryle Bennett the district conservationist?
A. He was at that time.
Q. And what did Mr. Bennett tell you about the reason for your visit?
A. Just what I told you, that there was some water problems there that we wanted to investigate.
Q. Did he tell you about a meeting that was held with the CCC Ponds committee?
A. I don't remember anything about that.
MS. EASTMAN: Let's mark this as Exhibit 1.
(Exhibit No. 1 marked for identification.)
Q. (BY MS. EASTMAN) Is Exhibit 1 the notes that you took when you visited the Forsgren property on August 26th, 1993?
A. Yes, it is.
Q. And can you tell me what these notes mean?
A. We met with the Forsgrens on the 26th, Daryle Bennett and I did, and went over their concerns, their problems that they had been experiencing. They stated that they had been having continuing water problems,



water in the yard and the lawn, water in the crawl space under their house. And they showed us -- they had a trap door in their house -- I can't remember if it was in the living room or the bathroom or whatever -- to get down into the crawl space. And they showed us into there, the wetness problems that they'd been experiencing. And we determined that the best way to approach their problem was try and figure out where that water might be coming from.
So I installed three monitoring wells where we could monitor the water levels in the ground periodically. And this log -- this field book shows the logs of those three monitoring wells and some notes I took on the visit there with them.
Q. The notes, do those describe where they're located?
A. Where what's located?
Q. Where the monitoring wells are located.
A. They do describe an approximate position of the monitoring wells.
Q. And where it says, for example, zero to twelve, sandy, gravel --
A. Yes. Test Hole 1, that's the log of that hole. From zero to twelve inches, it was sand, gravel, silt. And it was a fill material and so forth on down to a



45-inch depth.
Q. And how could you tell it was a fill material?
A. It did not appear to be alluvial material like I would have expected it to be. There's no stratification to speak of in it like you might find in an alluvial stream.
Q. Did you dig any other wells in the Forsgren yard that you might have been able to compare?
A. That was the only one at the time. We later used a bucket auger to investigate the soils out farther from the -- in the yard itself.
Q. When was that?
A. I believe it was in 1995, October 1995, my next trip out there.
Q. And did you compare the material you found with that auger to the material you remember from Monitoring Well Number 1?
A. I do not remember the specifics of that other well at this time. It was, as I remember, somewhat similar, but not exactly the same.
Q. Did you take notes of what type of soil you found?
A. Yes.
Q. On the second page, you'd taken some additional notes?



Def.'s Ex. 7

wells near Dick Forsgren's property." Do you know if they're referring to you in that sentence?
A. I was the SCS state geologist.
Q. The third sentence in that paragraph says, "The water table is shallower than expected." Is that correct?
A. That's not my statement.
Q. Do you agree with that statement?
A. No.
Q. Why not?
A. In the position that that -- the house and lawn, I would have expected a very shallow water table, especially after seeing the wetness in the crawl space.
Q. The next sentence says, "A drain location was recommended that could help the water problem." Did you recommend a drain location?
A. We talked about it at that time. I'm not sure there was any formal recommendations made.
Q. And when you say, "We talked about it," who is "we"?
A. Daryle and I.
Q. What did you discuss?
A. As I say in my report of '95, that the normal way we would address a problem like that was to install a subsurface interceptor drain to catch the water before it



reached the Forsgren property. However, that was on the BLM land. And my recollection is that the BLM would not want to do that there. So we talked about possibly cleaning out the existing ditch and just using an open surface drain there.
Q. And what existing ditch are you referring to?
A. Well, there is an existing ditch along the -- what is it? -- the east edge of their property adjacent to the BLM and Forest Service land that flowed to the north into Pine Creek.
Q. And do you know if this was on the Forest Service property or the Forsgren property?
A. I believe it was on the Forsgren property to begin with. And as it went to the north, then it turned and went around through the Forest Service land to Pine Creek itself.
Q. And what do you base your belief that it was on the Forsgren property on?
A. It was on the west side of the buck and rail fence that was there, which they said was their property line.
Q. And did you say that that ditch was filled in?
A. It was partially covered with planks, as some of the photos there showed. And as it went to the north, then it was open. But it was partially filled, yes.



Q. Was there water in it?
A. Yes, there was.
Q. How much?
A. I don't remember what my note said. It's in one of the reports, I believe, about what it was flowing.
Q. So these statements at the meeting, you did not make these statements?
A. I wasn't at the meeting.
Q. And you didn't -- you didn't prepare a written report that somebody was reading your statements?
A. No, I had no written report.
Q. Did you have any involvement in the CCC ponds project?
A. Very little.
Q. What was your involvement?
A. I went out there, I believe it was after the original construction, and just reviewed some of the construction at that time. I don't remember the specifics of that. I don't believe I ever wrote any report on that one, either.
Q. Do you remember why you were reviewing it?
A. No, I don't.
Q. Do you know what the construction refers to?
A. I was not involved in any of the design or the construction. I do not know.



Q. So you don't know how the ponds were changed or --
A. No.
Q. Did you ever discuss the CCC ponds project with either Daryle Bennett or Kirk Hoover?
A. Well, just from the standpoint that the Forsgrens thought that those ponds were going to increase their problems. I can't remember anything else we might have talked about with them.
Q. Did you ever review the environmental assessment for the CCC ponds?
A. No.
Q. Did you participate in preparing a topographic map of the CCC ponds?
A. No.
Q. After the monitoring wells were put in in 1993, did you ever monitor the wells?
A. I don't believe so. Daryle did all the notes on those. I believe he was the only one that ever did. I may have checked them when I went back, but I'm not positive.
MR. PRITCHARD: Just to clarify, that's Daryle Bennett?
THE DEPONENT: Daryle Bennett, yes.
Q. (BY MS. EASTMAN) After 1993, when was the next

Q. Did you ever do any training with the SCS in reading aerial photos?
A. Not formal training, although as I said, I spent a tremendous amount of time studying aerial photos.
Q. And the second sentence of paragraph 4 reads, "When the house was built, fill was hauled in to level the lot." What's that statement based on?
A. I do not remember whether that was something told to me. It was obvious there was fill there. And it could have been hauled in before the house was built. I do not know.
Q. The last paragraph on that page indicates that there were three drains installed sometime in the past. Did you see these drains?
A. I saw two of them.
Q. Where were they?
A. The one was the old surface drain that drained to the north. It was partially covered by planks at the south end, and then it was open as it went to the north. The other drain was a subsurface drain that drained to the south into a drainageway that came through or around the Forsgrens' property there. And you could see the outlet of the pipe. And it was flowing, I don't know, ten or fifteen gallons a minute at the time.
Q. Did you see these in 1993?



A. I believe I saw them in '93 and again in '95.
Q. Do you remember if they were flowing in 1993?
A. Yes, I believe so.
Q. Both the surface drain and the subsurface drain?
A. Yes.
Q. And did you take any photos?
A. No, I didn't.
Q. And the subsurface drain, you indicated was flowing to the south. Could you describe, in terms of the Forsgrens' yard, where it was?
A. As I remember, Dick Forsgren told me that it started under approximately the boat shed or near the boat shed and went to the south. All you could see of it was just actually the outlet itself, just the pipe outletting into that surface drainageway.
Q. Where was that outlet?
A. In the surface drainageway. I don't know where their property line was there to the south.
Q. On the second page of your report, you talk about there being two separate problems. Says, "The water in the crawl space is a result of groundwater." Do you know how deep the crawl space is?
A. I do not know specifically.
Q. Do you remember looking in it?



A. Yes.
Q. You don't know how deep it was?
A. I did not measure it.
Q. Could you estimate?
A. Probably three feet.
Q. And when you said you felt in there, you felt water, how did you feel the water?
A. Just reaching down in there. I believe there might even have been some black plastic vapor barrier type of material down in there, too.
Q. Did you look in the crawl space in 1995?
A. No.
Q. Did anybody tell you whether there was water in the crawl space in 1995?
A. I don't remember anybody telling me.
Q. The third sentence reads, "The level of the crawl space is such that when the water table rises, it comes up in the crawl space." Does this mean every year seasonally as the water table changes, there should be water in the crawl space?
A. I don't know if that would be every year or not. But as the groundwater would come up, the crawl space was -- the bottom of the crawl space was lower than the yard elevation. So you would expect to see water come up in the crawl space.



Q. And do you think that would correlate -- you say it's highest in the summer and fall and lowest in the winter. So you think that would correlate with precipitation?
A. Yes, precipitation or creek levels.
MR. PRITCHARD: I just want to interject on the record my old objection. He's not an expert, but he's testifying to his opinions reached at the time he wrote this report.
Q. (BY MS. EASTMAN) Then you talk about the water standing in the yard being a result of surface water, and, "Seepage from the stratified terrace sands and gravels in the willow area flows across and ponds on the surface fill material because it is not able to soak in." Where would that water be coming from?
A. Well, it's coming out of the willow area. I don't know where it would be coming from as an original source.
Q. And the last sentence in that paragraph, you say that a particular solution will only solve one problem. What do you mean by that?
A. Let's see. Which paragraph are you reading?
Q. I'm sorry. The conclusions and recommendations paragraph.
A. And could you repeat the question?





Def.'s Ex. 7

you mean more than 44 inches below the surface of the ground?
A. Correct. And Test Hole 3 had eight-foot casing with nine inches aboveground. So that would be over seven feet, three inches deep that would show as dry.
Q. And for the math-impaired among us, seven feet is -- that would be 84 inches. Is that correct?
A. Correct. I have to figure that out for sure myself.
Q. You said seven feet, plus three.
A. Seven feet, three inches.
Q. So around 87 inches?
A. Around 87 inches, yes.
Q. And you're also stating in your Exhibit 3, your '95 report -- I believe at the bottom of the first page, you identify three drains.
A. Correct. Yes.
Q. And I believe during questioning earlier, you talked about two of those, one being on the east side of the Forsgren property, a second being -- could you go through which drainage you saw on the property?
A. The two drains I saw on the property was an open surface drain that was along the edge of the Forsgren property there by the buck and rail fence.
Q. To the east?



A. Yeah, on the east side of their property. And it drained to the north.
Q. Into Pine Creek?
A. Into Pine Creek. And the other drain I saw was just the outlet of a subsurface drain. It drained into that drainageway to kind of on the south there of their property.
Q. And that drain was located on their property?
A. The outlet of it, I believe, was on their property, yes.
Q. What about the rest of it other than the outlet?
A. I don't know where it would have been.
Q. Because it was subsurface?
A. Yeah, it was buried.
Q. And you identified a third drain?
A. The Forsgrens had told us about a third drain. I never did see one. There was no indication there.
Q. Do you remember what they told you about it, its location or its purpose or anything?
A. Well, I believe it was -- it started in that same general location of the boat shed and went to the north into Pine Creek.
Q. And the boat shed is on the --
A. It's on the east side of their property.



Q. And you said you think that they told you it went north from the boat shed to Pine Creek?
A. Yes. The one we saw supposedly is from the boat shed, south. And the other one went from the boat shed to the north. You couldn't see any outlet or anything on it.
Q. Earlier you were asked about the city pipeline, water being in the manhole for the city pipeline in 1999 when the subsurface drain was being installed.
A. Yes.
Q. Is this the original city pipeline, or is this the new city pipeline you're referring to?
A. I believe it's the new one, but I'm not sure.
Q. And you said that the water was tested for chlorine, and the result was negative?
A. Correct.
Q. So did you make any conclusion as to where that water was coming from that was near the pipeline?
A. No. It was whatever the groundwater level was around it.
Q. Did you have any -- at the time, did you have any ideas about where that water could be coming from?
A. Same as all the other groundwater. We really didn't make a determination where it was coming from.
MR. PRITCHARD: That's all I have.



EXAMINATION
BY MS. EASTMAN:
Q. The three drains referred to in the 1995 report, you said one went from the boat shed, south. And one went from the boat shed, north. And the third one also went from the boat shed, north?
A. Yes. One surface drain, the ditch went from the boat shed to the north. And then there was reportedly a subsurface drain that went from the boat shed, north.
Q. So the Forsgrens told you that there was a subsurface drain from the boat shed, north?
A. Yes.
Q. And what did they tell you about that?
A. That was about it.
Q. Did they say when it was put there?
A. I do not remember.
Q. Did they say who put it there?
A. I do not remember that, either.
MS. EASTMAN: No questions.
(Deposition proceedings concluded 12:39 p.m., February 21, 2006.)



Def.'s Ex. 7