IN THE UNITED COURT OF FEDERAL CLAIMS

---

CLAYTA FORSGREN, et al.,

Plaintiffs,

vs. No. 04-1223L
Judge Margaret M. Sweeney

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF JANET L. MONTGOMERY
Taken in behalf of Defendant

10:58 a.m., Tuesday
February 14, 2006

PURSUANT TO NOTICE, the deposition of JANET L. MONTGOMERY was taken in accordance with the applicable Federal Rules of Civil Procedure at the offices of Bureau of Land Management, Pinedale Field Office, 432 East Mill Street, Pinedale, Wyoming, before Kathy J. Mullivan, a Registered Professional Reporter, and a Notary Public in and for the State of Wyoming.

COPY

Def.'s Ex. 12

Q. And Clayta Forsgren?
A. Yes.
Q. When did you first meet Dick Forsgren?
A. It would have been when I was zoning administrator, and I can't tell you when. So it was prior to 1991.
Q. Did you meet Mr. Forsgren in connection with your responsibilities in the county?
A. Yes.
Q. What was the subject matter, do you recall?
A. I can't tell you. I would have to pull the zoning office files.
Q. But is it your recollection that you had contact with Mr. Forsgren sometime prior to 1991 regarding a zoning issue?
A. Either zoning or building permits. I -- you know.
Q. Do you recall when you first met Mrs. Forsgren?
A. I can't tell you for sure, because I don't know if she came into my office at that time or not.
Q. Have you ever visited the Forsgren property, 99 Riverside Drive?
A. Yes.
Q. And when did you first visit that property?
A. Again, we would have to look at the zoning



office records. I was up there in 1997 because I -- I had known that there were problems -- you know, Mr. Forsgren had told me he had problems with drainage, which he believed was coming from the CCC Ponds. In 1997 I went there to review it, because they felt their property was valued too high and to look at the damage that occurred. And after that inspection I agreed with them that the property was valued too high for the condition of the home. And I believe you have a copy of the letter I wrote regarding that subject.
Q. Did Mr. Forsgren contact you prior to 1997?
A. I can't tell you for sure. I would hate to say yes or no to it.
Q. But sometimes in --
A. Yes.
Q. -- 1997 you were contacted by Mr. Forsgren regarding tax assessment of their property?
A. Yes, and the condition of the property.
Q. In general, can you explain for us the process that the county undertakes to assess a tax -- to assess the value for tax purposes of the property?
A. Okay. Typically we do not see the inside of homes, so we go to the property once every four years and evaluate from the outside, unless someone's at home and they offer for us to see the home, otherwise we evaluate



it from the outside, the condition, to assess it, and then it's based upon the fair market value of that property as determined by sales of similar properties in a similar condition.
Q. It's done once every four years unless requested otherwise by the homeowner?
A. Once every four years by state statute. We're required to visit every property. And then in between, if someone requests us to go look at it, we will. The property, though, is assigned a new value every year, because our state requires that based upon sales and what's in the file.
Q. What documentation is created in connection with a tax assessment evaluation -- or, excuse me, valuation?
A. Okay. We have the file where we have the diagram of the home and then the property characteristics as far as the house goes. There's always pictures in it, which you received copies of. Photos taken in 1997 and ones taken in 2001 is what I had in the file. Then in addition, the -- each year in April we send out a property assessment notice, and I have those going back to when the county was first formed. The assessment notice gives the estimated value of the property for that year, then estimated taxes. People once -- from the date of that notice they have 30 days to protest their assessment, and



this ledger that resulted in 1997 and Mr. Forsgren and my going up there was a result of the assessment notice. He felt the value was too high and I visited the property and he allowed me to inspect the home, to go inside of it.
Q. Did you also inspect the property, the land itself?
A. We walked -- yes, I walked around it.
Q. Do you recall when this was?
A. It would have been May 1997.
Q. Can you describe what you observed during your walk around the grounds?
A. Walk around the grounds? The land was frost heave, I guess, would be the best way to describe it. It was very, very uneven.
Q. And what did you observe within the house itself?
A. Within the house itself, doorways were not straight anymore, the kitchen cupboards were pulled -- I should say the walls pulled away from the kitchen cupboards, the foundation was cracked, the garage door was twisted, was uneven. These are the things that I remember.
Q. Would it be part of your responsibilities to undertake any kind of investigation as to the cause of the situation?

A. No.
Q. Did Mr. Forsgren request a specific value be placed on the house?
A. No, he didn't. I thought about it and came up with the value, as you see in the letter, and sent him what I had decided, told him if he objected, you know, he could present me with more data, which I would certainly consider. He didn't, so we arrived at that as being a fair value at that time.
Q. I'm going to have this marked.
(Deposition Exhibit No. 2 marked for identification.)
Q. I'm going to hand you what has been marked as Exhibit 2 to the deposition.
A. Uh-huh.
Q. And it's a copy of a June 2, 1997 letter.
A. Uh-huh.
Q. Actually, it has on the bottom corner on the right it has some Bates number FOR 000450 -- oh, that's not on there. Sorry that's not on the copy. This is a copy of what you produced, but that's fine, we can use that identified just by the date of the letter. And this is a letter from you to Mr. and Mrs. Forsgren?
A. That's correct.
Q. And it's addressed to Mr. and Mrs. Richard



Forsgren in Rock Springs, Wyoming?
A. Correct.
Q. And you state I have given your problem much thought, in the first sentence?
A. Uh-huh.
Q. And what problem are you referring to?
A. I'm referring to the condition of the home, the structural problems that existed with it.
Q. Within the tax assessor's office?
A. Uh-huh.
Q. Is it you who normally makes these decisions regarding specific properties?
A. Yes.
Q. Do you have a staff?
A. Yes.
Q. And what functions do they perform?
A. They go out and typically do the field work, but whenever there's a question, that's my job to field that and take that responsibility.
Q. And you say for this year I am reducing the value of your property to 156,422?
A. And $22.
Q. Right. I'm sorry $156,422.
A. Uh-huh.
Q. Do you know what percentage reduction that is



from the previous year?
A. No, I don't, but if you would like copies of the assessment schedules for any years, I can secure those for you. You also have to consider our market has been changing yearly in a steady -- very steep slope as far as costs and fair market values, so even though you may not see from year to year a great reduction, it is a reduction because of what the market is doing.
Q. So --
A. Like, for example, this year, houses went up approximately one and a half to 2 percent per month, the price, and that's very significant in a market.
Q. Had the market in this Pinedale area decreased in the 1990s?
A. No, it has been going up steadily since I took office in 1991.
(Deposition Exhibit No. 3 marked for identification.)
Q. I've handed you what has been marked as Exhibit 3 in your deposition. Can you describe what that exhibit is?
A. This is out of our mass appraisal computer system and it's a history of the assessment of that property.
Q. And the entry for June 6, 1997, as you read



across to the far right is $156,422?
A. That's right.
Q. And that's the amount you reduced the property value to in 1997, according to your letter?
A. Yes.
Q. Prior year it was $174,034?
A. Yes.
Q. That was the same in 19 -- well, looks like there are two entries for the same year in June of 1996?
A. Uh-huh.
Q. And in 1995 it was assessed at $161,559?
A. Uh-huh.
Q. Okay. Had -- after June 1997, did anyone from your office go back to the property and reassess it?
A. In 1998 -- I don't know if I sent you a copy of --
Q. Yes.
A. -- this.
Okay. My person was there and they were there again in 2001. And in addition to that, I would verify by telephone with Mrs. Forsgren have you done anything, have you made any corrections, has anything been done with your case, and she always said no, we're still in a holding pattern, so I left it at that.
Q. For the record, when you refer to this, can you



Def.'s Ex. 12

for the problems with the structure. And then other than that, the rest of it falls out just the way it does against any other property of that type, if you understand what I'm trying to tell you.
Q. I believe so.
A. Okay.
Q. So when you visited the property in 1997, you observed a significant property damage?
A. Yes.
Q. And did you associate that damage to water damage?
A. Yes, I did.
Q. And was the water damage obvious at that time?
A. Yes.
Q. At that time in 1997, did the water damage look like a permanent nature?
A. To me it did. When a wall starts to separate from the cupboards, that's a very serious structural problem when the house starts doing that. And I'm not an engineer, just, you know, looking at it, you know, it's permanent damage. They might -- it might have been fixable, I don't know. That's why in my letter I put, you know, if you have estimates for what it's going to cost to repair this, I'm certainly willing to receive it.
In August there's a field note I just happen to



notice in the file, too, that says structural damage from water and ice and we did a 50 percent negative factor on the property.
Q. What year is that?
A. That was August of 2001.
Q. So in 1997, as the county tax assessor then --
A. Uh-huh.
Q. -- based on your observations --
A. Uh-huh.
Q. -- the damage to the property would continue significant -- was significant and continuing unless repaired?
A. Yes.
Q. And that led you to -- for subsequent years, to decrease the tax assessment?
A. Yes.
Q. And the years 1998, '99, 2000 -- 2000 -- and 2000 were based upon your initial observations?
A. Yes, and subsequent conversations and my people going there and saying there's been no changes. When you're looking at that chart, it's important that you look at what you're considering here is the improvement value and not to look at the land or the total.
Q. The improvement value is the value?
A. Is the value of the buildings, yes.



Q. Now, is the improvement value here mainly to the residential structure?
A. It will be mainly to the residential structure, yes.
Q. Were there other structures on the property?
A. Let's see. Their property is listed on a couple of different parcels. I think this one is -- we have one small outbuilding with it of 264 square feet.
Q. Did the outbuilding figure into the improvement assessment?
A. Yes, it does.
Q. Did you observe damage to the outbuilding?
A. No, I didn't.
Q. Did you visit the outbuilding to inspect it?
A. I would have looked at it when it was there, yes, because I walked over the whole property.
Q. Do you know approximately how far away the out building is from the residence?
A. No, I do not.
Q. So if we look at the improvements and just focusing on that --
A. Uh-huh.
Q. -- that has consistently declined the assessment value from 1997 and -- and '98, '99, 2000, and increased slightly in 2001?



A. Yes.
Q. Those years from '97, '98, '99, 2000 the value has decreased mainly based, in your observations, in 1997?
A. Yes.
Q. And the fact there had not been any repairs made to the structure?
A. That's correct.
Q. And that's what you would have expected when you observed it in 1997?
A. Yes.
(Deposition Exhibit No. 4 marked for identification.)
(Off-the-record discussion.)
Q. (BY MR. TRAUBEN) Let me hand you what has been marked as Exhibit 4.
MR. TRAUBEN: Do you have a copy? I have an extra one.
Q. (BY MR. TRAUBEN) You testified earlier that you produced some photographs out of your file.
A. Yes.
Q. Are these the photographs you were referring to?
A. Yes, these are ones that if you'll notice, the ones marked 1993 were small photos, and I took these to the office supply place, had them copied and enlarged to help with your -- the case that was before you so you


Def.'s Ex. 12