**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CLAYTA FORSGREN, et al. | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 04-1223 L |
| UNITED STATES OF AMERICA, | ) | Chief Judge Margaret Sweeney |
| Defendant. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS AND PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h)(2) of the Rules of the Court of Federal Claims, Plaintiffs submit the following responses to Defendant's Proposed Findings of Uncontroverted Facts. Although the issue of the statute of limitations is ripe for this Court's review, as shown below, Defendant's facts do not accurately portray the history of flooding on the Forsgren property nor the date when the temporary takings of the Plaintiffs' property accrued. Plaintiffs' numbers below correspond with Defendant's individually numbered statement of facts. Following Plaintiffs' opposition is Plaintiffs' own statement of uncontroverted fact pursuant to Rule 56(h)(2) of the Rules of the Court of Federal Claims.

**A. Plaintiffs' Opposition to Defendant's Proposed Findings of Uncontroverted Facts**

1. Plaintiffs agree with Defendant's characterization of this fact.

2. Plaintiffs agree with Defendant's characterization of this fact.

3. Plaintiffs' disagree with Defendant's statement of fact. Rather, until 1995 when the Civilian Conservation Corp Ponds ("CCC Ponds") were reconstructed and refilled, the Forsgrens had not experienced problems with water flooding and destroying their

basement, garage, or back yard. Ex. 1 at 61:13-15 (no water from 1967-1971), 62:12-13 (no water from 1971-1973), 76:6-11 (no water prior to 1995); Ex. 3 at 9:18-21; Ex. 5 at 6:1-2, 9:13-15; Ex. 10 at 8:18-20; Ex. 11 at 15:8-13; Ex. 12 at 13:20-22 to 14:1-3, 15:20-22 to 16:1-10; Ex. 13 at 7:23-25 to 8:1-9; Ex. 4 at 10:14-16; Ex. 14 at 9:23-25 to 10:1-8, 12:20-25; Ex. 15 at 9:5-7; Ex. 9 at 48:18-23; Ex. 16 at 15:21-25 to 16:1-9; Ex. 3 at 14:3-5; Ex. 7 at 34:10-12. In fact, other than Mr. Forsgren's self-serving statements, see Plaintiffs' Uncontroverted Fact number 3, the Defendant cannot produce a single witness who saw flooding or seepage on the Forsgren property prior to 1995. Id. Even David Harper, the Bureau of Land Management ("BLM") employee who inspected the property on May 6, 1988, after Mr. Forsgren requested a drainage ditch be built, testified that he saw nothing on the property to indicate water damage to the property. Ex. 7 at 19:5 to 21:18. Rather, Mr. Forsgren was concerned with the water located behind his house on the adjacent federal property. Ex. 3 at 9:22-25 to 10:1-22, 15:8-18; Ex. 1 at 112:17-25 to 113:1-9, 120:22-25 to 121:1. This water on the federal property became stagnant and caused both a bad odor that would emanate onto the Forsgren's property, and a breeding ground for mosquitos. Id.

4. Plaintiffs' disagree with Defendant's statement of fact. Rather, prior to 1995, the drains seen on the Forsgren property were in disuse. Ex. 3 at 11:2-10, 16:11-14; Ex. 5 at 13:20-21; Ex. 15 at 90:17-22 to 91:1-8. Additionally, after the CCC Ponds were refilled and Mr. Mitchem visited the property and observed the flooding, Mr. Mitchem testified that he was "not sure there was any formal recommendations made" as to the location of the recommended subsurface drain. Ex. 17 at 18:17-18; Defendant's Exhibit 9 at 2.

5. Plaintiffs' partially disagree with Defendant's statement of fact. Plaintiffs agree that the CCC Ponds were refilled in 1995 and that Mr. Forsgren reported having water problems at a CCC Ponds Committee meeting on September 27, 2005. However, based upon investigation, Mr. Mitchem did find water seepage problems and noted two possible causes of the water: (1) groundwater directly connected to Pine Creek, and (2) surface water "[s]eepage from the stratified terrace sands and gravels in the willow area." Defendant's Ex. 9 at 2. Mr. Mitchem recommended that the problem be solved by installing a subsurface drain on BLM and Forest Service ("FS") land. Defendant's Exhibit 9 at 2; Ex. 17 at 18:23-25 to 19:1; Ex. 9 at 62:21-23. However, the subsurface drain recommendation was not acceptable to the BLM, so the federal agencies agreed to fund and design a surface drain to be located on the Forsgren property. Id.; Ex. 18; Ex. 9 at 51:25 to 52:1-4.

6. Plaintiffs' disagree with Defendant's statement of fact. Janet Montgomery did not inform the Plaintiffs of "serious structural issues" or the need for "immediate attention" in 1997. Janet Montgomery only informed the Plaintiffs that "[f]or this year I am reducing the value of your property to $156,422. I believe that this is fair. If you have secured estimates for the cost of a new well, drainage work, basement and foundation repair, and other repair work, I would certainly accept those to document a different value." Defendant's Exhibit 13. In addition, Ms. Montgomery continued to lower the property in 1998 and 1999 based upon "conversations" and knowing that the property "was going downhill." Ex. 29 at 23:15-16, 24:8.

7. Plaintiffs' disagree with Defendant's statement of fact. The CCC Ponds Committee did continue to help the Forsgrens with their water problems. Ex. 20 at 6 (meeting on February 12, 1999 "ended with a mutual promise by the present authorities to remedy the problems"); id. at 7 (early Spring 1999 meeting "Mrs. Forsgren was assured that there certainly was a water problem and that a proper drainage system to intercept the CCC pond water would be constructed as soon as survey work was complete and they had a few nice days."); Ex. 21; Ex. 22; Ex. 23; Ex. 24 at 72:3-4 ("I may have made an obligation to try and help aleve the problem"); Ex. 25 ("Hopefully, this problem is moving toward solution in the near future."). A subsurface drain was constructed on BLM and FS land in November 1999 at the federal agencies' expense. Ex. 9 at 52:5-9. That drain alleviated the water and ice flooding problems on the Forsgren's property and the property began to dry. Ex. 15 at 42:20-22 to 43:1-9.

8. Plaintiffs' disagree with Defendant's statement of fact. In 1999, NRCS employee Daryle Bennett, wrote a letter in which he stated:

> I again looked over the monitoring well records and noted that I'd never recorded dry wells on BLM (#2 or #3) after April, 1995. Both wells seemed to maintain a pretty stable water table, at ~ 3 ft below ground surface from July '95 till Aug 1, 1997 when I stopped monitoring. . . . The fact that water tables have remained quite steady since the summer of '95 may indicate that there may be a correlation with the filling of the ponds. I had previously judged there not to be & attributed the lower water table in '94 & early '95 to weather conditions (drought). . . .

Ex. 8; Ex. 9 at 80:16-19. The drain installed in 1996 froze the first winter after it was installed. Ex. 19. The 1996 drain did not do what it was intended to do. Ex. 9 at 66:14-21 ("it wasn't always working, because winter compromised the function of the ditch"); Ex. 31 at 28:1-3 (ditch "hadn't done the job"); Ex. 24 at 70:9-10 ("the drain was not

functioning right"); Defendant's Exhibit 18 at 1 ("Option #1 [ditch on Forsgren property] . . . failed in all respects").

9. Plaintiffs' disagree with Defendant's statement of fact. In fact, Mrs. Forsgren requested no specific action, such as a drain. Defendant's Exhibit 18 at 2. She requested only that "immediate action be taken." Id.

**B. Plaintiffs' Proposed Statement of Uncontroverted Facts**

In addition, pursuant to Rule 56(h)(2) of the Rules of the Court of Federal Claims, Plaintiffs submit the following Proposed Findings of Uncontroverted Fact:

1. From 1966 to 1971, the Forsgren family visited the property mostly in the summer on the weekends. Ex. 1 at 58:2-3. During this time, they stayed in a trailer located on the property. Id. at 58:5-6, 59:7-17. In 1971 and 1972, the Forsgrens built a home on the property. Id. at 54:10-12, 21; Ex. 2 at 12:24-25 to 13:1-12. After the house was completed, the Forsgren family used the home year-round on the weekends. Ex. 1 at 62:16-23, 110:7-12; Ex. 4 at 9:1-8; Ex. 5 at 5:23-25 to 6:1.

2. In their planning process, the federal agencies recognized that the CCC Ponds project may affect adjacent property. See Defendant's Exhibit 1 at I-4 ("Goal – Restore water to old ponds without increasing ground water elevation to a level that will flood adjacent private property."). The agencies were aware from the outset of this project that one associated impact could be seasonal flooding of the neighboring properties. Specifically, the Environmental Assessment ("EA") issued by the federal agencies in April of 1994, in conjunction with its obligations under the National Environmental Policy Act ("NEPA"), specifically identified seasonal flooding and elevated groundwater levels as a significant

issue, to be addressed through monitoring and mitigation efforts. See Defendant's Exhibit 1 at II-3.

3. Dick Forsgren had a tendency to exaggerate the truth to get the things he wanted accomplished. This is what was happening with the 1988 letters and letter to the Editor of the local newspaper. As explained by Clayta Forsgren, Dick Forsgren's wife of approximately 50 years, Dick "wanted to get attention to have something done about the problem behind [the Forsgren property]." Ex. 1 at 146:11-13. "He thought that would probably – probably thought that would bring some response and he could get someone up there and then he would show them the water in the – on the BLM land and try to get them to do something about it." Ex. 1 at 147:14-18. Van Huffman, a member of the Highland Irrigation District, received the letter and thought it was partially Mr. Forsgren blowing off steam. Ex. 2 at 34:11-13.

4. David Harper, a BLM employee, visited the Forsgren property in 1998, just two weeks before Mr. Forsgren claimed to have three inches of water in his garage and water in his basement and did not see the water Dick claimed was flooding his property. See Defendants Exhibit 3; Ex. 7 at 20:2-7, 35:12-13 ("What [Mr. Forsgren] wrote in that [1988] letter I did not see on that property."), 36:5-6 ("Dick was telling me one thing out there and what I was seeing was different.").

5. After the CCC Ponds were refilled in 1995 and the Forsgrens started to experience flooding on their property, the CCC Ponds Committee funded the installation of a drain on the Forsgrens' property to alleviate the situation. This drain, installed in 1996, froze the first winter after it was installed. Ex. 19. The drain did not do what it was intended

to do. Ex. 9 at 66:14-21 ("it wasn't always working, because winter compromised the function of the ditch"); Ex. 31 at 28:1-3 (ditch "hadn't done the job"); Ex. 24 at 70:9-10 ("the drain was not functioning right"); Defendant's Exhibit 18 at 1 ("Option #1 [ditch on Forsgren property] . . . failed in all respects").

6. The flooding persisted, progressing each year, and by 1999 the water and ice had covered the entire Forsgren property. Ex. 1 at 77:21-25 to 78:1-2, 93:2-5; Ex. 30 at 24:6-19 ("[a] couple of inches" on property); Ex. 24 at 70:1-9 (on June 25, 1999 "we looked at water that was on the lawn and next to the house"), 86:6-11 (in November, 1999 before the subsurface drain was put in "[t]here was water standing on [the Forsgren lawn]. Maybe an average, inch and a half."); Ex. 9 at 74:13-15, 88:24-25 to 89:1-4. In February, 1999, Mrs. Forsgren, visiting her house for the first time since her husband had passed away, found it difficult to get in the house due to the ice. Ex. 1 at 77: 1-6.

7. In February, 1999, Mrs. Forsgren wrote a letter to the BLM asking for additional help. Defendant's Exhibit 18. The federal agencies settled upon a subsurface drain to help Mrs. Forsgren. This drain was to "complet[e] the recommendations that were made in 1994." Ex. 30 at 21:1-2, 22:14-16, 27:15-17. The subsurface drain was installed to "redirect the flow of overspill or seepage from the ponds only." Environmental Assessment for 1999 drain (attached hereto as "Ex. 32") (emphasis added). The subsurface drain was installed in November, 1999 at the federal agencies' expense. Ex. 9 at 52:5-9.

8. This drain worked; it stopped the flooding of the Forsgren property. Ex. 15 at 42:20-22 to 43:1-9; Ex. 24 at 90:24-25 to 91:1-17.

RESPECTFULLY SUBMITTED, this 26th day of May, 2006.

/s/ Karen Budd-Falen
Karen Budd-Falen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, WY 82003-0346
307/632-5105 Telephone
307/637-3891 Telefax
karen@buddfalen.com