stunned when I -- when my lawyer -- it was produced, because I had no idea he had written it. At that time he was in no condition to be -- so I -- I -- I only knew what he -- what we knew together, and I assumed that that was what he was telling them.

Q. And what exactly was that that --

A. That we didn't have any water on our property and never had any water on our property. We were there every single weekend and our friends -- we had friends there for six years, 12 -- 10, 12 people there every weekend, certainly somebody would have noticed flooding on our property. And at the time I wrote this letter, I was in very, very -- my condition was terrible. I -- I can't even imagine me being able to write this letter at that time, except that I am honest and I didn't want to do anything that was not right. And --

Q. So it's -- you don't know why you included that -- that phrase your husband had written because you don't -- you weren't aware of any letters he had written at that time?

A. No, I didn't -- until I saw the letters that were produced, I didn't know he had written any letters.

Q. We'll be getting to those, I think, what you're referring to in just a couple moments.

A. So I probably didn't word it properly.



Q. Okay. I probably wasn't clear at the beginning of the second paragraph when you said I also need to amend my last letter, that's referring to the February 11th letter we had just looked at?

A. Yes, uh-huh.

Q. Okay. There weren't any other letters you had written?

A. No, no, not that I recall.

Q. Okay.

MS. EASTMAN: Maybe we need to talk about timing, how much --

MR. PRITCHARD: Let's go off the record.

(Off-the-record discussion.)

(Deposition proceedings recessed 12:10 p.m. to 12:17 p.m.)

MR. PRITCHARD: Back on the record.

Q. (BY MR. PRITCHARD) Mrs. Forsgren, I believe you had something to add about --

A. Yes, I did. I thought about it a lot, about why I made that remark, and I remember I'm sure that my purpose was that when we have -- when we have a hard rain up there, water does accumulate in little places, like everybody else in town. And when it snows and melts, there may be little spots here and there that may have a -- if there's a little place that it dropped down. And



that was my concern was that if they said that -- if I said there was never any water, I wasn't talking about flooding, I was thinking about natural things that happen, like rain. When it rains real hard, water stands for a little while in some places.

Q. Okay.

A. But it couldn't possibly flood you, because that happened ever since we bought the property. It would have sometime or other rained and it snowed every year and we never had a problem.

(Off-the-record discussion.)

Q. (BY MR. PRITCHARD) Okay. Prior to work on the CCC Ponds in 1995, was your husband, Dick, concerned about the impact that the work on the ponds would potentially have on the property?

A. Yes.

Q. Okay. Do you know the basis for those concerns he had?

A. Yes.

Q. Could you explain what those were?

A. In the -- in the property to the east of us, where the Forest Service is, there were little pools of water that would form in there all the time and they would become very smelly. They attract mosquitos, they bred a lot of mosquitos there. The moose would go in there and



they would cause a bad smell in there after a while. And sometimes he would notice that the -- that it was a little bit more than it was the year before. He became concerned that if they charged the ponds, if that was there, then what would happen if they charged the ponds and we had millions of gallons of water pressing against our hill.

Q. Did he have any -- were his concerns based on any prior experiences with water on your property?

A. No.

Q. Okay. You had mentioned a while back that there were meetings held discussing the work that was to be done and what was eventually done on the ponds.

A. Yes.

Q. These were CCC Ponds committee meetings?

A. He attended some of the committee meetings when he was able. Sometimes he was having surgery and he couldn't go, but they had meetings with me in the BLM office in the -- I was trying to think. I think most of them were in the BLM offices, and they met with us -- Jerry Tully went with me, and his wife, because he felt he should be there with me. And they were discussing -- it seems to me they were trying to get me to say it was my fault that the water was coming on my property.

Q. I think I'm -- I want to focus a little further back in time back before the work was done on the ponds in

1995.
A. Oh.
Q. Preliminary meetings discussing the project to do work on the ponds. Did your husband attend any meetings like that prior to '95?
A. I'm sure -- I'm sure he did, but I couldn't tell you when it was or --
Q. Do you know if he expressed concerns about the ponds at those meetings?
A. Yes, I'm sure he did.
MR. PRITCHARD: I'd like to mark this as Exhibit 5, please -- oh, not this one.
(Deposition Exhibit No. 5 marked for identification.)
A. He felt we would have too much water in that area. With all the other water that was above us, we didn't need to have tons -- millions of gallons of more water when -- they expressed concern themselves that it was going to affect us.
Q. (BY MR. PRITCHARD) I'm handing to you what has been marked as Exhibit 5.
A. Okay.
Q. And at the top of this document it's titled minutes of CCC Ponds, June 22, 1993.
A. Uh-huh.



Q. If I could just draw your attention to the second paragraph it says "present at meeting."
A. Uh-huh.
Q. And the fourth name from the bottom is Dick Forsgren.
A. Uh-huh.
Q. Do you think -- is it fair to say he attended this meeting on June 22, '93 or --
A. He could have. I would say yes, if his name's there, he could have been there.
Q. Second to last paragraph of these minutes, there -- it's entitled land -- or begins, "Landowner concerns: Dick Forsgren representing the landowners said there has been a water problem in the past with his water in his basement, garage and in the back yard. He said that there was not a problem when the ponds were dry. There's some springs close to his property that might be causing some of the problem. Dick stated when the Highland Ditch broke several years ago, he was told that since he bought his lot under the ditch the FS was not responsible for his problem as he should have known this could happen."
Do you remember Dick discussing anything that's the subject of that paragraph, any of those sentences?
A. There was no water under our house or under our



property, and I can only assume that my husband was under such duress, because he wanted something done, concerned that after the ponds went in we would be flooded. I have no idea why he would make that statement, because there was no water under our house, on our property ever.
Q. Okay.
A. And I can't believe that -- the only thing I can -- he evidently wanted to get some action and felt that was the only way he could get it.
Q. Just to be clear, that sentence, "Dick Forsgren representing the landowners said there has been a water problem in the past with water in his basement, garage and in the backyard," is your contention that's not an accurate statement?
A. No, it isn't.
Q. It's not an accurate statement?
A. It's not an accurate statement.
Q. Do you know what springs are referenced there, what that might refer to?
A. No.
Q. Do you know what --
A. I don't think there are any.
Q. Do you know what it's referring to when it says, "Dick stated when the Highland Ditch broke several years ago," do you know what's that referring to?



A. The Highland Ditch broke and one of our friends -- not near us, it was closer downtown, it broke through and ruined his property. It came -- it flooded down onto his property and took away his garage and flooded the whole area. And I assume that's what he was talking about. We never knew -- I didn't know the Highland Ditch broke. It was way above us and -- what did he -- he was told -- he probably was probably thinking of the damage that was done to this friend of ours.
Q. So there was no damage to your property relating to the Highland Ditch breaking?
A. Absolutely not. I didn't even know when it broke and I was there every weekend.
Q. Do you know anything about the last part of that sentence, that the force -- he was told that since he bought his lot under the ditch, the FS, for Forest Service, do you agree that's what that stands for, FS is Forest Service?
A. Well, I don't know of anyone ever telling us that. They may have told it to everyone that was under the ditch. I'm sure they -- if they told -- if they did tell us, they had to tell everyone.
Q. So you don't remember Dick ever saying to you this is what I've been told that they're not responsible because this is where we bought our property?

A. I don't remember that.
Q. Okay.
A. No, but I assumed they wouldn't be if they told all the landowners, but we received no damage from it.
Q. You said that your husband, Dick, expressed concerns back in '93 before the ponds were built about the potential for problems on your property, if they were -- if the work was done on the ponds. Did the government send anybody to your property to address those concerns, to inspect your property?
A. I don't know if that's when Dave Harper came up, I don't recall anyone -- I think Dave Harper was before that.
Q. Okay.
A. I think he was back in '88, so I can't recall. I can't recall.
MR. PRITCHARD: Let's go ahead and mark this as 6.
(Deposition Exhibit No. 6 marked for identification.)
Q. (BY MR. PRITCHARD) I'm handing you what has been marked as Exhibit 6.
A. Okay.
Q. If you could take just a moment to review that. You don't have to read the whole thing, if you can just



get a sense of whether you've ever seen these documents before.
A. I think I have seen this one.
Q. Okay. If I could --
A. Yeah, I've seen them.
Q. Draw your attention to the first page of Exhibit 6, it's addressed to you and your husband, correct?
A. Uh-huh.
Q. And it's a letter from Daryle Bennett?
A. Uh-huh.
Q. It's addressed November 20, 1995?
A. Yes.
Q. And it says the first sentence, "Attached is Stan Mitchem's geologic report, along with his recommendations." Do you recall if Stan Mitchem visited your property?
A. I don't know Stan Mitchem.
Q. Do you remember if a geologist visited your property around this time, '95?
A. I remember some men coming up and standing outside -- it was supposed to be drilling some little holes or something up there.
Q. If you could turn to the next page. This is the attached report by Stan Mitchem, dated November 14, 1995.



If I could just read some of it --
A. Uh-huh.
Q. -- speed us along. First sentence says, "On August 26 and 27, 1993, I made an investigation of excessive water on land belonging to Dick Forsgren, along Pine Creek, north of Pinedale." Is that -- is it possible there was -- was there excessive water on your land in 1993?
A. There was no water on our land in 1993.
Q. Okay. And the next sentence says, "The Forsgrens have had a continuing problem of water standing on their lawn, up to 6 inches of water in crawl space under their house, and up to 2 inches of ice accumulation in their garage." Is that an accurate statement?
A. No.
Q. None of it is accurate?
A. No, it isn't.
Q. "Their land is about 1,000 feet from the CCC ponds, and the Forsgrens believed that the proposed reconstruction of the ponds would add to their water problems." Did you have any water problems to add to --
A. Just on the other side of the fence is all he ever worried about, any of us knew he was worried about, is that standing water, pools of water, which meant if they increased the water up above it, there could be more



water there and it could come over and flood our property.
Q. It says just the last sentence of that paragraph, "On October 30 and 31, 1995, I visited the site again."
The next paragraph, "During the original investigation in 1993, I augered three test holes with the Giddings soil auger and installed 1 and 1/4-inch PVC casing (see attached Log of Test Hole, sheet 1 of 2). Daryle Bennett has measured the water levels in these monitoring wells periodically." Do you believe this is a reference to the -- you said you recalled men coming and drilling holes on your property?
A. I remember we were there when there was someone out.
Q. Do you know if that's what is being referred to here by these PVC pipes called monitoring wells?
A. Is it the white pipes that sit at the end of my house and up above on the hill, is that what you're talking about?
Q. I think we'll get to that later in the letter, but I think that's correct.
A. Oh.
Q. "The water level in the monitoring well at the corner of the garage..." is that what you're referring to?

A. No, absolutely not.
Q. The next paragraph -- or actually skipping one paragraph, it says -- the paragraph that begins, "At times I've had as much as three inches of water in my garage." Do you ever remember having water in your garage?
A. I never remember there ever being water in my garage, even when we had the severe flooding from the ponds, it could not get into the garage.
Q. Do you know why Dick would have made this back in 1988?
A. Yes, to get attention -- he wanted to get attention to have something done about the problem behind us and --
Q. But you don't believe he was accurate when he made the statement?
A. No, he was not accurate on that.
Q. Is it fair -- do you believe he was lying when he made that statement?
A. I don't believe he was lying, I believe that he had tried so many years to get help -- get that water away from behind our house, that he was under such duress that he evidently did this to get -- to try to get their attention. And many times they sent people up there, they looked under our house, they looked all around and they said, "Dick, you don't have any water. Why are you



calling us all the time, telling us that you have water under your house?"
Daryle Bennett was one that had looked under our house more than once. And I can't remember -- there were other people up there. I don't recall their names. They went in and looked. He was insistent that there was water under there and there was no water. There was never any water under our house.
Q. So was it your contention that he was concerned about water on government land to the east of your property and in his effort to get some action taken to address that water, he made the statement that there were 3 inches of water in his garage?
A. He thought that would probably -- probably thought that would bring some response and he could get someone up there and then he would show them the water in the -- on the BLM land and try to get them to do something about it.
Q. Okay. The next sentence he says, "It has built a MARSH" -- marsh is capitalized -- "type problem in my backyard and at times the water has gotten under my foundation and into the basement." Do you agree with that statement?
A. No, no, I don't agree with it.
Q. Do you contend that he made that statement for



the same reason he made the statement about the garage?
A. Yes. I think that -- that that's -- that's why he made the statement, was to get attention and get someone up to our home. He wanted them to come on our property, and, of course, when they came, they said there was nothing wrong.
Q. Do you think he believed that there was water in his garage or marsh-type problem in his back yard?
A. I think he could have believed it. I don't know. I believe he believed that, maybe.
Q. And next sentence, "This causes the house to heave and settle and I'm afraid it's going to cause substantial damage to my home and property unless corrected."
A. I believe he knew that's what could happen to the house, which it would have happened if we had been having flooding, but in 35 years we never had any of that.
Q. Then in the -- skipping the last sentence of that and going to the last paragraph, "I have personally put a 6-inch perforated drain pipe in the area adjacent to the area of the BLM and Forest land, but this has not solved the problem." Do you know what the 6-inch perforated drain pipe he's referring to?
A. I don't know of any perforated drain pipe.
Q. Last paragraph on that page, it says, "I've even



offered to buy a parcel of their land so as to put a drain ditch in to stop this problem and they have informed me this is not for sale." Is this the property you mentioned that you tried to buy before?
A. Yes, and in his mind he probably -- must have felt that if he got the property, he would put a ditch in. He would have had to to build a garage there. He couldn't have built it on -- in the water.
Q. And second page, top of the second page it says, "Before I seriously consider filing an injunction," in all caps, the rest of the sentence is all capitalized, "I feel a thorough study of my seepage and/or drainage probably should be seriously considered, along with an in-depth study on the floodplains and wetlands involved." Do you know if your house is located in a floodplain?
A. No.
Q. No you don't know?
A. I don't know.
Q. And just for the record, this letter is on State of Wyoming 38 State Legislature letterhead, but he signs his name Former Wyoming State Representative, because this is well after he was out of the legislature, correct?
A. Yes.
MR. PRITCHARD: Okay. Well, thank you very much, Mrs. Forsgren.