IN THE UNITED COURT OF FEDERAL CLAIMS

---

CLAYTA FORSGREN, et al.,

Plaintiffs,

vs. No. 04-1223L
Judge Margaret M. Sweeney

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF DAVID HARPER
Taken in behalf of Defendant

9:08 a.m., Tuesday
February 14, 2006

PURSUANT TO NOTICE, the deposition of DAVID HARPER was taken in accordance with the applicable Federal Rules of Civil Procedure at the offices of Bureau of Land Management, Pinedale Field Office, 432 East Mill Street, Pinedale, Wyoming, before Kathy J. Mullivan, a Registered Professional Reporter, and a Notary Public in and for the State of Wyoming.

COPY

EXHIBIT
tabbies
7
04-1223

making decisions based on what was best for the land as well as the public.

Q. Do you have any expertise in hydrology or hydrogeology?

A. No, I do not.

Q. Any expertise in soil science?

A. No.

Q. Do you have an expertise in geography?

A. Clarify that.

Q. When I -- what I mean is maybe topography and slopes and things like that, land features. Is there a science that deals with that?

A. Well, it would be hydrology, geology and soils, basically. You know, it would also involve some range science or forestry science, depending on what vegetative growth occurred on the surface of the land. So when -- when you deal with topographical evaluations, there really isn't one specific science that deals with that. That's why so often we would have to assemble an interdisciplinary team, evaluate proposals. We would look at slope and soil, vegetation, and mostly at the time we found we could mitigate the impacts by manipulating vegetative -- vegetation on the land, revegetation, soil amendments.

Q. Is it fair to say that your expertise is not in



the details of the various sciences on the team, but in administrative oversight and supervision?

A. That's correct.

Q. Thank you. After you came to Pinedale, was there a time when you met Richard A. Forsgren?

A. There was. I don't remember exactly when it was. It was before May 6, 1988. I don't recall if it was over the telephone or in person. I think it may have been in person, but I don't recall.

Q. Did you meet Mr. Forsgren in connection with your work at the BLM?

A. I believe that's correct. I think he came into the office and was explaining his circumstances up on Pine Creek and I believe I made an appointment with him to go up and investigate -- investigate that.

Q. Was this approximately in 1986 or 1987?

A. This was in 1988, I would guess.

Q. And what circumstances on Pine Creek did he describe for you?

A. What I believe he described was that he was having some water problems and he wanted permission -- actually, let me take that back. He wanted BLM to take action by building a ditch or a trench above his property to prevent water from running onto his property.

Q. And did you visit the property in question at



that time?

A. I did. I went up there at 4:30 in the afternoon on May 6th, as is shown on my Daytimer, that date, and I met with Dick and Clayta and I looked at the back of their property and I looked under their house and I went inside the house with them and we discussed the nature of the visit.

Q. And upon your inspection, what did you observe?

A. What I observed was that there were -- there was some wetness behind his property. I could not determine whether the wetness was from water above the hill or snowmelt. The snow goes off of this country late in the year, around here. We don't often get leaves on our trees until the end of May. And there were -- there was some soggy ground in the back on the ~~flap~~ flat, that could have easily been from snow melt off, I don't know.

Dick was claiming that water was coming down off the hill and effecting his house at the time, but I didn't see that. That was not the conclusions that I drew. He asked me to look under his house. As I recall there was a hole or a door in the back of the house towards the hillside on the east side and I looked in there. I didn't see anything that would indicate water damage to me. And I didn't notice any -- to the best of my recollection, I did not notice any wet under the house. I felt that Dick



wanted the BLM to dig a ditch to prevent water from coming onto his house, but I didn't see that as being an immediate threat, although I think Dick may have been looking down the line a little bit and playing his cards a little close to his chest.

There was some rumors back then of the town building a new dam on Fremont Lake, which was going to raise the lake 3 to 6 feet, and raising the water of the lake that much I think he felt may cause some increased watering of sites downhill from the lake, which was very possible. The lake had -- in the shoreline and the basic relationship between the hydrology and the geology had come to an equilibrium in the area from the dam that was built many, many years before, and I think Dick saw a potential imbalance occurring that -- that could cause him problems further down the line. And, personally, I think that he wasn't having a problem as much as he thought he was going to have a problem.

Q. Now, let's go back and go through what you just said --

A. Okay.

Q. -- and figure out a little bit more here. You said that you did not conclude that water was coming from adjacent property onto the Forsgren property; is that correct?

34

issues did he have with water? You mentioned water coming into his house, did he have other issues with the water?
MR. TRAUBEN: Just to clarify the record, you mean May 6, 1988 meeting?
MS. EASTMAN: Yes, yes.
A. As I recall, Dick said that he was having problems with water under his house and water in his garage.
Q. (BY MS. EASTMAN) Now --
A. He had me look under his house to ~~me~~ show me the water and I looked under there and I really couldn't see any -- any wet ground or water underneath there. I didn't want to say no, Dick, I don't see what you're telling me, because of respect for him and his age, and so I didn't make any comment at the time.
Q. Did you include that in your brief to Jordan?
A. I probably would not have.
Q. And you said is that on May 6th or about May 16th you sent a letter to Forsgren. Did you ever receive a response?
A. I could not tell you that. That was part of the reason I came into the BLM office and tried to locate that information.
Q. Okay. Were you aware that Mr. Forsgren sent a letter to -- that was copied to the BLM about his water

35

problem in May?
A. I was aware of that.
Q. Did that come into your investigation at all? Did you review that letter?
A. I looked -- I read the letter. At that point in time, as I recall, since Dick was not pursuing a right-of-way application, which he would then -- if he had pursued a right-of-way, he would have held the title, I guess you might say, or the right of that right-of-way, since he was not pursuing that. I read the letter and put it with the rest of the file that would have existed back at that time. What he wrote in that letter I did not see on that property.
MR. TRAUBEN: Objection. There's no question pending.
Q. I'd like to mark this as Exhibit 3.
(Deposition Exhibit No. 3 marked for identification.)
Q. (BY MS. EASTMAN) Mr. Harper, would you look at Exhibit 3. Is this the letter you were referring to?
A. Yes, this -- this first letter -- let me read this one. You have two letters here.
Q. It's two pages.
A. Oh, I see. Okay. Yes, this is the letter that I was referring to.

36

Q. And do you agree that this is what you saw in May, when you visited the Forsgren property?
A. No, I don't -- I don't agree I saw this out there. This was the problem I was having out there the day that I visited with Dick. Dick was telling me one thing out there and what I was seeing was different.
Q. What did you see? You've already said that you didn't see water.
A. Spongy ground --
Q. Okay.
A. -- around the back of the house. And as I have -- having read this letter again, I remember him -- I remember that he had tried to put something in back there on his own property and it didn't seem like it was very effective.
Q. Something as in --
A. I'm sorry. He says in his letter I have personally put a 6-inch perforated drain pipe in the area adjacent to the BLM forestlands, but this has not solved the problem. And what I recall seeing out there did not seem like it was a very well constructed facility.
Q. Did you see a drain pipe or he refers to it as a 6-inch perforated drain pipe?
A. Right. As I recall, it was kind of a trench and the drain pipe was down in there and I don't recall seeing

37

the pipe itself down in there. It seemed to me at the time that there really wasn't enough area between his property line, wherever that was. As I said we didn't locate that exactly, but we kind of looked at where we thought we suspected it was, and where we suspected the property line may have been and his house. There did not seem to be enough room in there to put a facility in there that would do what he was wanting to do.
Q. Did you notice anything else about their yard?
A. It was --
Q. How did their yard look?
A. It was beautiful. Their yard looked beautiful. And I might say as a follow up to this question, when I was out there again in '90 -- '99, was it -- yes, '99, I was appalled at the damage that had been done to the yard.
Q. Okay. Let's talk about when you went back out there. Have you only been on the property twice?
A. No, I think I've been out there on other occasions, but I could not find any evidence that I was out there at any other time. I remember Daryle Bennett telling me that there was a tremendous problem with ice buildup and glaciated ice around the house. I think that was in the spring of '99. And I -- it was my intention to go up and look at it, and I don't recall if I actually did or not.

Q. Okay. On June 25, 1999, according to your Day Planner that you brought in, you -- it says meet Clayta Forsgren around 2 p.m. Could you explain -- did you meet Clayta Forsgren?
A. I did.
Q. And were other people there?
A. There were other people there. There were perhaps six or eight people altogether. There were -- and incidentally, I need to say at this point in time I was not working for BLM. I was interested in this case. I -- I was not involved in this case after the right-of-way application process of '88, but I was interested in this case because it seemed to have a lot of loose ends and potential problems. And so when this meeting came up in '99, I heard about it from Daryle Bennett and asked Daryle if I could go up there with him. And I think he may have contacted Clayta, I don't know.
Q. Who all was at that meeting?
A. I do not recall. I remember Daryle Bennett and Bob Reese -- now, let me back up. Daryle Bennett was with the Soil Conservation District, which later became the NRCS, the Natural Resource Conservation Service. And he was head of that office. And Bob Reese was with the U.S. Forest Service. He was the district ranger for the Pinedale office and he was there. Who else was there



other than Clayta? I remember there were other people there, but I don't remember who they were.
Q. Okay. What was discussed at that meeting?
A. There was -- there was a discussion as to what might have caused the water that caused the ice buildup in the yard, because there was a tremendous amount of -- there -- this was night and day difference between when I was there in '88 and '99, 11 years later. There had been a tremendous amount of water. As I recall, somebody had gone up the hill and dug a fairly substantial trench on the hillside and it drained out north towards -- actually emptying into Pine Creek. And there was a French drain, I believe, a facility installed in that trench to try to bring water off the property. And it seems as if the discussion centered around the failure of that trench to accomplish what the trench was intended to accomplish.
Q. Okay. Was anything else discussed?
A. Well, damage to the property that I was -- like I said, I was appalled, they had a nice yard there. I don't know if they've a nice yard now. I haven't been up there since then, but they had a nice yard and the damage to the yard around the west side -- the north and west side of the property consisted of damage to the lawn. There was -- it seemed at the time that the grass had been killed, and there were long -- what would you call it,



long patches of dead grass that looked like they had been under a snow load or -- Daryle Bennett said it was part of ice buildup. I don't know. You know, that's all speculation at that point.
Q. Okay. So you discussed what the possible causes of the water were and the failure of the ditch, did you discuss any -- anything that would happen in the future, any -- what was going to be done?
A. You know, I didn't really get in on the discussion. I was there as an observer.
Q. Uh-huh.
A. And I observed the condition of the ground and listened in on the conversation. And at that point in time I told Clayta I thought she should probably get an attorney.
Q. And why did you tell her that?
A. Because there just didn't seem to be any reasonable resolution to what was happening.
Q. Did you have any other contact with either Clayta or Richard Forsgren throughout the years?
A. I did occasionally.
Q. Okay. What sort of contact?
A. I would see them in church on Sunday occasionally, and see them on the street.
Q. Okay. And you indicated that after 1988, you



were -- as a BLM employee you were not involved in the Forsgren case, but you were --
A. I was not.
Q. -- you were interested?
A. Uh-huh.
Q. Explain that to me. Did you attend meetings?
A. No.
Q. Did you discuss it with other BLM employees?
A. Occasionally.
Q. What sort of discussions?
A. Discussion was centered around the issue relating to wetlands and the water load, the hydraulic water load on that hillside. And as time went on and the dam was built, there was a proposal to put CCC Ponds in above their house. And Dick, again, he was very concerned about additional problems from that. Two main problems Dick had with the CCC Ponds, one dealt with the possible increase of water in the spring and the other one was increase in traffic, people milling around above his house that hadn't been around it before.
Q. You indicated that you suggested Clayta get legal counsel. You were not a BLM employee at that time?
A. I was not a BLM employee at that time.
Q. And is there any particular reason that prompted you to suggest that?