Q. Would that letter be in the NRCS files?
A. Should be.
Q. And there were three monitoring wells, correct?
A. Correct.
Q. And only one of them was on the Forsgren property?
A. Correct.
Q. Why didn't you take readings from the wells on the government property?
A. Do you mean during that time?
Q. Yes.
A. Because I had to access those wells -- I didn't have to, but the easiest way, by far, to access those wells was through the Forsgren property, because they were close to the east boundary of the BLM.
I didn't feel it was necessary to continue monitoring those BLM wells if I stopped monitoring down there at Forsgrens, at that point in time.
Q. And you also said that you didn't feel it was necessary to monitor any of the wells at that time. Why?
A. Well, I thought that the record was established on what was happening in the wells from the time they were installed in '93 through the time that I



quit monitoring them in 1997. August of '97. And I didn't see any point in further monitoring, because it did take quite a bit of my time to go up there.
Q. Did you see water on the Forsgren property in 1997?
A. '97? Okay. What are we talking about? Water on -- on the lawn, do you mean?
Q. Yes. On the lawn?
A. Or ditches, or --
Q. Anywhere on the property?
A. Yeah, I saw water in -- there was water in the drain ditch that was installed in the fall of '96. I believe that there was water that was standing on the surface between the boat shed and the house. I think that was in '97.
And I didn't look at the ditch to the south -- on the south boundary.
So there was a little bit of water standing in a low area, as I recall, on the east side of the house.
Q. And did the Forsgrens complain at all in 1997 about water on their property?
A. Oh, yes. Mm-hmm.
Q. And despite these complaints, you felt monitoring wasn't necessary?



A. I guess it must not have been identified as important enough to re-monitor.
Q. And who would have identified the importance of that?
A. Possibly me, or Stan Mitchem, or a representative of the BLM, or the Forest Service, or Forsgrens themselves.
Q. Exhibit 9 has the monitoring well readings that you took. Is that correct?
A. Yes.
Q. On page seven of the document.
A. Okay.
Q. Did you take all of these readings as well?
A. I --
MR. PRITCHARD: Just to clarify, why don't you read the date?
THE WITNESS: 9-4-96, and 5-31-96, and 11-13-96.
Q. (BY MS. EASTMAN) Did you take the readings on 9-4-96?
A. Yes.
Q. And is that -- that's your handwriting?
A. Yes. The handwriting in 5-31-96 is Allison Engels. She was with me. She was a soil conservationist. I believe that we did it together.



Q. And did she go with you every time you monitored?
A. No. That's her handwriting -- let's see. 12-9-96. It looks different, but I still think that was her handwriting there.
And then 11-13-96 is mine again.
Q. And on page five, on the notes marked February 23rd, '96, is that the first time you saw ice on the property?
A. I believe it was.
Q. And you say "Obviously ice inside garage, but could not verify since Forsgrens were not home."
How do you know there was ice inside the garage?
A. Well, it appeared to me that the ice continued on past the garage door and went into at least the -- think it was on the south side of the garage, but I just deduced that it must be in the garage too, because it wouldn't just sit there on the outside of the garage, because the seal wasn't good enough on the door, I didn't think.
Q. And then on the next page, May 20th of '96.
A. Mm-hmm.
Q. It says, "I saw more water than any time in the past."

Page 77

How much water did you see?
A. Okay. You're looking at 5-20-96 notes?
Q. Yes.
A. Okay.
Okay. That would have been water in the open drain ditch that I was referring to. "I saw more water than any time in past observations from around wellhead going north." So that had to be in that drain ditch. And there was no ponded water in the low spot between the kitchen and the wood pile, but ground was saturated.
Q. And was this after the ditch was put in in 1996?
A. No. This would have been in the spring prior to the ditch being installed. This was 5-20-96, and the ditch was installed in the fall of '96.
Q. Okay.
So how much water did you see in the ditch?
A. Boy. I don't know. I'd just be purely speculating.
It must have been several gallons a minute, because it got my attention that it was different than I had seen before.
Q. Was it more than you had seen in 1993?
A. I believe it was, based on my note.

Page 78

Q. And did you visit the property at all after 1997?
A. After, meaning --
Yes, I did. Of course I did. I'm just -- are you asking in 1998?
Q. Any time. Did you visit at all in 1998?
A. It seems that I would have. I don't recall when, but I would have expected that I did visit the property in '98. I would have had at least communication with the Forsgrens, I think, in 1998.
Q. Do you remember how much water you saw on the property in 1998?
A. Not for sure. I really don't.
Q. On page three of the monitoring notes.
A. Okay.
Q. At the bottom, dated 4-25-95.
Oh.
A. Oh. Okay.
Q. Okay.
You've written "Wetland pond has been dry for several months."
A. Okay.
Q. "Fish pond had four feet --"
A. Approximately four feet of water.
Q. "Approximately four feet of water over

Page 79

winter?"
A. Okay.
Q. Is that correct?
A. That's what I wrote.
Q. So the pond -- one of the ponds was dry?
A. Mm-hmm. Yep. The wetland pond, or the duck pond as it's also called, on the north side.
Q. What did this monitoring data show you?
A. Well, it showed me that there seemed to be -- there was fluctuation in the water tables at all three of the monitoring wells. And it showed me that the water table in the well number one on the Forsgren property was probably not related to the water table in wells number two and three on the BLM, because of how they fluctuated.
And in discussions with Stan Mitchem, primarily, that was brought out in documents, and in the report that he had sent to Duane Clemm, and that I was gleaning from, on things that were observed on the property.
Q. Did you prepare any charts of this monitoring well information?
A. I didn't myself.
Q. Do you know if anybody else prepared charts?
A. Yes. Stan Mitchem did.

Page 80

Q. And did you review those charts?
A. Yes.
Q. And what did those charts show you?
MR. PRITCHARD: Objection, calls for a narrative.
THE WITNESS: It showed there was a lot of fluctuation during portions of the year throughout the years as I had monitored the wells.
MS. EASTMAN: I'd like to introduce Exhibit 10.
(Whereupon, Exhibit No. 10 was marked for identification.)
Q. (BY MS. EASTMAN) Exhibit 10. Did you write this letter?
A. Yes.
Q. And when did you write it?
A. Let's see.
I believe that I would have written this in -- probably not until 1999.
Q. And it's addressed to Jack. Who is that?
A. Jack Doyle.
Q. About two-thirds of the way down the page.
A. Mm-hmm.
Q. The line on the left starts, "Two greater than 87."

Page 81

A. Yes.
Q. At the end of that line there is a sentence that begins, "The fact."
Can you read that sentence?
A. "The fact that the water tables have remained quite steady since the summer of 1995 may indicate that there may be a correlation with the filling of the ponds. I had previously judged there not to be, and attributed the lower water table in '94 and early '95 to weather conditions. In parenthesis, drought. What do you think?"
Q. So the water tables were steady?
A. Inasmuch as I was monitoring them, they appeared to be more consistent than before. But I was missing monitoring during the times that they could have gone down, because I couldn't find the tops of the wells because there was too much snow cover. That would have been in the winter.
I wasn't able to monitor every month.
Q. So what did you mean by writing this statement?
A. Which statement?
Q. That there may be a correlation with the filling of the ponds?
A. It was a speculative statement that I

Page 82

thought might have some meaning, but I didn't know. And I wanted to get Jack's opinion on it, and I wrote this statement.
Q. Why did you write the statement?
MR. PRITCHARD: Objection. Asked and answered.
THE WITNESS: My role as the district conservationist was to provide assistance to, primarily, private landowners. And I was wanting to address the problems that they were having, and try to find solutions, and to be a positive influence on the CCC ponds committee, that regardless of what was causing the problem, that there's an opportunity to provide a solution.
And I don't know if that's what I was thinking at the time I wrote this, but I knew that that possibility existed. There could be the correlation. You can't say yes for sure, you can't say no for sure. And I thought, you know, there's an opportunity that -- and a responsibility, that we agreed to as a CCC ponds committee, to address the concerns that the Forsgrens had.
The first -- the first ditch wasn't -- was not doing the job as we wanted it to, and I was looking for other solutions.

Page 83

Q. Did Jack respond to this letter?
A. You know, I don't remember if he did or not. It would have been verbal if he did, and I don't recall getting anything in writing from him on it.
We had numerous verbal discussions.
Q. You said you were looking for other alternatives. Eventually a ditch was put in in 1999. Is that correct? I'm sorry, eventually a drain --
A. A drain.
Q. -- was put in in 1999?
A. A sub-surface drain. Referred to as a French drain.
Q. And were you there when the drain was constructed?
A. Yes.
Q. You said it's referred to as a French drain. Is it also referred to as a tile drain?
A. Yes.
Q. And what did you observe when the drain was constructed?
A. That it effectively de-watered the spring, in my opinion, before the water would have a chance to get up on the surface at the spring. And it was taking away a substantial amount of water from the spring, and it was working exactly the way it was supposed to.

Page 84

Q. Did you see the trench being dug for the drain?
A. Yes.
Q. And did you see water in that trench?
A. Yes.
Q. How much water did you see?
A. I knew you were going to ask me that.
A lot more water than I saw in that open drain ditch on the property boundary with Forsgrens and the BLM.
Q. Did you see any water on the Forsgren property at that time?
A. Let me think of the timeframe here when the ditch was installed. That would have been in the fall of '99.
I don't recall seeing water on the lawn at that point. There may have been saturated soil in that area on the -- in the lawn between the house and the property boundary. I don't remember for sure.
Q. Did you look under the crawl space?
A. No. Not then.
I only remember looking in the crawl space once when Dick showed it to me.
Q. Do you remember when the sub-surface drain was installed, other people looking into the crawl

space?
A. The one that we're talking about on the BLM?
Q. Yes.
A. "Other people" meaning other --
Q. Anybody else that was there constructing the drain, or observing construction?
A. I don't remember that there is anybody. I would imagine they could -- it's certainly possible, but I don't know.
Q. Do you remember anyone commenting about how the water was receding from the Forsgren property?
A. As the drain was being installed?
Q. As the drain was being installed?
A. It wasn't receding that quickly, but it was effectively de-watering any -- dewatering the Forsgren property, because it pulled the water away from the spring.
MS. EASTMAN: Let's go off the record for a second.
(Whereupon, a discussion was held off the record.)
THE WITNESS: It was doing exactly what it was intended to do.
Q. (BY MS. EASTMAN) And what was it intended to do?



A. To pull the water away from the spring, which flowed on to the Forsgren property.
It wasn't intended to pull the water table down in the lawn area, if it was water communicating with the creek.
If there were two different sources of water there, it was only intended to address the surface water issue, as I understood it.
Q. Did it address the groundwater issue?
A. Groundwater?
Q. Yes.
A. The groundwater that was -- that was associated with the creek?
Q. Let me ask you a different question.
Did the sub-surface drain affect the amount of water in the monitoring wells?
MR. PRITCHARD: Objection.
MS. EASTMAN: Based on?
MR. PRITCHARD: Calls for speculation.
MS. EASTMAN: I'd like to introduce an exhibit --
THE WITNESS: I don't know.
MS. EASTMAN: -- at this point.
THE WITNESS: I'm trying to think of when I looked at those monitoring wells after the drain was



installed.
(Whereupon, Exhibit No. 11 was marked for identification.)
Q. (BY MS. EASTMAN) At the bottom of Exhibit 11.
A. Mm-hmm.
Q. There is monitoring well notes that are cut off. Did you make these monitoring well notes?
A. Yeah. Those are my notes. That's my sloppy writing.
Q. And they're dated January 5th of 2000?
A. Yes.
Q. And well number one, which is the garage, the water level is listed as 51.5?
A. Yes. It looks like it.
Q. And that means from the top of the pipe to the water was 51.5 inches?
A. Right. To the water surface.
Q. Do you know what the -- what the wells were prior to that? The monitoring well at the garage?
A. Not between then and -- I must have read them in April of 1999, so I don't think I would have known what was going on with that water table at number one.
Q. Was the sub-surface drain intended to pull



the water off of the Forsgren property?
MR. PRITCHARD: Objection, asked and answered.
THE WITNESS: Yes.
Again, it was intended to directly take the water that was feeding the spring, which in turn was affecting the Forsgren property.
MS. EASTMAN: Let's go back to Exhibit 8.
Q. (BY MS. EASTMAN) Did you take Clayta's interview by telephone, or did you meet with her in person?
A. No, I met with her in person.
Q. Okay.
So at the top where it says, "She called me at home at approximately 12:30 p.m. today."
A. Mm-hmm.
Q. What does that refer to?
A. She called me, I believe it was from her house in Pinedale, when I was at home that day, and told me what was happening.
And as I recall, I went up there right away and met with her and saw the problem.
Q. And what was the problem?
A. There was ice across the east side of the -- north of the boat shed, and east of the house, and

around to the north of the house, and it was moving further to the west. And there was water that was coming up through the ice to form additional sheet ice, and it was growing.
Q. And had you ever seen that much ice on the property before?
A. No. Never.
Q. When did you write these notes?
A. I believe that I wrote them in the next -- like next day, or two, or three, particularly after I had spoken with Clayta, because I would have written them when I got back to the office. And it was my recollection of what the conversation was when I talked to her. And it would have been shortly after I spoke to her, I just don't remember which date it was.
Q. Did you ever receive any monitoring well readings from Jerry Tully?
A. I think I did.
Q. And do you know if you reviewed those readings?
A. I believe I did.
Q. And did they seem correct?
A. I didn't know if they were correct, because I don't think he used a tape.
Q. Do you know how he measured it?



A. I think with a stick.
Q. And then you measured that stick to know the depth?
A. He did.
Q. Would that produce inaccurate readings?
A. It could. It depends on how accurate he was to put the stick down to the surface of the water, and marking it correctly in the top of the pipe. And he's certainly cap -- I thought he would be capable of doing it, but I didn't know how -- how he did it, so I -- I couldn't be sure.
Q. At any of the CCC ponds meetings, or meetings about the Forsgrens, did you tell Mr. or Mrs. Forsgrens, that if they went ahead and sued, that they would die before a suit could be resolved?
A. State that again? If they went ahead and sued, what was the last?
Q. If they sued the government, they would die before a suit could ever come to an end?
A. Did I say that?
Q. Yes.
A. Is that what you're asking?
Q. Yes.
A. Not that I recall.
Q. Did you hear anyone say that?



A. I -- it vaguely sounds familiar, but I don't recall who it would have been. It does have a familiar ring to it, but I don't know.
Q. At any of the meetings you attended, where the Forsgrens were discussed, did you ask Mrs. Forsgren to sign a form waiving the Government's liability?
A. I'm trying to remember. There was a document that addressed the Government's liability for causing the problem, when she accepted the alternative that was presented to her to put in the tile drain on the BLM.
Q. And when you say "the problem," what are you referring to?
You said the "government's causing the problem." What -- the problem.
A. The problem of creating all of this water on the Forsgren property by recharging the CCC ponds.
Q. And did you ask her to sign those?
A. I don't remember if I did personally, or --
I just don't remember if I did it personally. I knew that the document existed.
Q. Did you prepare the document?
A. No.
Q. Do you know who did?
A. Not for sure. I think it came out of the



BLM, but I'm not sure.
Q. Do you know why she was asked to sign it?
A. Well, it was because there was no proof that the CCC ponds were directly causing the problem, and so the -- the Federal agencies represented, primarily the BLM and the Forest Service, were not going to just automatically take responsibility for having caused their problem that hadn't been proven that it existed. But there was an agreement that the agencies would take responsibility for solving a problem that did exist. And that was my main objective, is to -- was to get the problem solved the best way that I knew how.
Q. Did she sign the document?
A. I believe she did.
MS. EASTMAN: I don't have any other questions right now.
THE WITNESS: All right.
MR. PRITCHARD: We'll probably take just about five minutes.
MS. EASTMAN: Okay.
(Whereupon, a break was taken.)
Q. (BY MS. EASTMAN) Mr. Bennett, I have another thing that I want to ask you about.
A. Okay.
Q. Have you seen these photos before?