UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CLAYTA FORSGREN, et al., | ) | DEPOSITION OF: |
| | ) | DARYLE BENNETT |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 04-1223 L |
| UNITED STATES OF AMERICA, | ) | Judge Margaret M. Sweeney |
| | ) | |
| Defendant. | ) | |

BE IT REMEMBERED that on the 8th day of March, 2006, that the deposition of DARYLE BENNETT, produced as a witness herein at the instance of the plaintiffs herein, in the above-entitled action now pending in the above-named court, was taken before DEBRA A. DIBBLE, a Registered Professional Reporter in and for the State of Utah, commencing at the hour of 9:00 a.m. of said day, at the offices of PRUITT & GUSHEE, 48 West Market Street, Suite 300, Salt Lake City, Utah.



A P P E A R A N C E S

FOR THE PLAINTIFF:

Erin S. Eastman
Karen Budd-Falen
Attorney at Law
Budd-Falen Law Offices, LLC.
300 East 18th Street
P.O. Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105
Main@buddfalen.com

FOR THE DEFENDANT:

G. Evan Pritchard
Attorney at Law
National Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Room 3207
1510-1292-2
Washington, DC 20004
(202) 305-0203

Diane M. Connolly
Deputy Regional Attorney
U.S. Department of Agriculture
Office of the General Counsel
Mountain Region
740 Simms, Suite 309
Golden, Colorado 80401
(303) 275-5555
diane.connolly@usda.gov

ALSO PRESENT:

Clayta Forsgren
Barbara Thompson



I N D E X


DARYLE BARRETT: Page

Direct Examination by MS. EASTMAN: 4
Cross Examination by MR. PRITCHARD: 97
Redirect Examination by MS. EASTMAN: 102


E X H I B I T S


| Number | Description | Page |
|---|---|---|
| 1 | 4/20/94 letter to "interested party." DOJ000043-62. | 21 |
| 2 | CCC Ponds Recreation Area map. | 25 |
| 3 | Forsgren property facts. DOJ000008. | 35 |
| 4 | Map of ditches by witness. | 44 |
| 5 | 11/8/95 Assistance Notes. DOJ 000401 and 000400. | 46 |
| 6 | 11/23/93 Minutes of CCC Ponds. 00036-0038. | 49 |
| 7 | 5/11/99 CCC Ponds meeting minutes. | 53 |
| 8 | 2/2/99 handwritten notes. | 68 |
| 9 | 5/5/99 fax to Stan Mitchem. | 71 |
| 10 | Letter to Jack from Doyle. | 80 |
| 11 | Well monitoring documentation. | 87 |
| 12 | Photographs | 95 |
| 13 | 8/26/97 assistance note. | 95 |

REPORTERS CERTIFICATE: Page 104




PROCEEDINGS

DARYLE BARRETT

having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. EASTMAN:

Q. My name is Erin Eastman, and I represent Clayta Forsgren in this case.

Could you please state your name and your address for the record?

A. Daryle Lee Bennett. Address is 1249 South Red Elm Way; Riverton, Utah, 84069.

Q. And have you ever had your deposition taken before?

A. No.

Q. So what's going to happen today is I'm going to ask you some questions, and then Mr. Pritchard may have some questions for you also.

And the court reporter is going to take down everything that we say.

The court reporter is going to send you a transcript, a few weeks from now, and you'll need to review that transcript. And if there's anything that you find that you think is incorrect, you make the changes and you'll sign it and send it back to the

EXHIBIT 9 04-1223

Page 45

thought it dog-legged over on to U.S. Forest Service property at that point.
Q. And the ditch on the bottom half of the page goes to the west?
A. Yes.
Q. And do you know if that is on the Forsgren property?
A. I don't know that for sure.
Q. Okay.
And the ditch on the top half of the page, how much water was in that ditch when you were there in 1993?
MR. PRITCHARD: Objection. Asked and answered.
THE WITNESS: Again, it increased in volume as it went north, and there was a small volume of water in the first part of the ditch.
And there was always -- as I remember, there was always water standing in the bottom of this ditch, because it was dug so deep that it communicated with the water in Pine Creek.
Q. (BY MS. EASTMAN) And you're pointing to the area where it dog-legs?
A. Yes.
I don't recall how far south that pond of

Page 46

water stayed, I just know that the ditch was deeper up here on the north end of it.
Q. And you said a small amount. Or a small volume. Do you know -- do you have any estimate?
A. It would definitely be less than one CFS.
Q. And CFS is cubic foot per second?
A. Yes.
Q. And this ditch on the bottom half of the page, did you see water in that ditch in 1993?
A. That I am not sure of.
Q. Did you see water anywhere else on the Forsgren property in 1993?
A. Not that I recall.
Q. And did you look in the crawl space?
A. In '93? I don't believe so.
Q. Did you ever look in the crawl space prior to the ponds being filled?
A. I don't believe I did.
MS. EASTMAN: I'd like to mark this as Exhibit 5.
(Whereupon, Exhibit No. 5 was marked for identification.)
Q. (BY MS. EASTMAN) Could you tell me what Exhibit 5 is?
A. It's a technical assistance note that I

Page 47

recorded on the computer and placed into the Richard Forsgren file.
Q. And is this something that you do regularly? Or that you did regularly as district conservationist?
A. Yes.
Q. The second note is dated 10-11-1993 and says assisted by DLB. Are you DLB?
A. Yes.
Q. And the note reads, "Dick has attended the CCC ponds committee meetings occasionally, and expressed concern from the start about getting excessive water onto his property resulting from filling the ponds on the CCC ponds project above his property to the east. He wanted the committee to address the additional wetness issues should it arise."
Could you explain to me that note?
A. I was stating a fact of Dick attending the meeting. And I wanted to make a record of his concern about possible impacts that the project may have on his property, because I was wanting to provide my assistance to him and his concerns.
I was looking out for his concerns as a member of the CCC ponds group.
Q. And what did you mean by "should it arise?"
A. If additional wetness became an issue in the

Page 48

future, is what I meant.
Q. And when you say "additional wetness," could you explain that?
A. That's an ambiguous term, isn't it?
It would be enough water to where it would raise the concern of the landowner, which would bring it to my attention.
I don't have a measure of how much that is.
Q. So prior to this note of 10-1-93, did the Forsgrens have a wetness problem that was brought to your attention?
A. I don't remember if it was brought to my attention before this date. I can't remember if Dick and I had conversations about issues and his concerns with wetness before this meeting or after the meeting. I can only speculate that I probably had a conversation with him before, but I don't remember.
Q. When did you first see water on the lawn of the Forsgren property?
A. It was either in 1990 -- 1995 or 1996, and it's in my notes somewhere.
Q. And was that after the ponds were refilled?
A. Yes.
Q. And at that time did you look in the crawl space?

Page 49

A. I don't remember if it was the same time that I first saw the water in the -- on the lawn on the east side of the house, or whether it was a little bit later. Because Dick showed it to me.
Q. So the first time you saw water in the crawl space was sometime after 1995?
A. I believe it was. Because I had not looked in the crawl space prior to that.
MS. EASTMAN: Let's mark this as Exhibit 6.
(Whereupon, Exhibit No. 6 was marked for identification.)
Q. (BY MS. EASTMAN) Could you tell us what Exhibit 6 is?
A. It's a record of the meeting minutes of the CCC ponds group. November 23rd, 1993, it says.
Q. And were you present at that meeting?
A. Yes.
Q. In the last paragraph on the first page, it discusses a SCS state geologist. And it says, "The water table is shallower than expected."
Do you agree with that statement?
A. It means that the water surface in the monitoring wells was closer to the surface than expected.
Q. And did you monitor the water level in the

Page 50

monitoring wells?
A. Yes.
Q. And what would the "water being closer to the surface than expected" mean?
MR. PRITCHARD: Objection. Calls for speculation.
THE WITNESS: It is pure speculation.
We -- "we" meaning Stan Mitchem and I, were involved in placing the monitoring wells, and we both had our own opinions on where that water table might be at. And it was not where we anticipated, by my note that I made. It was just a guess.
Q. (BY MS. EASTMAN) And this note was made before the environmental assessment for the CCC ponds was done? Is that correct?
A. Yes.
Q. Do you know if -- let's see.
Did you have any discussions about the water table being shallower than expected in relation to designing or planning the CCC ponds project?
A. I don't remember any discussion. It was intended to be a starting point, prior to the project being implemented, so that we could monitor change.
Q. In the next sentence it says, "A drain location was recommended that could help the water

Page 51

problem."
Did you recommend that drain?
A. I don't remember me recommending it.
Q. Do you know who did?
A. I'm not real sure, but I would venture to guess that it was Stan Mitchem.
Q. The next sentence says, "It was discussed if the project should pay for correcting Dick's water problem. It was discussed that if the problem was there before Dick built, then it should be resolved at his expense."
Do you remember those discussions?
A. Vaguely.
Q. Was a drain ever put in the Forsgren property?
A. Prior to when?
Q. At any time, did the committee recommend a drain being put on the Forsgren property?
A. I don't remember if there was a formal recommendation out of the committee on that.
But in answer to your first question, if there were -- if there was knowledge of any drains on the property? Is that what you're asking me?
Q. Let me rephrase.
In 1996, was a ditch put on the Forsgren

Page 52

property?
A. Yes.
Q. And did the committee pay for that ditch?
A. Yes, to my understanding, they did.
Q. And in 1999 was a sub-surface drain put adjacent to the Forsgren property?
A. That's correct.
Q. And did the committee pay for that drain?
A. Yes.
Q. Could you explain to me, then, this discussion of, "If the problem was there before Dick built, then it should be resolved at his expense?"
A. The intent of that statement meant that the committee didn't feel that it was their responsibility to correct a pre-existing problem at that point in time.
Q. Later, did the committee change that view?
A. The committee decided that we should help to solve an additional wetness problem on the Forsgrens' property that needed to be resolved, without trying to determine the cause of the problem.
It was done as a good will, or like a neighborly thing to do, because the committee felt that they wanted to help the Forsgrens with the problem of additional wetness.

he had at the time.

It was a water problem that he had expressed, and we had a recommendation on what could be done to alleviate the problem that he had told us about.

Q. What problem did he tell you about?

MR. PRITCHARD: Objection, asked and answered.

THE WITNESS: Unwanted water coming onto the property.

Q. (BY MS. EASTMAN) Do you know, was there fill on the Forsgren property?

A. It appeared that there was from the augured test hole that Stan Mitchem and I dug over in the lawn on the east side of the kitchen addition.

Q. And how did the -- how did it appear to be fill?

A. Because of the material that was in the profile was not in a sequence that would be expected in that location.

Q. Did you auger any other holes on the property to see if fill was there?

A. I don't remember -- I don't think there's another documented test hole on the lawn, but it seems like Stan and I had probed around a little bit over to



the west of where that test hole was documented, but I don't remember for sure what we saw. It just seems like we were speculating, and did a little probing around.

Q. And when you said it didn't seem to match up with what the layers would normally be? Is that what you said?

A. Yes.

Q. Would topsoil being brought in show up like that?

A. It could.

Q. What was your involvement in the drainage ditch constructed on the Forsgren property in 1996?

A. It was discussions with Stan Mitchem, and how to install a surface drain. It was based on his recommendations, in a 1995 report, I believe, that he had submitted to Duane Clemm, the state conservation engineer.

And I'm sure there was discussions with Jack Doyle about that, and probably with Kirk Hoover.

Q. Did Mr. Mitchem originally suggest a sub-surface drain?

A. Yes.

Q. And why wasn't a sub-surface drain put in in 1996?



A. It was my understanding that it was not an option, because it would have had to have been installed on the BLM, and would have had a major detrimental impact on that spring, which is classified as a well end.

Q. And what do you base that understanding on?

A. On input that came from the BLM employee at the time.

Q. Do you know which BLM employee?

A. I believe it came from Bob McCarty.

Q. Could you look at this document and tell me what it is?

A. This is notes supporting the design and -- of the open drain, or the ditch that was installed in the fall of 1996, that I documented, and I drew, and I had reviewed by an engineer with job-approval authority, and in which I'd reviewed with Dick Forsgren, and he had agreed with the design and signed off on it.

Q. Was this a drain or a ditch?

A. How about if we call it the drain ditch?

Q. Okay.

A. Because I did call it a drain ditch right here, on page two.

Q. Starting on page five, through the end of



the document, there's numerous pages that look similar.

A. Mm-hmm.

Q. Could you tell me what these are?

A. Yes.

They're -- it's a computer program that NRCS used -- uses, or used at the time, to assist in the design of convey -- of ditch conveyance systems.

And these are design worksheets, plugging in different variables, to look at how much water can be conveyed, at what depth, and at what velocity, and at a given slope. So it sets up the design criteria for a ditch.

Q. And how much water was the ditch designed to carry?

A. The final design, I don't recall for sure, but it --

It would have been well over one CFS.

Q. And one CFS is what you saw in the ditch in 1993?

A. No.

Q. How much did you see in the ditch in 1993?

A. Less than a CFS.

Q. Less than one CFS?

After the ditch was installed in 1996, did you see water running in it?

A. Yes.
Q. How much?
A. Did I make an estimate of flow in my technical notes?
I don't know.
Q. I don't know. Do you remember?
A. Perhaps a few gallons per minute, is what I remember. At the upper end. And then it gradually increased as it went north, and picked up more -- intercepted more water coming from the spring.
Q. So how does gallons per minute relate to CFS?
A. Oh, boy. Let's see. One CFS is 449 gallons per minute.
Q. So in 1993, you saw less than 449 gallons per minute?
A. (Witness nods.)
Q. How much --
A. Much less.
Q. -- did you see in 1996?
A. Much less. It was a matter of a few gallons per minute in '96.
Q. And that's '96, after the ditch you designed was put in?
A. Yes.



Q. Do you know why there was only what you say, gallons per minute in 1996?
MR. PRITCHARD: Objection, calls for speculation.
THE WITNESS: I don't know.
Q. (BY MS. EASTMAN) Who put that ditch in in 1996?
A. I believe it was Carl Winters, as the contractor.
Q. Did it work?
A. Yes. At the time it did work.
Q. Then did it not work later?
A. Apparently, from the problems that occurred.
Q. Did you ever inspect it to see if it was working?
A. Yes.
Q. And was it always working when you inspected it?
A. No, it wasn't always working, because winter compromised the function of the ditch. Of the drain ditch.
Q. How?
A. It began to freeze. And it first started freezing in the pipe that was placed in the north end of the ditch.



Q. What happened when the pipe froze?
A. It --
MR. PRITCHARD: Objection --
THE WITNESS: -- shut off --
MR. PRITCHARD: -- vague.
Q. (BY MS. EASTMAN) You just said that the pipe froze. What happened -- what did that cause?
A. As the pipe froze, it would shut off the flow of water through the pipe, until it froze completely, and then it would shut off the complete flow of water through the pipe. And then it would have to find another delivery, or point at which to bypass the pipe to go into the creek.
Q. And how did it do that?
Let me ask that again. How did the water find another delivery?
A. It had the opportunity to go back into the old ditch, that was going on to the adjacent property, before it entered the pipe.
Q. Did the water go on to the Forsgren property when the ditch was frozen?
A. At which point in time?
Q. When you saw the ditch frozen?
A. No.
Q. Did the water begin to flow on to the Forsgren property?
A. Not when I saw it, no.



Q. In February of 1999, did you conduct some interviews of people?
A. Yes.
Q. Why did you do these interviews?
A. To try and find out what was going on historically with the issues involving pre-existing conditions. That means pre-existing the construction of the ponds.
Q. Did anyone ask you to do those interviews?
A. No.
Q. And did you conduct those interviews by telephone?
A. I believe I did them in person. There might have been one or two that I did over the phone, but I was just trying to gather information.
MS. EASTMAN: Let's mark this as Exhibit 8.
(Whereupon, Exhibit No. 8 was marked for identification.)
THE WITNESS: Can I make a correction to a statement I made a minute ago?
MS. EASTMAN: Yes.
THE WITNESS: You asked me did I ever see water flow on to the Forsgren property when the ditch