IN THE UNITED COURT OF FEDERAL CLAIMS

---

CLAYTA FORSGREN, et al.,

Plaintiffs,

vs.

No. 04-1223L
Judge Margaret M. Sweeney

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF JOHN THURSTON DOYLE
Taken in behalf of Plaintiffs

11:21 a.m., Friday
February 17, 2006

PURSUANT TO NOTICE, the deposition of JOHN THURSTON DOYLE was taken in accordance with the applicable Federal Rules of Civil Procedure at the offices of Bureau of Land Management, Pinedale Field Office, 432 East Mill Street, Pinedale, Wyoming, before Kathy J. Mullivan, a Registered Professional Reporter, and a Notary Public in and for the State of Wyoming.

COPY

EXHIBIT
24
04-1223

Q. Okay. On June 25, 1999 at 2:00, do you remember meeting at the Forsgrens' property with several government employees, Mrs. Forsgren and Jerry and Elaine Tully?
A. Yes, I remember that.
Q. Was there -- what do you remember about that meeting.
A. We looked at the -- we looked at the water that was on the lawn and next to the house and observed the water from the springs on the south side. Looked at the -- where the drain was not functioning right. That was prior to the design and installation of a final drain that's in there.
Q. And you said you looked at water from the springs on the south side?
A. Yes.
Q. In reference to the house, where is the south side?
A. That direction.
Q. There's a deck on one side, there's --
A. It's on the garage side.
Q. It's on the garage side?
A. That helped.
Q. And what water springs did you see on the south side?
A. The springs that had water in them, it was kind



of a pool. It's been there for a long, long time.
Q. Was anything else discussed at that meeting?
A. Not to my knowledge.
Q. You did not ask Clayta to join in the cost of a drain at that meeting?
A. I did not.
Q. Did anyone else?
A. I don't know.
Q. You didn't -- did you try to get Clayta to sign a waiver of liability at that meeting?
A. I did not.
Q. Did anyone else?
A. I believe so. Somebody tried to.
Q. Do you know who that was?
A. I don't know who it was. I do not know who it was.
Q. Do you remember who was at the meeting?
A. I couldn't name them offhand.
Q. At that meeting or at any other meeting, do you remember anyone telling Clayta or Dick that if they were to sue, they would never see a result before they died?
A. I'm sorry somebody may have said that, because I don't -- I don't think that's proper.
Q. But you wouldn't know who might have said that?
A. No.



Q. Do you remember at the February 12, 1999 meeting promising to remedy the problems?
A. I don't know as I made it a promise, but I may have made an obligation to try to help aleve the problem, because there was a problem there and I could see that there was a possibility of putting the subsurface drain to intercept the water, no matter where it's coming from.
Q. Do you know where it was coming from?
A. I wish I did.
Q. Have you been to the Forsgren property before 1995?
A. Yes.
Q. When?
A. The first time?
Q. Uh-huh.
A. On May 9, 1991.
Q. And why did you visit on May 9, 1991?
A. That was when I was doing the survey for relocating the Fremont Lake dam, doing a legal survey. And I was looking for a section corner, which was adjacent to the Forsgrens' property, BLM property and Forest Service property. This was in the spring. I was following a fence line down between the -- would have been between the BLM and Forest Service properties, and I remember -- well, I ran into a cow and calf moose and I



had to detour a little bit. I did have hip boots on, because it was wet down through there. There was a lot of willows in there, a lot of groundwater and a lot of surface water in that area.
I did get down to the corner and there was water standing at the benchmark, which is on public -- at that junction of the properties, maybe -- so I recall monument -- a brass cap monument stands up 11 inches above the ground, and there was water around the base of that monument, maybe 2, 3 inches.
Q. And that monument marked what?
A. Marked the property boundaries, BLM, Forest Service and Forsgrens.
Q. Does it mark a section corner?
A. It is a section corner. It's between 14, 15, 22 and 23.
Q. Do you know which section the Forsgren property is on?
A. 22.
Q. And which section is the Forest Service property on?
A. 14.
Q. And what's on section 22? -- I mean -- I'm sorry, 23?
A. BLM. It's Township 34 North, Range 109 West.

Q. Do you remember what was discussed?
A. Probably more what to do about it than cause.
Q. And why was it the CCC Ponds that were going to do something about it?
A. Because it looked like there was a need and there was -- looked like there was a solution to it and we could help them out and so we elected to.
Q. Now, we've looked at a whole bunch of meeting minutes. Was there a meeting in 1998?
A. Probably was, but I have no record of it in my files.
Q. Why wouldn't there be a record of those meetings?
A. I would assume there is a record of them, but they would be in the official file in the conservation district.
Q. So you believe there were meetings in 1998?
A. Yes, I do.
Q. Do you know what was discussed at those meetings?
A. Not offhand.
Q. And you believe those records would be in the NRCS files?
A. They would be in conservation district files --
Q. Conservation district files?



A. -- which are at the NRCS office.
Q. Were you involved in the design of the 1996 drainage ditch on the Forsgren property?
A. Not the '96 one, no.
Q. Did you discuss the '96 drain at any of the meetings?
A. Yes, we did.
Q. What did you discuss about it?
A. Paying for it, for one thing. Reviewed Stan Mitchem's report on what was needed, the recommendations.
Q. Okay. And isn't it true that Stan Mitchem's report recommended a subsurface drain and not a drainage ditch?
A. That -- initially, yes. His initial was the same as mine, which was a subsurface drain.
Q. And why wasn't a sub -- I'm sorry. Why wasn't a subsurface drain put in?
A. The people that design the surface drain thought that would work better. The subsurface drain that Stan recommended would have been excavated on the BLM property, not on Forsgrens like the one that was put in.
Q. So --
A. And they did -- BLM did not want an open ditch.
Q. Do you know why the BLM did not want an open ditch?



A. Potential hazard.
Q. Do you know who constructed the 1996 ditch?
A. Carl Winters. '96 being when the pipe was put in?
Q. Uh-huh. What was your involvement in the design of the 1999 subsurface drain?
A. I designed it.
Q. You designed it.
MS. EASTMAN: Let's mark this as Exhibit 20.
(Deposition Exhibit No. 20 marked for identification.)
Q. (BY MS. EASTMAN) Is this the 1999 subsurface drain?
A. April 24, 1999 is when I surveyed it as a plan.
Q. And this is the drain that was put on the Forsgren property?
A. Yes, it is. I'm sorry. No, it's not.
Q. Oh, this is the drain that was put on the BLM property adjacent to the Forest -- Forsgrens' property?
A. Yes.
Q. Okay. And could you tell me a little bit about how you chose to design this, what the design was based on?
A. Based on the wetland, the water in the vicinity,



the gradient of the water in Pine Creek and the slope of the land from there up to the city pipeline.
Q. And were other alternatives discussed besides this drain?
A. Just the open ditch versus an enclosed.
Q. And when you say open ditch, what do you mean? Do you mean the open ditch that was already on the Forsgren property?
A. No, a new ditch would have been excavated down to the grade of this ditch, which is, I think, probably our deepest cut was around 6 feet. It could have been excavated down into the soil to intercept the water and gravel on the bottom of it and the slopes would have been laid back so you -- probably at least three to one, so it would be a pretty good-sized open structure.
Q. Okay. But instead you went with this enclosed drain?
A. Yes.
Q. Were you involved in construction of this drain?
A. I conducted it.
Q. Okay. So you were in charge of --
A. Construction.
Q. -- the construction.
What does that mean, you were in charge?
A. I actually set up the crew and carried the grade

of the drain, the excavation and placement of the fill material, backfill material. I had two of my employees that actually were putting the pipe in. Let me see, I had Volcheck there, doing the investigation for the -- any cultural archeological features that might be encountered.
Q. On the day you went to put the drain in, did you cross the Forsgren property?
A. Yes, we did.
Q. And did you see water on the Forsgren property then?
A. Yes, there was.
Q. And did you drive heavy equipment across the Forsgren property?
A. I did not.
Q. Did anyone?
A. Yes.
Q. Do you know who did?
A. We had two backhoes, the City furnished one of them. Game & Fish Department furnished the other one. We had to have an awful lot of gravel to support the installation, and the County donated their dump trucks and they furnished the gravel.
Q. And where on the Forsgren property did you drive these?
A. I didn't drive them.



Q. Did the people you were in charge of drive these?
A. They dumped most of the loads up just above the pipeline, city pipeline on the upland grounds, and then they -- they had to cross the -- be the east side of the Forsgrens' property to get the material to the lower end and installing the drain. You start lower end and work up so you don't have to fight water all the way, and it drops as you get the pipe installed.
Q. Okay. And when you say you start at the end so you don't have to fight water all the way --
A. Uh-huh.
Q. -- were you fighting water when you dug this drain?
A. And mud and muck, organic materials and lots and lots of willow roots.
Q. And the heavy equipment was sinking into the mud?
A. Yes. We had to operate the trackhoes in tandem.
Q. Were the sides of the ditch sloughing off?
A. There was probably some sloughing. We were trying to build those slopes as steep as we could so we could intercept where the water was coming out of the sands and gravels, and where the water was coming out there was some sloughing, but that's where we were putting



so much gravel in there, control the sloughing and get the pipe in and cover it up.
Q. And where was the water coming out?
A. All along the east side of the canal -- or the bank, all the way through the excavation area.
Q. Okay. Was it coming from the top of the excavation area, the bottom or just all over?
A. When you open a trench like that it always appears most of it's coming from the bottom.
Q. Okay.
A. But --
Q. Okay.
A. But there was -- it was very moist all the way to the surface.
Q. Okay. And how much water would you say was in the trench as you were digging it?
A. We measured it at the end of it -- at the end of the construction, and we had dropped the water table, and the pipe was probably running half full of water. We did not measure it at that time, so I couldn't give you exact flow, but it was flowing -- it was flowing good. It was operating properly.
Q. And what was the design capacity of the pipe?
A. So the pipe was running half full. That's why we set the grade on them. You couldn't set them for



discharge, you're never real sure how much water's going to be coming out of groundwater, it's not like you measure a ditch and say I got to have a pipe to carry that much, so it's kind of a trick.
Q. When you install a pipe, you install it such that it will only run half full at its fullest?
A. When it's -- when it's -- it's designed at half full, leaves you a little room in case for some reason there's an increased water flow it can carry more.
Q. What was the design capacity of this pipe or --
A. It's not on the plan. I don't have time to run hydraulics on it right now.
Q. This 6-inch diameter drain tubing --
A. Yes.
Q. -- is that the drain pipe?
A. It's perforated corrugated polyethylene pipe.
Q. Is that the pipe that you put in the trench?
A. Yes.
Q. So it was a 6-inch diameter pipe?
A. Yes.
Q. So running it half full in a 6-inch diameter pipe --
A. Yes.
Q. -- that's what you saw?
A. Yes.

Q. Okay. People standing in the ditch in the -- I'm sorry. In the trench, as it was being dug, they were standing in water?
A. Yes, and mud and muck.
Q. Do you know how much water?
A. Oh, had to have their hip boots on. It was -- sinking in the mud, it's hard to -- it's 50 percent mud and 50 percent water, but it was horrible to work in, and that's why we had to put the gravel down -- overdig the trench, put gravel in it, so they'd even have something firm enough to set the pipe in. There was probably couple feet at times until we got everything cleaned out.
Q. Was this water that would have flowed onto the Forsgren property if the trench hadn't been dug?
A. Well, there was water going onto Forsgrens property, assuming from that same location on the east side and this intercepted it.
Q. And where was that water coming from?
A. I wish I knew.
Q. Did you see the water on the Forsgren property begin to recede after you put that drain in?
A. Immediately.
Q. And could you describe what you saw?
A. Kind of was watching it down where the old well was installed, and that low -- that location it dropped



9 inches from where we measuring it at the well casing.
Q. The water on the Forsgren property dropped 9 inches?
A. Dropped 9 inches down along the well. It wasn't that deep.
Q. Oh, in the well. In the well.
Okay. Was there water standing on the Forsgren lawn at that time?
A. Not after we got the drain in.
Q. There was before?
A. Yes.
Q. How much was before?
A. I didn't -- I didn't measure it. There was water standing on it. Maybe an average, inch and a half.
Q. And by the time you completed the drain, was that water gone?
A. Yes.
Q. Okay. Did you or anyone else discuss driving the heavy equipment across the Forsgren property with the Forsgrens?
A. Yes.
Q. And what did you discuss?
A. Permission to get the job done.
Q. And did you notice any damage caused by driving the equipment across the --



A. It undulated the lawn.
Q. And did you or anyone else discuss repairing that damage?
A. I think there was some discussion, but I don't know what was a result with it. I wasn't in on that.
Q. Someone else discussed it?
A. Yeah.
Q. The subsurface drain that you designed, does it require maintenance?
A. Yes, it does.
Q. Do you know if maintenance had been done on it?
A. No, it has not. I don't think it has been.
MS. EASTMAN: Mark this as Exhibit 21.
(Deposition Exhibit No. 21 marked for identification.)
Q. (BY MS. EASTMAN) This is a Forsgren drain revision that you prepared in November of this year -- 2005?
A. Yes, it is.
Q. And why did you prepare this?
A. One of our site visits that we noticed the drain was not functioning as well as it should have, so we took a flow meter up there to measure the flow of water to see if something was wrong. And we did notice water standing in the manhole at the upper end, which should not have



been that high. And so I came up with a recommendation of maintenance to either clean out the pipe or replace it with an open ditch.
Q. And can you show me where in that document you recommend that?
A. In the conclusion and recommendations.
Q. So you believe that maintaining the ditch and drain could have the same affect as modifying the drain?
A. Yes.
Q. Will you take a look at this. Could you tell me what that is?
A. It is a field chloride -- chlorine test that's conducted 11/2/99. It was conducted and watered -- in the drain. Sample 1 was from the spring at the spring box. Sample 2 was city waterline. Sample 3 was in a tap water in town. And sample 4 was water at one and a half miles south of town.
Q. And what was the test for?
A. To try to determine if there might be a possibility that the chlorine was leaking out of the city pipeline.
Q. And what did this show you?
A. That shows us that the treatment for the chlorine was above the site of -- and we could not -- the tests show that there was no chlorine coming from the