IN THE UNITED COURT OF FEDERAL CLAIMS

---

CLAYTA FORSGREN, et al.,

Plaintiffs,

vs. No. 04-1223L
Judge Margaret M. Sweeney

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF JANET L. MONTGOMERY
Taken in behalf of Defendant

10:58 a.m., Tuesday
February 14, 2006

PURSUANT TO NOTICE, the deposition of JANET L. MONTGOMERY was taken in accordance with the applicable Federal Rules of Civil Procedure at the offices of Bureau of Land Management, Pinedale Field Office, 432 East Mill Street, Pinedale, Wyoming, before Kathy J. Mullivan, a Registered Professional Reporter, and a Notary Public in and for the State of Wyoming.

COPY

EXHIBIT
tabbies
29
04-1223

describe the document that this refers to?
A. Okay. It's a memo dated October 12th of 1998, and it's signed by Barry, whose name is Barry Johnson. He works for me as my field person.
Q. It's a handwritten memo?
A. Handwritten memo. And response was made by Mrs. Forsgren and it was sent back to us. That date -- that is not dated, the response, though.
Q. And the memo from your office is asking whether any corrections or improvements had been made to the property?
A. Yes.
Q. And the response was that there had not been?
A. Yes.
Q. That was in 1998?
A. That was in 1998, yes.
Q. And did your office make a subsequent inquiry in 2001, excuse me?
A. In 2001 we visited there because there was a photo in the file of the property taken on that date. And I can tell you it would have been August 6th of 2001 when someone was there. And again, we observed there hadn't been any improvements to the property, to the home.
Q. Then at the -- if I'm understanding correctly from your testimony, the property was not visited in 1999



or in 2000?
A. I do not believe so, no.
Q. If you look at Exhibit 3 --
A. Uh-huh.
Q. The tax assessment for the year 1999, was 95,987?
A. Uh-huh.
Q. Can you explain what that would be based on?
A. This would have been -- once again, I just reduced it to. I felt it was still too high for what was happening. They weren't able to use the property so I reduced the assess.
Q. How were you able to know they weren't able to use the property?
A. Talking to the people, and I believe them to be honest people.
Q. Was there a record of that conversation?
A. Probably not.
Q. Is that normal procedure?
A. That's normal procedure. I do not make a record of every conversation I have with people. In fact, typically, unless I know there was some specific reason to, I do not keep records of them.
Q. Now, from 1998 to 1999, the assessment decreased by roughly $45,000; is that correct?



A. That's correct.
Q. And which is approximately a third of the value of the property?
A. Yes.
Q. Were there other events going on in the market that would cause such a large decrease?
A. No, it was strictly a matter of knowing that the property was in such poor repair and was going downhill. When a house sits vacant, it just goes downhill more rapidly than if it's occupied. And having seen the damage before, I just felt maybe I had it overvalued, and be very honest with you, I try to err on the side of the taxpayer.
Q. So in 1999, erring in the favor of the taxpayer?
A. Uh-huh. I reduced it down even further, yes.
Q. Was the -- did the taxpayer, Mr. and Mrs. Forsgren, request a specific reduction?
A. No.
Q. And the assessment in 1998 also working on $140,243 in 1998?
A. In 1998? Yes.
Q. Was that also based on a telephone conversation?
A. Probably. I can't tell you for certain. I do not remember for sure. And I'm sorry to say I did not make notes in the file. We're much better about making notes in the files these days.



Q. Actually, I may have misled you. I think in 1998 you had the memo asking if there were --
A. Uh-huh.
Q. -- any improvements made, and none were --
A. Yeah.
Q. -- and that led you to decrease the assessment by approximately $16,000 that year?
A. Yes, uh-huh.
Q. And that was a decision you made personally?
A. Yes.
Q. And it was your decision also in 1999, then, to reduce the assessment by $45,000?
A. Yes.
Q. Now, the assessment increased in 2004 to $117,000, roughly. Do you see where I'm looking?
A. Yeah, I see where you're looking, and it would have been a factor of the market, because I probably did not revisit that -- look at that specific property. This is mass appraisal and I do not look at individual properties when I set the market adjustments. Plus the factors used in this mass appraisal system, the cost of construction was going up and so that would have raised the basic cost. That on this property, where I would have had -- it would be in a certain class of property, and it had a negative adjustment for the functional obsolescence

could see better.
And the second one was in our computer digital file and we printed them out at this larger size for you.
Q. Do you know why photographs were taken in 1993?
A. It's customary that we photograph property.
Q. As part of the routine --
A. Part of the routine.
Q. -- tax assessment that year?
A. Yes. We don't always take new photos every time we go there. If everything seems about the same we don't take new photos.
Q. And --
A. Especially back then, because we were having to pay to have these developed. Now we take many more photos because it's all digital.
Q. Do you know who in your office took the photographs in 1993?
A. 1993, in looking at the handwriting, I would guess that Luanne Freeman was probably there.
Q. You're not sure?
A. But I'm not sure.
Q. In 2001 there are initials here dated beside the date 8/6/01, if you look at Exhibit 4. If you could just focus on the exhibit.
A. Okay.



Q. Are those your initials?
A. Yes, what I did is I wrote the date on it to acknowledge I wrote the date on after we printed the photo, but it is the same date that is on the photo in the file.
Q. It doesn't indicate then that you took --
A. No.
Q. You did not take the photo?
A. I did not take the photo, no. I was strictly acknowledging the fact that photo is not quite -- this one, you see, has the date. The date didn't come out when we enlarged them.
Q. Just to make the record clear, what you're saying is the original in your file has in typed written text beneath the picture the date and time, and that does not appear in the enlarged photocopy that you produced to us in this case?
A. That's correct.
Q. And so you just wrote in by hand the date and your -- and initialed?
A. Yes.
Q. Okay. I understand.
And from looking at those photographs, do you recognize the structure as the Forsgren residence at 99 Riverside Drive?



A. Yes.
Q. Since you have first met Richard A. Forsgren and Clayta Forsgren, did you have any contact with them socially?
A. No.
MR. TRAUBEN: This would be a good point to, I think, take a break, have photocopies made of the other documents that you brought with you today.
THE DEPONENT: Okay.
MR. TRAUBEN: And then we'll see if there are any follow-up questions, otherwise I would be finished, unless plaintiffs' counsel has questions.
(Deposition proceedings recessed
11:45 a.m. to 11:56 a.m.)
CROSS-EXAMINATION
Q. (BY MS. EASTMAN) I have a couple of questions I want to ask to clarify the exhibits that were shown, and the first question is Exhibit 3, I believe -- yes, Exhibit 3 --
A. Uh-huh.
Q. -- in the first column there's dates.
A. Uh-huh.
Q. And then it's followed by year-end?
A. Uh-huh.
Q. How do those -- do those dates mean anything?



A. That would be when the state backed up our computer system, is what that date refers to.
Q. Okay. So the --
A. The assessment actually would have occurred in April.
Q. Okay. And so the year end is April of every year?
A. Yes.
Q. Okay. I don't believe this was entered as an exhibit, but it's in your file and being copied now.
A. Uh-huh.
Q. This was the 1998 memorandum, handwritten. It's signed by Barry. That's one of your staff members?
A. Yes, that's correct.
Q. Was this when Barry was at the property or is this something that would be mailed to the Forsgrens?
A. He would have gone to the property and then mailed it and -- is what he would have done.
Q. Okay. So he did visit the property?
A. I do believe so. Let me change that, because this is very explicit what Barry says here, because he wrote to see if the problems had been resolved. He wrote if there's a weekday time you expect to be here, we'd be happy to visit at your convenience. We'd appreciate days notice of the time and Clayta wrote back to us that, no,

the seepage into our property from above is still causing damage, but we are trying to drill a well now, but have problems with ground being so saturated that they have to bring in three, four loads of sand and gravel to keep their equipment from sinking. So, no, Barry was not there.

Q. Okay.

A. The next time somebody actually visited was 2001.

Q. Okay. And you visited in 1997?

A. Yes.

Q. Did you visit any other times?

A. No.

Q. Okay. Thank you.

Did you visit the property -- I mean, have you ever been to the property for not professional reasons?

A. No, I haven't.

Q. You've only been there in the capacity as an assessor?

A. That's correct.

Q. Okay.

A. And possibly zoning administrator will have to look at the file to tell you the answer there.

Q. Okay. Now, by statute, you assessed the property -- or you visit the property every four years?



A. That's correct.

Q. We have photos from '93 and you visited in '97?

A. Yes.

Q. And we have photos from 2001?

A. Yes.

Q. Those are each four years apart?

A. Yes.

Q. Prior to 1993 is there any record of when those visits were made?

A. No, there isn't.

Q. Was it normal procedure to take photos prior to 1993?

A. No, it wasn't, but prior to my taking office, they did not take a lot of photos.

Q. Okay. In 1997 there were no photos --

A. No.

Q. -- taken?

Prior to 1993, were the records of the site visits?

A. No, there wouldn't have been. Prior to my taking office in 1991, they did not go on a four-year schedule at all. They might not go to a property for 10 years or more. That in the late '80s the statutes were changed to require that assessors or their staff visit properties once every four years.



Q. Okay. When they visit every four years, sometimes they take pictures and sometimes they don't?

A. That's correct.

Q. Do they write anything down?

A. If changes are made to the file -- now we take notes. Back then we were very poor about it. We learned with time.

MS. EASTMAN: I don't think I have any other questions, unless there's something in those documents.

MR. TRAUBEN: I do have a follow-up question to actually sort of a prior position that you held relating to your position as zoning administrator.

THE DEPONENT: Uh-huh.

REDIRECT EXAMINATION

Q. (BY MR. TRAUBEN) Do you know -- or can you explain to me are properties in the county zoned for a particular use? In other words, residential, commercial, et cetera?

A. Yes.

Q. And does the zoning of property relate to the topography, also?

A. If my recollection is correct, Riverside subdivision was created before there was zoning, and as a consequence, it was zoned to rural residential when zoning



was adopted. I was not the zoning administrator then, but going through the history of the zoning office, when I was in there. At that time when they adopted zoning, the existing subdivisions were all zoned to some type of residential, rural residential.

And the ag lands were also zoned for agriculture, and the public land was zoned as resource conservation. And basically it was with a broad sweep that they did this, that there are still small tracts of land that are zoned agricultural that's really used as residential on their property. You know, that's just the way it is. And they zone some properties commercial along the fringes of the towns.

Q. Are some properties zoned to be maintained in a natural state because they're not suitable for building?

A. That would be resource conservation, because resource conservation does not allow a building of residences without a variance. And exceptions to that are, I believe, Sylvan Bay, the summer home site that the Forest Service has, is zoned as resource conservation, but there's home sites within it.

Q. So that responsibility does not fall within the zoning administrator's office?

A. Of which --

Q. Regarding lands that are unsuitable for