UNITED STATES COURT OF FEDERAL CLAIMS

---

CLAYTA FORSGREN, et al.,

Plaintiffs,

vs. Case No. 04-1223L

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF PRILL MECHAM
Taken in behalf of Plaintiffs

9:00 a.m., Monday
March 27, 2006

PURSUANT TO NOTICE, the deposition of PRILL MECHAM was taken in accordance with the applicable Federal Rules of Civil Procedure at Honaker Law Offices, 214 Winston Drive, Rock Springs, Wyoming, before Ashley Davis, a Court Reporter and a Notary Public in and for the State of Wyoming.

COPY

EXHIBIT
tabbies
30
04-1223

Ponds and the Forsgren property.

A member of my staff was actually a member of the CCC Ponds Committee.

Q. And who was that?

A. Martin Hudson. He is still a member of that committee.

(Deposition Exhibit No. 4 marked for identification.)

Q. (BY MS. EASTMAN) Let's take a look at Exhibit 4. Could you tell me what Exhibit 4 is?

A. It looks like it's minutes of a meeting held on May 11, 1999.

Q. And were you present at that meeting?

A. I was present, yes.

Q. And could you tell me what was discussed at that meeting, in general?

MR. TRAUBEN: From your recollection.

A. From my recollection, what I would be able to discuss or say was that it appears as though there was a discussion of Mrs. Forsgren's property and her belief that it was caused by the recharging of the CCC Ponds. And it appears as though there was just discussion about whether there was an issue regarding that that was related to the people that were involved in the recharging of the ponds.

MR. TRAUBEN: I have to -- is that your



recollection or --

A. No. I'm just reading this. I don't remember what happened in a meeting that happened seven years ago. I'm sorry. I'm 60 years old, and I don't remember those things.

Q. (BY MS. EASTMAN) That's fine.

A. I'm just reading you what it says on these sheets.

Q. Was it discussed at this meeting whether or not the committee should pay for the drain?

A. All I can tell you is what's on these sheets.

Q. Well, why don't you take a minute to review the minutes from that meeting.

A. I still don't think I'm going to be able to remember whether at that meeting or not that happened seven years ago, whether there was a discussion about that, other than what it says here on these sheets.

Q. Okay.

MR. TRAUBEN: You can --

Q. (BY MS. EASTMAN) Was there a discussion about whether the CCC Ponds Committee should pay for the drain?

A. I see that that was talked about on these sheets.

Q. Do you remember talking about it at any time?

A. I don't remember specifically talking about it.

Q. Not specifically, even at this time, but any time



you were with the BLM, do you remember talking about that?

A. Yes, I do.

Q. Okay.

A. But I can't tell you exactly when I remember talking about that.

Q. Okay. And what did you discuss about that?

A. There was a discussion about whether paying for installation of a drain or not would implicate the BLM, NRCS, Forest Service, in terms of being the cause of the flooding on Mrs. Forsgren's property. And that discussion -- under no circumstances did any of the agencies feel as though that was the case.

Their reason for discussing -- putting in that drain -- solely was because in the original -- in the original -- what do I want to say -- construction ideas for the reconstruction of the ponds, it was suggested by the NRCS that a deep drain be put in, which was not done during the original 1994 and 1995 reconstruction of the ponds.

The reason it was not done was that there was a concern about eliminating willows up above the Forsgrens' property on the BLM land. That concern was shared by BLM and the Forsgrens. Therefore, a compromise was made and a very small shallow surface drain was put in on the Forsgrens' property instead.

So the discussion about building this drain was



related to completing the recommendations that were made in 1994, not related to anything regarding responsibility in terms of the flooding.

Q. And you said that the Forsgrens were concerned about eliminating willows?

A. Correct.

Q. And how do you know that?

A. That was what was told to me; and that, I believe, is in some documents that I don't have in my hands right now.

Q. If you look at Exhibit 2 --

A. Two?

Q. Yes.

A. Okay.

Q. Under 1994 to 1995.

A. Uh-huh.

Q. It says, "Reconstruction done," and then later in the sentence it says, "French Drain was part of original reconstruction plan."

A. Yes.

Q. "But not built because the Forsgrens asked that it not be installed because construction would destroy some of the willows just above the edge of their yard."

A. Correct.

Q. And is that where you got that information?

A. Yes.
Q. And you also said the BLM did not want to display those?
A. That's what I said.
Q. Okay. The Forsgrens never told you that?
A. No.
Q. Okay. Were different options discussed when deciding whether or not to put the drain in?
A. Yes.
Q. Okay. And what different options were discussed?
A. Not putting the drain in, putting the drain in, and -- I don't know. There may have been a third option as well.
Q. And why was it decided to put the drain in?
A. To complete the original project which had been recommended by the NRCS engineer back in 1994.
Q. You said you attended a meeting at the Forsgren property?
A. Yes.
Q. Do you remember what was discussed at that meeting?
A. I -- the only thing I recall was the -- that was discussed was the damage that had occurred to Mrs. Forsgren's property.
Q. And what damage had occurred?



A. There was some damage to the house and the foundation, as I recall. I don't recall the specifics of the discussion.
Q. Did you observe the damage?
A. I did.
Q. And what did you observe?
A. I observed some movement in the floor and some cracking around the foundation.
Q. And did you observe any damage to the property outside of the house?
A. Not really.
Q. And do you know when that meeting was?
A. No.
Q. Was there snow on the ground?
A. I don't remember.
Q. Okay. Do you remember seeing water when you were at that meeting, either on the property or in the house?
A. I never saw water in the house.
Q. Did you look in the crawl space at all?
A. I don't recall seeing any water in the crawl space.
Q. Do you know if you looked in the crawl space?
A. I remember looking in the crawl space. I just don't remember what I saw. I don't recall seeing water.
Q. And did you see water on the property anywhere



else?
A. I -- there was one time when I was there where I did see water on the property, yes.
Q. Do you know when that was?
A. No.
Q. And where was the water that you saw?
A. It would have been on the side of the house that paralleled the BLM boundary.
Q. And how much water did you see there?
A. A couple of inches.
Q. Do you think that was in 1999?
A. I have no idea.
Q. Okay. You said that you had been to the Forsgren property three times; once in 1999 for a meeting, once in 1999 during the ditch construction, and again in 2005?
A. Yes.
Q. You don't know which of those three times you saw that?
A. No.
Q. Okay. Let's go off the record.
(Recess taken 9:50 a.m. to 9:58 a.m.)
MS. EASTMAN: Let's go back on the record.
MR. TRAUBEN: Okay.

(Deposition Exhibit No. 8 marked for



identification.)
Q. (BY MS. EASTMAN) Mrs. Mecham, will you take a look at Exhibit 8?
A. Okay.
Q. And tell me if this is the geological report we were referring to earlier.
A. Yes, it is.
Q. Okay. And did you ask Mr. Howland to prepare this?
A. No, I didn't. He just prepared it and gave it to me as information.
Q. Okay. And will you take a look at Exhibit 4? Those are the meeting minutes we were talking about.
A. Okay.
Q. On the third page.
A. All right.
Q. The first full paragraph, about halfway through that paragraph, there's a sentence that says "We are only ..." It begins "We are only..."
A. Okay.
Q. Can you read me that sentence?
A. "We are only admitting that the CCC Ponds could possibly have exacerbated previously existing problems."
Q. Okay. What was meant by that statement?
A. I have no idea.

Q. What previously existing problems were referred to?
A. I don't know. I didn't write these minutes, and I don't know who made that statement.
Q. Okay. At any of the meetings you attended on the CCC Ponds project or the Forsgren property, did you tell Mr. or Mrs. Forsgren that if they were to go ahead and sue the government, they would die before a suit could be resolved?
A. No. I never heard that statement.
Q. Okay. So you didn't say it?
A. No.
Q. You never heard anybody else say that?
A. No.
Q. Okay. Did you ask Mrs. Forsgren to sign a waiver of liability waiving the government's liability?
A. No. No, not specifically.
Q. Okay. What do you mean "not specifically"?
A. We discussed with the Forsgrens that what we were doing was only completing the project that was originally designed in 1994 and that that was the only reason why we were doing that project. And we asked Mrs. Forsgren to sign a piece of paper that she understood that that was the reason and that it was not because of any involvement in the -- what was going on with her property with the water.



Q. And did she sign that?
A. Yes. We have a letter from Mister -- that came from Mr. Gerald Mason's office.
Q. But was it a different form?
A. Pardon me?
Q. That wasn't the form that you asked her to sign?
A. I don't know about a form that we asked her to sign. There was a letter that came from Mr. Mason's office.
Q. Did you talk to Mr. Mason about that letter?
A. I did.
Q. What did you talk to him about?
A. Basically, I explained to him what the purpose was of our talking about installing the drain and that it was not -- we wanted to make it very clear that the purpose was solely to complete the project as originally designed in 1994.
Q. Ms. Mecham, what was your involvement with the environmental assessment for the subsurface drain that was put in in 1999?
A. Can you repeat the question? I didn't hear.
Q. What was your involvement in the environmental assessment for the subsurface drain that was put in on government property in 1999?
A. I signed it.



Q. Did you have any duty in preparing it?
A. No, I -- no. My staff and the Forest Service actually prepared the environmental document.
(Deposition Exhibit No. 6 marked for identification.)
Q. (BY MS. EASTMAN) Will you take a look at Exhibit 6?
A. I have it.
Q. Is that the environmental assessment you're referring to?
A. Correct.
Q. Do you contend that the Forest Service prepared this?
A. Actually, no. Forest Service did not prepare it.
Q. Okay.
A. BLM prepared it.
Q. Okay. And on the last page is your signature?
A. That's correct.
Q. Did you review this before you signed it?
A. Did I what?
Q. Did you review the environmental --
A. Yes, I did.
Q. Okay. And your signature on there, what does that indicate?
A. I'm the authorized officer.



Q. Okay. Does that mean that you --
A. Means I have reviewed the document and found no significant impact.
MR. TRAUBEN: Just let her finish her question before you --
A. Oh, sorry.
Q. (BY MS. EASTMAN) Does that mean you agreed with the findings of the environmental assessment?
A. Correct.
(Deposition Exhibit No. 5 marked for identification.)
Q. (BY MS. EASTMAN) And will you take a look at Exhibit 5?
MR. TRAUBEN: Okay. She just has that now.
Q. (BY MS. EASTMAN) Is that your handwriting on this exhibit?
A. No, it is not.
Q. Do you know whose handwriting that is?
A. No, I don't.
Q. Okay. Did you suggest any changes to an environmental assessment before it was finalized?
A. I don't recall.
Q. Exhibit 5 looks -- appears to me to be a draft of the environmental assessment; is that correct?
MR. TRAUBEN: I'll object to the -- that it