IN THE UNITED COURT OF FEDERAL CLAIMS

---

CLAYTA FORSGREN, et al.,

Plaintiffs,

vs. No. 04-1223L
Judge Margaret M. Sweeney

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF ROB DOYLE
Taken in behalf of Plaintiffs

2:04 p.m., Thursday
February 16, 2006

PURSUANT TO NOTICE, the deposition of ROB DOYLE was taken in accordance with the applicable Federal Rules of Civil Procedure at the offices of Bureau of Land Management, Pinedale Field Office, 432 East Mill Street, Pinedale, Wyoming, before Kathy J. Mullivan, a Registered Professional Reporter, and a Notary Public in and for the State of Wyoming.

COPY

EXHIBIT
tabbies
31
04-1223

A. I was the person right next to the bucket as it was digging the trench. We would dig down approximately 3 to 4 feet from the ground surface down. I took elevation measurements as we -- as we progressed from the creek up, and -- and as we -- as we would get elevationwise as deep as -- as the plan was, then we would put in gravel followed by a 6-inch diameter PVC pipe, followed by some more gravel. And then we'd take the next stretch and continued to laying it and then they backfilled behind us.
Q. When the backhoe dug down into the ground, did you see water?
A. Oh, yes, yes. I was standing in -- let's see, if the hole at the spot where I was standing was 3 foot deep, then I was probably about 2 and a half feet deep in water and mud and muck.
Q. And do you know where that water was coming from?
A. Everywhere. Specifically I couldn't tell you, no. It was -- it was real wet.
Q. And after the pipe was laid --
A. Uh-huh.
Q. -- was water running through the pipe?
A. Yes.
Q. And do you know where that water was coming from?



A. From out of the trench where we laid that pipe, it was a perforated pipe, so the design was the water would then flow into the perforations and out the lower end of the pipe into Pine Creek, and the pipe was running full.
Q. Running full. About how much would you say that is?
A. Oh, it was at least 1 CFS of water flowing out of the end of that pipe.
Q. 1 cubic foot per second?
A. Yes.
Q. And before the backhoe dug into the ground to create the trench, was there water on top of the ground?
A. Yes.
Q. About how much water?
A. Just standing water. It was puddles.
Q. Puddles? So not 2 and a half feet worth of water?
A. No.
Q. Do you know why this drain was put in?
A. That there had been a small ditch dug on the -- would have been on the west side of that fence on the Forsgren property previously, approximately 1 foot wide in the top and, hmm, maybe a half a foot deep in the deepest, as I recall, at the bottom of the ditch. It was a small



ditch that had been dug and it hadn't done the job, so we were putting in subsurface drain. It hadn't carried all the water off the property.
Q. It's when you say it hadn't done the job, you mean it hasn't carried the water off the property?
A. It hadn't carried the water off the property.
Q. Do you know why there was water on the Forsgren property?
A. Because it's a wetland.
Q. Do you know where the water on the Forsgren property had come from?
A. No.
Q. And when you say because it's a wetland, what do you base that on?
A. The criteria for a wetland are that there -- the plants, the soil and the hydrology of the water, there are wetland plants, the willows, there's -- the soil is a wetland soil that has iron in it and it's a hydric soil, it's a wetland soil, it smells, and there's water present.
Q. Did you see any willows on the Forsgren property?
A. Yes.
Q. Where?
A. On the -- on the south property line. Along the south property line.



Q. The south property line?
A. Yes.
Q. Which -- the drain you dug or helped dig, what property line was that near?
A. It would have been near their east property line. It would have been -- it was -- it runs north-south along the east property line.
Q. So the willows that you saw were on the south property line?
A. Uh-huh.
Q. Could you explain to me was there anything located near them to give me a reference point?
A. There -- the driving -- the entryway, when you drive in on the Forsgrens' property, there -- the house is on the north side of it and there were willows on the south.
Q. So on the other -- on the south side of the driveway?
A. Yes.
Q. Okay. And do you know if that was the Forsgren property or are you assuming that was the Forsgren property?
MR. TRAUBEN: Objection to the form.
Q. (BY MS. EASTMAN) Do you know if those willows were definitely located on the Forsgren property?