**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CLAYTA FORSGREN, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 04-1223 L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Chief Judge Margaret Sweeney |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION PURSUANT TO 28 U.S.C. § 1500, AND PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT ON THE STATUTE OF LIMITATIONS**

**ELECTRONICALLY FILED MAY 26, 2006**

## TABLE OF CONTENTS

LIST OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A. Plaintiffs' Opposition to Defendant's Motion to Dismiss - 28 U.S.C. § 1500 Does Not Bar Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

2. The Plaintiffs' claim was not pending in the District Court . . . . . . . . . . . 9

3. Defendant has not had to defend two lawsuits at the same time . . . . . . . 10

4. The District Court did not even have jurisdiction to hear the complaint . 13

a. Tort claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

b. Constitutional claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

c. Punitive damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

B. Plaintiffs' Claim Is Not Barred By the Statute of Limitations . . . . . . . . . . . . . . 16

1. The extent of the damage was not foreseeable until the flooding stopped in 1999 and a final account could be struck . . . . . . . . . . . . . . . . . . . . . . . . . 17

2. Defendant continued to offer "help" to Plaintiffs until completion of the subsurface drain in 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## TABLE OF AUTHORITIES

**CASES** **PAGE NO.**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986) . . . . . . . . . . 17

Applegate v. United States,
25 F.3d 1579, 1583 (Fed. Cir. 1994) . . . . . . . . . . 23

Banks v. United States,
314 F.3d 1304, 1309 (Fed. Cir. 2003) . . . . . . . . . . 23

Barnes v. United States,
538 F.2d 865 (Cl.Ct. 1976) . . . . . . . . . . 18-20

City of Newport v. Fact Concerts, Inc.,
453 U.S. 247, 263 (1981) . . . . . . . . . . 16

Firebaugh Canal Water District v. United States,
2006 WL 950205 (Fed. Cl. March 29, 2006) . . . . . . . . . . 12

Forsgren v. United States,
64 Fed.Cl. 456, 458 (2005) . . . . . . . . . . 17, 18, 20, 23, 26

Harbuck v. United States,
58 Fed. Cl. 266 (2003) . . . . . . . . . . 12

Keene Corp. v. United States,
508 U.S. 200 (1993) . . . . . . . . . . 12

Loveladies Harbor, Inc. v. United States,
27 F.3d 1545 (Fed. Cir. 1994) . . . . . . . . . . 12

McNeil v. United States,
508 U.S. 106, 113 (1993) . . . . . . . . . . 14

Pardozi v. Cullman Medical Center,
702 F.Supp. 852 (N.D. Ala. 1988)
rev'd on other grounds, 896 F.2d 1313 (11th Cir. 1990) . . . . . . . . . . 10

United States v. Dickinson,
331 U.S. 745 (1947) . . . . . . . . . . 18-20

**CASES cont.** **PAGE NO.**

UNR Industries, Inc. v. United States,
962 F.2d 1013, 1018-19 (Fed. Cir. 1992) . . . . . . . . . . 11

**STATUTES**

5 U.S.C. § 702 . . . . . . . . . . 15

28 C.F.R. § 14.2 . . . . . . . . . . 14

28 U.S.C. § 1346(a)(2) . . . . . . . . . . 15

28 U.S.C. § 1491 . . . . . . . . . . 20

28 U.S.C. § 1500 . . . . . . . . . . 9, 10, 16

28 U.S.C. § 2401(b) . . . . . . . . . . 14

28 U.S.C. § 2674 . . . . . . . . . . 16

28 U.S.C. § 2675 . . . . . . . . . . 13, 14

28 U.S.C. §§ 1346(a)(2), 1491(a)(1) . . . . . . . . . . 15

**RULES & REGULATIONS**

Fed. R. Civ. Pro. 3 & 4 . . . . . . . . . . 9, 10

U.S.D.C.L.R. 4.1(b) . . . . . . . . . . 10

**OTHER AUTHORITIES**

81 Cong. Globe, 40th Cong., 2d Sess. 2769 (1868) . . . . . . . . . . 11

## LIST OF EXHIBITS

| EXHIBIT # | EXHIBIT DESCRIPTION |
|---|---|
| 1 | Excerpts of Deposition Transcript of Clayta Forsgren |
| 2 | Excerpts of Deposition Transcript of Van Huffman |
| 3 | Excerpts of Deposition Transcript of Troy Thompson |
| 4 | Excerpts of Deposition Transcript of Barbara Thompson |
| 5 | Excerpts of Deposition Transcript of Lance Hager |
| 6 | Letter from Larry Kirkpatrick dated December 1, 1999 |
| 7 | Excerpts of Deposition Transcript of David Harper |
| 8 | Handwritten Letter from Daryle Bennett |
| 9 | Excerpts of Deposition Transcript of Daryle Bennett |
| 10 | Excerpts of Deposition Transcript of John Kershisnik |
| 11 | Excerpts of Deposition Transcript of Dean Forsgren |
| 12 | Excerpts of Deposition Transcript of Richard Forsgren |
| 13 | Excerpts of Deposition Transcript of Dale Thompson |
| 14 | Excerpts of Deposition Transcript of Jack Cain |
| 15 | Excerpts of Deposition Transcript of Jerry Tulley |
| 16 | Excerpts of Deposition Transcript of Greg Hager |
| 17 | Excerpts of Deposition Transcript of Stan Mitchem |
| 18 | CCC Ponds Meeting Minutes December 11, 1995 |
| 19 | CCC Ponds Meeting Minutes January 16, 1997 |
| 20 | Jerry Tulley Notes |

| **EXHIBIT #** | **EXHIBIT DESCRIPTION** |
|---|---|
| 21 | CCC Ponds Meeting Minutes February 12, 1999 |
| 22 | CCC Ponds Meeting Minutes May 11, 1999 |
| 23 | Estimates for Alternatives |
| 24 | Excerpts of Deposition Transcript of John Doyle |
| 25 | Letter from Daryle Bennett dated July 19, 1999 |
| 26 | Notice of Impending Dismissal |
| 27 | Plaintiffs' Tort Claim |
| 28 | Letter Responding to Tort Claim |
| 29 | Excerpts of Deposition Transcript of Janet Montgomery |
| 30 | Excerpts of Deposition Transcript of Prill Mecham |
| 31 | Excerpts of Deposition Transcript for Rob Doyle |
| 32 | Environmental Assessment for Subsurface Drain |
| 33 | Docket for Forsgren v. United States, No. 3-CV-1040-B (D. Wyo.) |

## I. INTRODUCTION

In 1966, Clayta and Richard "Dick" Forsgren bought a piece of property in Pinedale, Wyoming on which to build a second home. Compl. ¶ 16. From 1966 to 1971, they visited the property mostly in the summer on the weekends. C. Forsgren Dep. at 58:2-3 (relevant excerpts attached hereto as "Ex. 1"). During this time, they stayed in a trailer located on the property. Id. at 58:5-6, 59:7-17. In 1971 and 1972, the Forsgrens built a home on the property. Id. at 54:10-12, 21; Huffman Dep. at 12:24-25 to 13:1-12 (relevant excerpts attached hereto as "Ex. 2").

This home was to be their weekend retreat and, eventually, their retirement home. Ex. 1 62:16-23; T. Thompson Dep. at 12:19-21 (relevant excerpts attached hereto as "Ex. 3"). The Forsgren family used the home year-round on the weekends, visiting with family and friends, adding to the house, and cultivating a beautiful yard. Ex. 1 at 62:16-23 (visited every weekend throughout the year), 63:24-25 to 64:1-4 (in 1975, a garage and game room were added; in 1976, the kitchen was expanded), 110:7-12; B. Thompson Dep. at 9:1-8 (relevant excerpts attached hereto as "Ex. 4"); L. Hager Dep. at 5:23-25 to 6:1 (relevant excerpts attached hereto as "Ex. 5"). They used and enjoyed the home for almost 25 years with no problems.

The home is now damaged beyond repair. Letter from Larry Kirkpatrick (attached hereto as "Ex. 6"). As explained by David Harper, a Bureau of Land Management ("BLM") employee who visited the property in 1988 and again after his retirement from the BLM in 1999, "this was night and day difference between when I was there in '88 and '99, 11 years later." Harper Dep. at 39:7-8 (relevant excerpts attached hereto as "Ex. 7"). After being married for nearly 50 years, Mr. Forsgren has now passed away and Mrs. Forsgren, nearing 80 years old, is spending her retirement years fighting for the place she planned to be relaxing.

In 1993, the BLM and Forest Service ("FS") began planning a project located on federal land adjacent to the Forsgren property. Complaint ¶ 25. The federal agencies planned to modify and refill some Civilian Conservation Corps Ponds ("CCC Ponds") that were originally built in the 1930s but had fallen into disuse. See Defendant's Exhibit 1 at I-1 to I-2. The CCC Ponds are located approximately 1,000 feet from the Forsgrens' property boundary. Complaint ¶¶ 10, 16.

In their planning process, the federal agencies recognized that the CCC Ponds project may affect adjacent property. See Defendant's Exhibit 1 at I-4 ("Goal – Restore water to old ponds without increasing ground water elevation to a level that will flood adjacent private property."). The agencies were aware from the outset of this project that one associated impact could be seasonal flooding of the neighboring properties. The Environmental Assessment ("EA") issued by the federal agencies in April of 1994, in conjunction with its obligations under the National Environmental Policy Act ("NEPA"), specifically identified seasonal flooding and elevated groundwater levels as a significant issue, to be addressed through monitoring and mitigation efforts. See Defendant's Exhibit 1 at II-3.

Due to these concerns, three monitoring wells were put in to monitor the groundwater levels. See Defendant's Exhibits 8 & 9. Throughout the years, the federal agencies claimed that these wells proved they did not cause the flooding. See Defendant's Exhibit 17. However, in 1999, Daryle Bennett, an employee of the federal Natural Resources Conservation Service ("NRCS"), the person in charge of the monitoring well program, reversed direction and stated:

> I again looked over the monitoring well records and noted that I'd never recorded dry wells on BLM (#2 or #3) after April, 1995. Both wells seemed to maintain a pretty stable water table, at ~ 3 ft below ground surface from July '95 till Aug 1, 1997 when I stopped monitoring. . . . The fact that water tables have remained

> quite steady since the summer of '95 may indicate that there may be a correlation with the filling of the ponds. I had previously judged there not to be & attributed the lower water table in '94 & early '95 to weather conditions (drought). . . .

Letter from Daryle Bennett (attached hereto as "Ex. 8"); Bennett Dep. at 80:16-19 (relevant excerpts attached hereto as "Ex. 9").

Defendant seems to claim, although it has no relation to the issues raised in either its motion to dismiss or its motion for summary judgement, that a 1988 letter written by Dick Forsgren, a 1988 letter to the editor written by Dick Forsgren, and 1993 comments by Dick Forsgren made at a CCC Ponds meeting show that there was already water on the Forsgren property prior to refilling of the CCC Ponds. Defendant's Memorandum at 2-4. However, Dick Forsgren had a tendency to exaggerate the truth to get the things he wanted accomplished. As explained by his wife Clayta Forsgren, Dick "wanted to get attention to have something done about the problem behind [the Forsgren property]." Ex. 1 at 146:11-13. "He thought that would probably – probably thought that would bring some response and he could get someone up there and then he would show them the water in the – on the BLM land and try to get them to do something about it." Ex. 1 at 147:14-18. According to Mrs. Forsgren, "There was no water under our house or under our property, and I can only assume that my husband was under such duress, because he wanted something done, concerned that after the ponds went in we would be flooded. I have no idea why he would make that statement, because there was no water under our house, on our property ever [prior to the refilling of the CCC Ponds]." Ex. 1 at 115:25 to 116:1-5. Van Huffman, a member of the Highland Irrigation District in 1988, also received Dick Forsgren's letter and thought it was partially Mr. Forsgren blowing off steam. Ex. 2 at 34:11-13.

In fact, the evidence shows that no one, not even any federal government officials, saw water or ice on the Forsgren property prior to 1995. Ex. 1 at 61:13-15 (no water from 1967-1971), 62:12-13 (no water from 1971-1973), 76:6-11 (no water prior to 1995); Ex. 3 at 9:18-21; Ex. 5 at 6:1-2, 9:13-15; Kershisnik Dep. at 8:18-20 (relevant excerpts attached hereto as "Ex. 10"); D. Forsgren Dep. at 15:8-13 (relevant excerpts attached hereto as "Ex. 11"); R. Forsgren Dep. at 13:20-22 to 14:1-3, 15:20-22 to 16:1-10 (relevant excerpts attached hereto as "Ex. 12"); D. Thompson Dep. at 7:23-25 to 8:1-9 (relevant excerpts attached hereto as "Ex. 13"); Ex. 4 at 10:14-16; Cain Dep. at 9:23-25 to 10:1-8, 12:20-25 (relevant excerpts attached hereto as "Ex. 14"); Tulley Dep. at 9:5-7 (relevant excerpts attached hereto as "Ex. 15"); Ex. 9 at 48:18-23. Prior to 1995, the drains seen on the property were in disuse. Ex. 3 at 11:2-10, 16:11-14; Ex. 5 at 13:20-21; Ex. 15 at 90:17-22 to 91:1-8. Prior to 1995, there was no water in the crawl space under the house. G. Hager Dep. at 15:21-25 to 16:1-9 (relevant excerpts attached hereto as "Ex. 16"); Ex. 3 at 14:3-5; Ex. 7 at 34:10-12. Prior to 1995, there was no damage to the yard. Ex. 14 at 16:19-24; Ex. 1 at 108:24-25 to 109:1-2; Ex. 15 at 8:15-19; Ex. 7 at 37:12-15. Prior to 1995, there was no damage to the house. Ex. 1 at 109:3-6; Ex. 15 at 11:18-22 to 12:1.

David Harper, a BLM employee, visited the Forsgren property in 1998, just two weeks before Mr. Forsgren's letter claimed that he had three inches of water in his garage and water in his basement. See Defendant's Exhibit 3; Ex. 7 at 20:2-7. "What [Mr. Forsgren] wrote in that [1988] letter I did not see on that property." Ex. 7 at 35:12-13. Mr. Harper explained:

> Dick was claiming that water was coming down off the hill and effecting his house at the time, but I didn't see that. That was not the conclusions that I drew. He asked me to look under his house. As I recall there was a hole or a door in the back of the house towards the hillside on the east side and I looked in there. I didn't see anything that would indicate water damage to me. And I didn't notice any – to the best of my recollection, I did not notice any wet under the house. I

> felt that Dick wanted the BLM to dig a ditch to prevent water from coming onto his house, but I didn't see that as being an immediate threat, although I think Dick may have been looking down the line a little bit and playing his cards a little close to his chest.

Id. at 20:17-25 to 21:1-5. "Dick was telling me one thing out there and what I was seeing was different." Id. at 36:5-6.

David Harper confirmed what other family members and visitors to the property saw – there was no water on the Forsgren property prior to the CCC Ponds being refilled; rather what Mr. Forsgren was concerned with was the marsh water located behind his house on the adjacent federal property. Ex. 3 at 9:22-25 to 10:1-22, 15:8-18; Ex. 1 at 112:17-25 to 113:1-9, 120:22-25 to 121:1. This water on the federal property became stagnant and caused a bad odor that would emanate onto the Forsgren's property and was a breeding ground for mosquitos. Id. Mr. Forsgren exaggerated the problem in order to get the federal agencies to do something about it.

The Forsgrens did not have water on their property until September of 1995, just months after the CCC Ponds were refilled. See Defendant's Exhibit 11; Complaint ¶ 33. At that point, the Forsgrens began to notice water on their back lawn. Ex. 1 at 75:12-16. The NRCS came to investigate. See Defendant's Exhibit 9. Based upon that investigation, the state geologist found two possible causes of the water: (1) groundwater directly connected to Pine Creek, and (2) surface water "[s]eepage from the stratified terrace sands and gravels in the willow area." Id. at 2. The state geologist recommended that the problem be solved by installing a subsurface drain on BLM and FS land. Defendant's Exhibit 9 at 2; Mitchem Dep. at 18:23-25 to 19:1 (relevant excerpts attached hereto as "Ex. 17"); Ex. 9 at 62:21-23. However, the subsurface drain recommendation was not acceptable to the BLM, so the federal agencies agreed to fund and design a surface drain to be located on the Forsgren property. Id., Minutes from December 11,

1995 meeting (attached hereto as "Ex. 18"); Ex. 9 at 51:25 to 52:1-4. This drain froze the first winter after it was installed. Minutes from January 16, 1997 meeting (attached hereto as "Ex. 19").

> After 1995, the flooding persisted, progressing each year:
> Every year the water moved further. The first year it moved to the back of the house, the second year it moved to the middle of the house, the third year it was at the front of the house, the ice and water. And by the time I –they decided to dig the ditch to help me, it was running through my sister's butt [sic] fence. It was going into her yard.

Ex. 1 at 77:21-25 to 78:1-2. In February, 1999, Mrs. Forsgren, visiting her house for the first time since her husband had passed away, found it difficult to get in the house due to the ice.[1] Ex. 1 at 77: 1-6. Mrs. Forsgren wrote a letter to the BLM asking for additional help. Defendant's Exhibit 18. In June, 1999, she amended part of this letter. In her deposition, Mrs. Forsgren explained the reasons for this amendment: ". . . I didn't have a copy of the letter and I wanted to clarify that at some time maybe somebody was up there and some snow melted. It melts on my lawn in Rock Springs and I get little puddles of water." Ex. 1 at 107:14-18. She also explained that she "was not aware of a [the 1988] letter that [Dick Forsgren] wrote and so I didn't know that when I wrote this [the February 11, 1999] letter. [See Defendant's Memorandum at 7]. And I was stunned when I – when my lawyer – it was produced, because I had no idea he had written

---

[1] Note that the Forsgrens and the federal agencies' efforts to rectify the situation were briefly interrupted in 1997 and 1998 due to the death of Dick Forsgren. Specifically during that time, Dick and Clayta Forsgren were unable to travel to the property due to his severe illness and impending death. Dick Forsgren passed away in 1998. Clayta Forsgren was severly distraught for sometime after and returned to the property when she was first able to in the winter of 1999. Ex. 1 at 73:13-16. Although the Defendant's attempt to opine that this "year and a half of silence" somehow bolsters its statute of limitations argument, Defendant's Memorandum at 17, the fact is that during this year and one half, Mrs. Forsgren was trying to work with the doctors to save her husband's life then grieving over the loss of her husband of nearly 50 years. Id.

it. At that time he was in no condition to be – so I – I – I only knew what he – what we knew together, and I assumed that was what he was telling them." Id. at 109: 24-25 to 110:1-5.

The NRCS, BLM, and FS immediately responded to Mrs. Forsgren's February, 1999 complaints with meetings and discussions of alternatives to help with Mrs. Forsgren's problem. Tulley Notes (relevant excerpts attached hereto as "Ex. 20") at 6 (meeting on February 12, 1999 "ended with a mutual promise by the present authorities to remedy the problems"); id. at 7 (early Spring 1999 meeting "Mrs. Forsgren was assured that there certainly was a water problem and that a proper drainage system to intercept the CCC pond water would be constructed as soon as survey work was complete and they had a few nice days."); Notes of meeting on February 12, 1999 (attached hereto as "Ex. 21"); Minutes May 11, 1999 meeting (attached hereto as "Ex. 22"); Estimates for alternatives (attached hereto as "Ex. 23"); J. Doyle Dep. at 72:3-4 (relevant excerpts attached hereto as "Ex. 24") ("I may have made an obligation to try and help alleve the problem"); Daryle Bennett letter July 19, 1999 (attached hereto as "Ex. 25") ("Hopefully, this problem is moving toward solution in the near future.").

A subsurface drain was constructed on BLM and FS land in November, 1999 at the federal agencies' expense. Ex. 9 at 52:5-9. This drain worked; it stopped the flooding of the Forsgren property. Ex. 15 at 42:20-22 to 43:1-9; Ex. 24 at 90:24-25 to 91:1-17. When there was no longer water on the Forsgren property, the Forsgrens were able to assess the damage done. Ex. 6.

## II. ARGUMENT

### A. Plaintiffs' Opposition to Defendant's Motion to Dismiss - 28 U.S.C. § 1500 Does Not Bar Jurisdiction

#### 1. Procedural Background

On July 28, 2003, Plaintiffs, through the counsel of Peter Young of Schwartz, Bon, Walker & Studer, L.L.C., filed a complaint in the United States District Court for the District of Wyoming (hereinafter District Court). Complaint in Forsgren v. United States, No. 3-CV-1040-B (D. Wyo. filed July 28, 2003) (attached to Defendant's motion as Exhibit 21). This Complaint was never served on any of the defendants in that case. Shortly thereafter, Plaintiffs became aware that Mr. Young was not pursuing the case and was, in fact, misleading Plaintiffs about the status of the case. After finding out the true status of their case, Plaintiffs contacted current counsel at Budd-Falen Law Offices and additionally contacted Mr. Young to request that he dismiss his complaint. Mr. Young did not take the action requested by the Forsgrens. However, neither was any action taken by the Defendant. Specifically, Defendant did not file either an answer or motion to dismiss the District Court complaint. Rather, no action on the part of any party other than the filing of the District Court complaint was ever taken in that case. Thus, Plaintiffs did not pursue, and Defendant did not defend, either the jurisdictional issues or the merits of the District Court litigation.

On February 18, 2004, the Wyoming District Court issued a "Notice of Impending Dismissal," in Forsgren v. United States, No. 3-CV-1040-B (D. Wyo. filed Feb. 18, 2004) (attached hereto as Ex. 26). This notice stated that pursuant to Local Rule 41.1(b), the case would be dismissed for lack of prosecution. Id. This district court rule states: "If no action has been taken in any case by a party for three (3) months or the case is not at issue by that time, the Court

shall direct the Clerk of Court to notify counsel of record . . . that the case shall be dismissed for lack of prosecution thirty (30) days from the date of said notice. . . ." Local Rule 41.1(b). The Defendant did not respond to this notice. However, despite the mandatory local rule, the District Court waited until August 16, 2004, approximately six months rather than 30 days to dismiss the case. See Defendant's Exhibit 22. On July 27, 2004, 20 days prior to the District Court's final dismissal (although well after the Notice of Impending Dismissal was filed, Plaintiffs filed the instant complaint in this Court. Because (1) the District Court case was not "pending," (2) the District Court did not even have jurisdiction to hear the case and (3) certainly because the Defendant was never forced to defend the same litigation in two forums, 28 U.S.C. § 1500 does not require dismissal of the instant complaint.

**2. The Plaintiffs' claim was not pending in the District Court**

The statute that Defendant claims divests this Court of jurisdiction reads: "The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States . . . ." 28 U.S.C. § 1500 (emphasis added). Plaintiffs' suit was not pending in the District Court at the time they filed the complaint in this case.

In order to file suit in the United States District Court for the District of Wyoming, a plaintiff must: (1) file a complaint; and (2) serve the complaint on the defendants together with a summons. Fed. R. Civ. Pro. 3 & 4. "The summons shall be signed by the clerk, bear the seal of the court, identify the court and the parties, be directed to the defendant, and state the name and address of the plaintiff's attorney. . . ." Fed. R. Civ. Pro. 4. "Upon or after filing the complaint, the plaintiff may present a summons to the clerk for signature and seal." Id.

"The plaintiff is responsible for service of a summons and complaint within the time allowed under subdivision (m). . . ." Id. The United States is served by delivering a copy of the summons and complaint to the United States attorney in the district where the action was brought and the Attorney General of the United States. Id. "Every party causing a summons . . . to be served shall file the return of service with the Clerk of Court immediately following receipt thereof from the process server, and no later than within the time during which the person served must respond to the process." U.S.D.C.L.R. 4.1(b); see also Fed. R. Civ. Pro. 4 (allowing 120 days for service).

Although a complaint was filed, no summonses were ever issued in this case. See Docket for Forsgren v. United States, No. 3-CV-1040-B (D. Wyo.) (attached hereto as Ex. 33). Additionally, the complaint was never served on the Defendant. Id. Nothing occurred in this case other than the filing of a complaint and a dismissal. Id. No action was ever pending against the Defendant because it was never served with a complaint which it was required to answer[2].

**3. Defendant has not had to defend two lawsuits at the same time**

Additionally, 28 U.S.C. § 1500 should not require this complaint be dismissed because the purposes of the statute have not been violated. The dual purposes of 28 U.S.C. § 1500 are (1) "to force plaintiffs to choose between pursuing their claims in the Court of [Federal] Claims or in another court," and (2) to "protect the United States from having to defend two lawsuits over the

---

[2] At most the district court action was only "provisionally" commenced, pending service of the complaint. If the complaint is not served on the defendant within the time period set forth in the rules, the complaint shall be dismissed without prejudice. Pardozi v. Cullman Medical Center, 702 F.Supp. 852 (N.D. Ala. 1988) rev'd on other grounds, 896 F.2d 1313 (11th Cir. 1990). In this case, the time limitation for service ran long before the instant Complaint was filed and properly served thus the case was never pending.

same matter simultaneously." UNR Industries, Inc. v. United States, 962 F.2d 1013, 1018-19 (Fed. Cir. 1992). As explained by the Federal Circuit using the words of the original author of the bill, "the claimants would not be able to 'put the Government to the expense of beating them once in a court of law' and then try the question again in the Court of Claims." Id. at 1018 (citing 81 Cong. Globe, 40th Cong., 2d Sess. 2769 (1868)). In other words, § 1500 prevents a plaintiff from requiring the government to go to the "expense" of litigating the same matter twice.

As explained above, Plaintiffs had chosen the Court of Federal Claims over the District Court, and had, in fact, asked their former attorney Mr. Young to dismiss the District Court complaint shortly after he had filed it. No summonses were issued and the District Court complaint was never served on the Defendant, so it did not have to defend against it. Thus, the United States has not at any time had to defend against two lawsuits concerning the flooding of the Forsgren property. The United States, in fact, did not do anything in the District Court case, as it was never served, never entered an appearance, never filed an answer, never filed a motion. Ex. 33.

The words of the Federal Circuit in Loveladies Harbor, although dealing with claims for different relief as opposed to the situation at hand, are pertinent:

> Litigation can serve public interests as well as the particular interests of the parties. The nation is served by private litigation which accomplishes public ends, for example, by checking the power of the Government through suits brought under the APA or under the takings clause of the Fifth Amendment. Because this nation relies in significant degree on litigation to control the excesses to which Government may from time to time be prone, it would not be sound policy to force plaintiffs to forego monetary claims in order to challenge the validity of Government action, or to preclude challenges to the validity of Government action in order to protect a Constitutional claim for compensation. Section 1500 was enacted to preclude duplicate cotton claims–claims for money damages–at a time when *res judicata* principles did not provide the Government with protection against such "duplicative lawsuits." Whatever viability remains in § 1500, absent

> a clear expression of Congressional intent we ought not extend the statute to allow the Government to foreclose non-duplicative suits, and to deny remedies the Constitution and statutes otherwise provide.

Loveladies Harbor, Inc. v. United States, 27 F.3d 1545 (Fed. Cir. 1994) (citation omitted).

The cases cited by the Defendant in its Motion to Dismiss do not directly apply to the facts at hand. Rather, the cases cited by the Defendant all involve a situation in which the federal government actually had to defend itself in multiple suits at the same time. See, e.g., Keene Corp. v. United States, 508 U.S. 200 (1993) (involving a case that was filed in the U.S. District Court, then the Court of Federal Claims, then dismissed from the U.S. District Court, then re-filed in the U.S. District Court, then a second suit filed in the Court of Federal Claims, and then dismissed from the U.S. District Court); Loveladies Harbor, Inc. v. United States, 27 F.3d 1545 (Fed. Cir. 1994) (involving a case filed in Court of Federal Claims while an appeal was pending to the Third Circuit); Firebaugh Canal Water District v. United States, 2006 WL 950205 (Fed. Cl. March 29, 2006) ("The present lawsuit is only one of several administrative or judicial proceedings plaintiffs have brought arising from these circumstances," involving a case that when filed in the claims court had five amended complaints filed in the U.S. District Court, had been appealed to the Ninth Circuit once, partially dismissed several times, and dismissed from the Court of Federal Claims once before); Harbuck v. United States, 58 Fed. Cl. 266 (2003) (involving a case that was filed in the U.S. District Court, then partially transferred to the Court of Federal Claims on August 6, 2002, and was still pending in the U.S. District Court until June 19, 2003). The case before this Court is completely different than the ones cited by the Defendant. Defendant in this case has not been required to litigate two suits at the same time – they were not even required to

litigate two suits, as no action had been taken in the District Court suit. Thus Defendant's Motion should be denied.

### 4. The District Court did not even have jurisdiction to hear the complaint

Even if the complaint had been "pending," the complaint filed in the District Court was not a valid complaint. Four claims for relief were included in that complaint: two torts (trespass and fraud/misrepresentation), one constitutional claim (due process), and punitive damages[3].

#### a. Tort claims

In order to bring a tort action against the United States, one must first present the claim to the appropriate Federal agency:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section. . . .

28 U.S.C. § 2675. In addition,

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless such action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b). The Supreme Court has held that the Federal Tort Claims Act ("FTCA") "bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." McNeil v. United States, 508 U.S. 106, 113 (1993) (affirming dismissal of suit that

---

[3] The instant complaint contains none of those claims for relief.

was filed four months prior to submittal of claim to Department of Health and Human Services). In this case, the claim was presented to the agencies on the same day the suit was filed–July 28, 2003. See Ex. 27. However, this does not save the claim. A tort "action shall not be instituted . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing . . . ." 28 U.S.C. § 2675. While it is questionable whether the same day filing of the complaint and the claim to the Federal agency would meet this requirement, there is no question that as of July 18, 2003, the agency had not yet denied the claim. In fact, the first response by an agency of the United States to this tort claim did not occur until December 2003. See Letter from Thomas Japhet to Peter Young (attached hereto as "Ex. 28"). On December 18, 2003, the Office of General Counsel for the United States Department of Agriculture responded to the "potential claim by your clients against a number of parties including NRCS and the Bureau of Land Management." Id. This letter does not appear to be a final denial of the claim, as in this letter the agency requests that a Standard Tort Claim Form (SF-95) be completed.[4] Id. So, unless the December 18, 2003 letter is deemed to be a denial of claim, the tort suit could not be filed until six months after the claim was presented to the agency, or January 28, 2004. The tort action was filed six months too early, and therefore, the District Court had no jurisdiction to hear that claim.

**b. Constitutional claim**

In addition, Plaintiffs' suit in the District Court included a claim for deprivation of property without due process. See Defendant's Exhibit 23 at 6. There are two possible waivers

---

[4] Note that the regulations do not require the standard form, but rather require "an executed Standard Form 95 or other written notification of the incident, accompanied by a claim for money damages in a sum certain. . . ." 28 C.F.R. § 14.2.

of sovereign immunity for a claim for deprivation of property without due process–either the Administrative Procedures Act ("APA") or the Tucker Act.

The APA allows "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. However, the APA waives sovereign immunity by allowing suit against the United States for "[a]n action in a court of the United States seeking relief other than money damages. . . ." Id. Plaintiffs' due process claim specifically requests money damages, "Clayta Forsgren is entitled to damages, including damages for loss in value, costs to repair and replace the damaged property, as well as other recoverable damages, including emotional, compensatory . . . ." Defendant's Exhibit 21 at ¶ 31. Because the claim is for money damages, the APA cannot be the waiver of sovereign immunity.

The Tucker Act and Little Tucker Act allow suit "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. §§ 1346(a)(2), 1491(a)(1). The Little Tucker Act, which allows for suits in the District Court, limits suit to actions "not exceeding $10,000 in amount." 28 U.S.C. § 1346(a)(2). The damages in the case filed in the District Court are clearly more than $10,000. The complaint demanded damages for "loss in value, costs to repair and replace the damaged property, as well as other recoverable damages." Defendant's Exhibit 21 at ¶ 31. Clearly the cost of repairing or replacing the extensive damage to the Forsgren house is more than $10,000.

Because neither the APA nor the Little Tucker Act provide the waiver of sovereign immunity for this claim, the only place this claim could be brought is the United States Court of Federal Claims. The District Court lacked jurisdiction to hear this constitutional claim.

**c. Punitive damages**

Punitive damages are not available against the United States in this type of suit. The FTCA specifically states that the United States "shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. The Supreme Court has stated that government bodies can be required to compensate for injuries caused by their wrongdoing, but punishment should apply only to the actual wrongdoers. "In general courts view[] punitive damages as contrary to sound public policy, because such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised." <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 263 (1981).

Thus, because the Plaintiffs' claim was not <u>pending</u> in two lawsuits at the same time, the District Court did not have jurisdiction to hear the complaint before it and the Defendant has not had to defend two cases at the same time, the purposes of 28 U.S.C. § 1500 have not been violated and the Defendant's motion to dismiss should be denied.

**B. Plaintiffs' Claim Is Not Barred By the Statute of Limitations**

This Court, under Chief Judge Damich, has already ruled that Plaintiffs' claim accrued in 1999. In arguing that new evidence causes Plaintiffs' claim to be barred by the statute of limitations, Defendant seems to forget the rule of law that was set forth by Chief Judge Damich

for this Court to follow. Chief Judge Damich held that as a matter of law, the claim accrued in 1999, based upon the date that the flooding ended.[5] In so holding, he stated,

> a claim does not accrue until "the consequences of inundation have so manifested themselves that a final account may be struck." The test therefore is one of foreseeability–the cause of action accrues when "the permanent character of intermittent flooding c[an] fairly be perceived." Put another way, "once it is clear that the process has resulted in a . . . taking and the extent of the damage is reasonably foreseeable, the claim accrues and the statute of limitations begins to run."

Forsgren v. United States, 64 Fed.Cl. 456, 458 (2005) (citations omitted). Thus, Chief Judge Damich's holding was based upon both the foreseeability of the final extent of the damage and the government's cooperative actions. In order for this Court to rule in favor of the Defendant's motion for summary judgment, the Defendant must show that there are new facts that change Chief Judge Damich's ruling and that "there is no genuine dispute as to any material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Defendant cannot do this.

**1. The extent of the damage was not foreseeable until the flooding stopped in 1999 and a final account could be struck**

As explained in Chief Judge Damich's opinion,

---

[5] In contrast, what the Defendant appears to be arguing is that since Mr. Forsgren wrote a letter in 1998 claiming water damage, an allegation for which there is not another single shred of evidence to support, the statute of limitations should be before the date the flooding ended. This contention flies directly in the face of the rule of law already set by this court. Defendant also admits that the instant motion does not concern whether the flooding was from the CCC Ponds or from another source. Defendant's Memorandum at fn 2. Thus, even assuming arguendo that there was water on the property in 1998, the statute of limitations question is whether the action of digging the ditch in 1999 dried up the property so that Forsgrens could assess their property damage. The Defendant has presented no evidence that the 1999 ditch did not stop the flooding of the property, thus that fact as applied to the rule of law set forth by Chief Judge Damich defeats this motion for summary judgement; Plaintiffs' complaint was filed within the statute of limitations.

> Although three years of seasonal flooding should have allowed Plaintiffs to foresee damage to their land, simply foreseeing the damage is not the test for accrual. Instead, accrual occurs when Plaintiffs should have reasonably foreseen the *extent* of the damage to their property, and when a "final account may be struck."

Forsgren, 64 Fed.Cl. at 459 (citation omitted) (emphasis added). In ruling this way, Chief Judge Damich relied mainly upon the cases of Dickinson and Barnes. United States v. Dickinson, 331 U.S. 745 (1947); Barnes v. United States, 538 F.2d 865 (Cl.Ct. 1976).

According to the Supreme Court, Dickinson warrants a flexible approach to accrual under the statute of limitations because the government has chosen to leave "the taking to physical events, thereby putting on the owner the onus of determining the decisive moment in the process of acquisition by the United States when the fact of taking could no longer be in controversy." Dickinson, 331 U.S. at 748. In Dickinson, the federal government constructed a dam which backed up water onto the plaintiff's property. The court held that the statute of limitations did not begin to run when the dam was constructed and the water began to flood the property, but rather the statute of limitations started when the flooding stabilized so that the property owners were aware of how much of the property would be taken. According to the court, a more flexible approach is appropriate because "[t]he Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'- when they are born, whether they proliferate, and when they die." Id.

The Supreme Court in Dickinson subsumed these flexible principles into the following general statement: A plaintiff does not have to bring a taking claim based on government-induced flooding until "the situation becomes stabilized," or "until the consequences of inundation have so manifested themselves that a final account may be struck." Dickinson, 331 U.S. at 749. The Court explained that there are practical reasons for allowing the delay. "If suit must be brought,

lest he jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him- for instance, the uncertainty of the damage and the risk of res judicata against recovering later for damage as yet uncertain. The source of the entire claim- the overflow due to rises in the level of the river- is not a single event; it is continuous." Id. Waiting for the claim to ripen until the government's liability is relatively certain also avoids piecemeal litigation. "[W]hen the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" Id. at 749.

Barnes held that in the context of a flowage easement, "the date the Government completed taking its flowage easement cannot be prior to when, through passage of time, the permanent character of intermittent flooding could fairly be perceived." Barnes, 538 F.2d at 873. In other words, the Forsgrens could not file their claim for a temporary taking of a flowage easement until a series of successive flood events established the foreseeability of the permanent and inevitably recurring nature of the government's invasion. In fact, Forsgrens would have had this exact problem had they filed their Complaint in 1997 when the first ditch was dug. Admittedly, flooding occurred after the 1995 CCC Ponds refilling and the 1996 ditch designed by the federal government and constructed on the Forsgren property with federal agency money. However, when that ditch froze, it caused ice to flow on the property and push in the foundation. It was not until the ditch on the BLM land was dug in 1999, again a ditch that was designed and funded by the federal agencies, that the property dried out. The Forsgrens could not invoke this Court's limited subject matter jurisdiction until the inevitably recurring nature of the flooding became apparent, thus distinguishing between a taking (in which this court does have jurisdiction)

from a tort (in which this court does not have jurisdiction). See Barnes, 538 F.2d at 870 citing 28 U.S.C. § 1491 ("Government-induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort. In such cases recovery is not authorized in this court.").

> Based upon these cases, Chief Judge Damich stated, citing to Supreme Court precedent: "when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" . . . . "If suit must be brought, lest he jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him–for instance, the uncertainty of the damage and the risk of res judicata against recovering later for damage as yet uncertain."

Forsgren, at 459 (citing Dickinson at 749). He concluded that "in this case, it would not be fair to charge Plaintiffs with foreseeing the extent of their damages, when an expanse of their lawn, including the area immediately surrounding their house, was still under water or ice." Id.

The above quoted language requires an accrual date of 1999, and none of the evidence cited to by Defendant in its Motion for Summary Judgment shows otherwise. While it is true that Plaintiffs were aware of some damage to their property prior to 1999, they were not aware of the full extent of damage and the "final account" of damage could not be struck until 1999 when the flooding stopped.

It is also true that in 1997 Plaintiffs were aware of some damage to their property and requested that the tax assessor lower the value of their property. In fact, Plaintiffs were aware of some damage as early as 1995 or 1996 when their yard became inundated with water and grass and other plants began to die. Rather more damage continued to occur after 1997 when Janet Montgomery assessed the property value. In fact, Ms. Montgomery testified that in 1998, her staff contacted the Forsgrens about the damage and Mrs. Forsgren "wrote back to us that, no, the

seepage into our property from above is still causing damage" and that they were having "problems with ground being so saturated." Montgomery Dep. at 33:25-34:1 (relevant excerpts attached hereto as "Ex. 29"). Ms. Montgomery also testified that she continued to lower the property in 1998 and 1999 based upon "conversations" and knowing that the property "was going downhill." Id. at 23:15-16, 24:8.

Defendant claims that "[a]t the very least, Plaintiffs were aware by [1997] that their foundation was cracked and that their house had serious structural issues that needed immediate attention." However, all Janet Montgomery's 1997 letter to the Plaintiffs said was: ". . . For this year I am reducing the value of your property to $156,422. I believe that this is fair. If you have secured estimates for the cost of a new well, drainage work, basement and foundation repair, and other repair work, I would certainly accept those to document a different value. . . ." Defendant's Exhibit 13. In this letter there was no mention of "serious structural issues" or the need for "immediate attention." In fact, the 1997 letter from Janet Montgomery states that she understood that the house could still be repaired; however, once the ice pushed in the foundation in 1998, Plaintiffs experts will testify that they have to now reconstruct the entire home.

The Forsgrens asked for the value of their property to be lowered because it was still covered with water. Plaintiffs could not have been aware of the full extent of their damage when there was still water on the property in 1997, 1998, and 1999. Mecham Dep. at 24:6-19 (relevant excerpts attached hereto as "Ex. 30") ("[a] couple of inches" on property); Ex. 24 at 70:1-9 (on June 25, 1999 "we looked at water that was on the lawn and next to the house"), 86:6-11 (in November 1999 before the subsurface drain was put in "[t]here was water standing on [the Forsgren lawn]. Maybe an average, inch and a half."); Ex. 9 at 74:13-15 (in 1997 "water that was

standing on the surface between the boat shed and the house"). After the drain installed in 1996 failed, the water was still progressing further across the Forsgren property. By 1999, the water and ice on the Plaintiffs' property extended completely across their property for the first time. Ex. 1 at 93:2-5 ("So the ice by the – the last year, the year that they finally decided to dig the ditch behind me, was when it totally surrounded my house from front, back, everywhere."); Ex. 9 at 88:24-25 to 89:1-4 (in 1999 "[t]here was ice across the east side of the – north of the boat shed, and east of the house, and around to the north of the house, and it was moving further to the west. And there was water that was coming up through the ice to form additional sheet ice, and it was growing."). Jerry Tulley explained, "As the spring thaw [of 1999] progressed, obvious signs of structural damage to the house kitchen area began to show, including wall-to-wall ceiling cracks, the cabinet doors pulling away from the sink, the sink from the wall, and the sliding glass doors, sticking windows, cracking noises throughout the house." Ex. 15 at 35:6-13.

Certainly if the property was still under water and new damages were still being discovered, the "final account" of damage to the property could not be struck. Plaintiffs could not and did not know the full extent of the damage to their property until 1999 when the flooding ceased. Plaintiffs filed suit in July, 2004. This was well within the six-year statute of limitations.

### 2. Defendant continued to offer "help" to Plaintiffs until completion of the subsurface drain in 1999

Chief Judge Damich did not rely solely upon the foreseeability of the extent of the Plaintiffs' damage in ruling that the statute of limitations began to run in 1999. He also relied upon "the government's attempts to repair the damage to Plaintiffs' land" which "caused the date of accrual to be uncertain." Forsgren, 64 Fed.Cl. at 459. In so holding, this Court relied upon Applegate v. United States and Banks v. United States. Id. The Federal Circuit in Applegate held that, "precisely because of the Government's promises to build a sand transfer plant, the landowners remain justifiably uncertain about the permanency of . . . the taking." Applegate v. United States, 25 F.3d 1579, 1583 (Fed. Cir. 1994). "In the case of Banks v. United States, an 'even greater uncertainty was created' when the government made promises of mitigation and then actually performed mitigation efforts." Forsgren, 64 Fed.Cl. at 459 (quoting Banks v. United States, 314 F.3d 1304, 1309 (Fed. Cir. 2003)).

In 2005, this Court found that "[a]lthough Defendant consistently denied liability and blamed other water sources for potentially causing Plaintiffs' flooding, it also tried persistently to mitigate the flooding." Id. at 460. This persistence to mitigate the flooding did not stop in 1997 as claimed in Defendant Memorandum at 17, but rather continued until 1999 when the subsurface drain was installed and paid for by the federal agencies.

This persistence to mitigate began in 1995 when the state geologist recommended that the problem could be solved by installing a subsurface drain on BLM and FS land. Defendant's Exhibit 9 at 2; Ex. 17 at 18:23-25 to 19:1; Ex. 9 at 62:21-23; Ex. 24 at 83:14-15. However, the subsurface drain recommendation was not acceptable to the BLM, so in 1996 the federal agencies

agreed to fund and design a surface drain to be located on the Forsgren property. Id., Ex. 18; Ex. 9 at 51:25 to 52:1-4.

This drain froze the first winter after it was installed. Ex. 19. The drain did not do what it was intended to do. Ex. 9 at 66:14-21 ("it wasn't always working, because winter compromised the function of the ditch"); R. Doyle Dep. at 28:1-3 (relevant excerpts attached hereto as "Ex. 31") (ditch "hadn't done the job"); Ex. 24 at 70:9-10 ("the drain was not functioning right"); Defendant's Exhibit 18 at 1 ("Option #1 [ditch on Forsgren property] . . . failed in all respects").

The flooding persisted, progressing each year, and by 1999 water and ice had covered the entire Forsgren property. Ex. 1 at 77:21-25 to 78:1-2. It was then that the federal agencies began to search for another measure to mitigate the flooding. Throughout the spring of 1999, the federal agencies discussed several different options. Ex. 20 at 6 (meeting on February 12, 1999 "ended with a mutual promise by the present authorities to remedy the problems"); id. at 7 (early Spring 1999 meeting where "Mrs. Forsgren was assured that there certainly was a water problem and that a proper drainage system to intercept the CCC pond water would be constructed as soon as survey work was complete and we 'had a few nice days.'"); Ex. 21; Ex. 22; Ex. 23; Ex. 24 at 72:3-4 ("I may have made an obligation to try and help alleve the problem"); Ex. 25 ("Hopefully, this problem is moving toward solution in the near future."). Daryle Bennett, with the NRCS, testified to this assistance in reference to the letter he wrote in 1999 stating that the monitoring well readings may indicate a correlation with the filling of the CCC Ponds (Exhibit 8):

> My role as the district conservationist was to provide assistance to, primarily, private landowners. And I was wanting to address the problems that they were having, and try to find solutions, and to be a positive influence on the CCC ponds committee, that regardless of what was causing the problem, that there's an opportunity to provide a solution.

> And I don't know if that's what I was thinking at the time I wrote this, but I knew that the possibility existed. There could be the correlation. You can't say yes for sure, you can't say no for sure. And I thought, you know, there's an opportunity that – and a responsibility, that we agreed to as a CCC ponds committee, to address the concerns that the Forsgrens had.
>
> The first – the first ditch wasn't – was not doing the job as we wanted it to, and I was looking for other solutions.

Ex. 9 at 82:7-25.

They settled upon a subsurface drain, a drain to "complet[e] the recommendations that were made in 1994." Ex. 30 at 21:1-2, 22:14-16, 27:15-17. The subsurface drain was designed and installed by the FS and BLM to "redirect the flow of overspill or seepage from the ponds only." Environmental Assessment for 1999 drain (attached hereto as "Ex. 32") (emphasis added). The subsurface drain was installed in November 1999 at the federal agencies expense. Ex. 9 at 52:5-9.

This drain accomplished the task. It worked so well that those present to watch the installation of the drain could actually see the water retreating off the Forsgren property as they installed and completed the drain. Ex. 15 at 42:20-22 to 43:1-9 ("And the water that was visible at the foundation of the property there where the sump pump was, it immediately started to decrease, and by the time the ditch was maybe 50 feet in length the water was gone. It had just – the water that was at the surface of the ground was gone and also the depth of the water in the old well, in the old well casing decreased markedly. I'm talking about in a matter of an hour or two. It was pretty obvious that the ditch was taking the ground water away."); Ex. 24 at 90:24-25 to 91:1-17 (water in old well casing dropped 9 inches and water on lawn dropped from 1.5 inches to none).

As agreed by the Court in 2005, “Defendant tried to mitigate Plaintiffs’ harm. As a result, it is easy to see how this appearance of cooperation from the government could have caused Plaintiffs to delay filing suit.” Forsgren, 64 Fed.Cl. at 460. “Furthermore, Plaintiffs’ actions were consistent with the purposes of the statute of limitations. Plaintiffs and Defendant acted in an exemplary manner: they tried to work through their problems before going to the courts for assistance.” This cooperation and attempts to “work through their problems” did not end until November, 1999 when the subsurface drain was installed and the flooding of the Forsgren property ceased. Plaintiffs filed their suit less than five years after this date on July 27, 2004. This is within the six-year statute of limitations and, thus, should not be dismissed.

## III. CONCLUSION

Plaintiffs’ suit was not pending in both the District Court and this Court at the same time and Defendant never had to defend two suits at the same time. In addition, Plaintiffs could not know the full extent of the damage to their property until 1999 when the flooding stopped due to the continued assistance of the federal agencies. For the reasons set forth above, Plaintiffs respectfully request this Court deny Defendant’s Motion to Dismiss and hold that Plaintiffs’ case was filed within the statute of limitations as was determined by Chief Judge Damich for Summary Judgment.

//

//

//

//

//

RESPECTFULLY SUBMITTED this 26th day of May, 2006.

/s/ Karen Budd-Falen
Karen Budd-Falen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, WY 82003-0346
307/632-5105 Telephone
307/637-3891 Telefax
karen@buddfalen.com