**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CLAYTA FORSGREN, et al. | ) | |
| Plaintiffs, | ) | Case No. 04-1223 L |
| v. | ) | Chief Judge Margaret Sweeney |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**SUPPLEMENTED COMPLAINT**

COMES NOW Plaintiff, by and through its undersigned attorney, and hereby alleges and asserts as follows:

**INTRODUCTION**

1. This case asserts a temporary taking of private property, via a water flowage easement. This "easement" was proximately caused by the U.S. Department of Agriculture, United States Forest Service's ("FS") and the U.S. Department of the Interior, United States Bureau of Land Management's ("BLM") efforts to reconstruct certain ponds, located near the Plaintiff's private property. This project, otherwise referred to as the CCC Ponds project, involved restoring water to two previously constructed but non-functional water impoundment areas. The first winter after these ponds were activated in 1995, the property owned by the Plaintiff began to experience significant flooding. Each year thereafter, despite the numerous complaints of the members of the Plaintiff's family, the flooding worsened, until the flood water inundated the house in some places, causing the foundation to crack and the bearing walls and beams to split.

2. This flooding was the natural and foreseeable result of the CCC Ponds reconstruction and operation.

3. This flooding continued resulting in substantial damage to the Plaintiff's property, including its home.

4. The flooding temporarily stopped when the federal government installed, at its own expense and on its own land, a subsurface drain in the year 1999. After the installation of the subsurface drain, the surface flooding immediately ceased and the subsurface water thereafter began to dissipate, taking approximately four years from the date the subsurface drain was installed for the land to completely dry out. This was the first time that the Plaintiff's property was completely dry since the Ponds were initially recharged in 1995. However in late 2005 and 2006, after more than six years with no maintenance and numerous denials by the Defendants to maintain the subsurface drain, the subsurface drain stopped functioning and the property began to flood again.

5. Plaintiffs are still unable to repair their home or have the full use and enjoyment of the property due to standing water on the property and in the crawl space. This water is on Plaintiffs' property because of the Defendant's failure to maintain its subsurface drain.

6. By its actions between 1995 and 2006, the federal government appropriated a flowage easement in violation of the United States Constitution's Fifth Amendment's prohibition against the taking of private property without just compensation. This action for temporary taking by physical invasion follows.

**JURISDICTION AND VENUE**

Jurisdiction by this Court is invoked pursuant to:

7. 28 U.S.C. § 1491, which specifically provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department . . . ."

8. The Fifth Amendment of the United States Constitution.

9. Venue by this Court is invoked pursuant to 28 U.S.C. § 1491(a)(1), which states that the United States Court of Federal Claims is the exclusive forum for Fifth Amendment claims over $10,000.

## PARTIES

10. Plaintiff, the Forsgren Family Trust, is the owner of the property located at 99 Riverside Drive in Pinedale, Wyoming. The legal description of the property is as follows: Township 34 N, Range 109 W, Section 27, the NE quarter of the NE quarter. This property is approximately 1,000 feet from the project known as the CCC Ponds project.

11. The property in section 27 was originally purchased by Richard and Clayta Forsgren in 1966. The property in Section 22 was originally purchased by Richard and Clayta Forsgren in 1974. The properties were transferred to the Forsgren Family Trust in 1991.

12. Defendant Forest Service is a governmental agency, within the Department of Agriculture, charged with the management of Federal lands in and within the National Forest system. As an agency responsible for the management of those federal lands, the Forest Service is charged with the duty of following and implementing the U.S. Constitution and other Federal laws and regulations governing the use of these lands.

13. Defendant Bureau of Land Management is a governmental agency, within the Department of the Interior, charged with the management of federal lands. As an agency responsible for the management of those federal lands, the Bureau of Land Management is charged with the duty of following and implementing the U.S. Constitution and other federal laws and regulations governing the use of these lands.

## FACTUAL ALLEGATIONS

14. In 1933, the Civilian Conservation Corps ("CCC") Camp F-13 was established along Pine Creek near Pinedale, Wyoming. The CCC constructed a series of ponds during this time period for purposes of fish rearing and to serve as a headwater reservoir for irrigation projects. These ponds are located on land managed by the BLM, approximately 4.5 miles NE of Pinedale, Wyoming, in Township 34 N, Range 109 W, Section 23, SW 1/4 and Section 26, NW 1/4. The ponds are approximately 700 feet south of Fremont Lake Dam.

15. In 1944, the Highland Irrigation canal was rerouted along the east side of the ponds, eliminating the ponds' use as a reservoir and eliminating the source of the water flowing into the ponds.

16. In January of 1966, Mr. and Mrs. Richard Forsgren purchased the property which is the subject of this lawsuit. In 1991, Mr. and Mrs. Forsgren transferred the ownership of the property to the Forsgren Family Trust, the plaintiff in this litigation. The Forsgrens' property is located approximately 1,000 feet from the CCC Ponds.

17. At the time the property was purchased, the condition of the Forsgren's land was in an undeveloped state. The existing vegetation was predominately wild grasses and sagebrush. Except for normal snowmelt, there was no standing water on the property.

18. The Forsgren's property lies to the west of the largest pond. Looking out from the Forsgrens' property to the CCC Ponds, approximately 100 yards from the boundary of the Forsgren's property, there is a berm which forms one side of the impoundment area for this pond. There is also a fence line midway down the side of the berm.

19. There are numerous willows along a natural spring/stream near the southeast boundary of the Forsgren's property to the south of the berm; however, there were no willows on the Forsgren property.

20. A house was constructed on the Forsgren's property in 1971. Since 1974, the Forsgren's have used this property as a weekend retreat, and have invested substantial time and money to create a high appeal property. In 1975, the Forsgren's added a garage and game room to the house. In 1976, the kitchen was expanded and a deck was added to the house. In its current state, the home consists of three bedrooms, one and three-quarter baths, a living room, a dining room, a kitchen and pantry, a two-car attached garage, a game room and a outside deck. The current square footage of the house is 2,724 square feet.

21. Additionally, the Forsgren's completed a substantial amount of landscaping on the property. The owners brought in top soil to level the ground and to plant a lawn. The lawn was watered with an underground sprinkler system, which the Forsgrens had installed. The lawn is approximately one acre in size. They also imported approximately 25 trees, including pine, aspen and evergreens. Flower beds were built all along the exterior boundary of the property.

22. From 1964, when the Forsgrens purchased the property, until 1971, when the house was constructed, the Forsgrens kept a travel trailer on the property. During this time, no excessive water was found on the property, either as a result of surface runoff or groundwater seepage.

23. There is one open drainage ditch on the Forsgren's property that lies to the east of the house. This ditch, which was approximately one foot wide and six inches deep, was completely dry with weeds and rocks covering the bottom, when the Forsgrens purchased the property. The ditch does not run the entire length of the Forsgrens' property boundary, but rather starts approximately one-half way down the boundary line. The ditch was installed before the Forsgrens purchased the property.

24. Between 1971, when the house was constructed, and 1995, the year the CCC Ponds were recharged with water, the Forsgrens had never experienced flooding problems. There was never any standing water in the ditch or on the property during this time period, nor was there any seasonal accumulations of ice on the property. The lawn installed and maintained by the Forsgrens between the house and the ponds was level, and the vegetative grasses and trees were in healthy condition.

25. In 1993, representatives from the Forest Service ("FS"), BLM, Sublette County Conservation District, the Wyoming Fish and Game Department, the Soil Conservation Service, and the Town of Pinedale began to meet to discuss the feasibility of the recharging the CCC Ponds.

26. During one such meeting on June 22, 1993, Mr. Forsgren raised concerns on behalf of the neighboring landowners regarding the potential for seepage if the ponds were refilled with water. In response to these concerns, the agency representatives arranged for a Natural Resource Conservation Service ("NRCS") geologist to visit the Forsgren's property on August 26-27, 1993. The NRCS is the predecessor of the Soil Conservation Service. Five test holes were dug out, with monitoring wells placed in three of the holes. One of these monitoring wells is located on the Forsgren's property, at the southeast corner of the garage. The two remaining monitoring wells were

each respectively placed 75 and 100 yards east of the Forsgren's property, but are not actually located on the Forsgren's property.

27. In April of 1994, the Forest Service issued an Environmental Assessment ("EA") for the construction of the CCC Ponds project. The proposed action included the reconstruction of the previously non-functional water impoundment facilities. The proposed project anticipated restoring water to these impoundment facilities on a year-round basis.

28. Prior to the reconstruction, the northern pond was approximately 4.5 acres in size, and had dried up after the Highland Irrigation canal was constructed. The center pond contained standing water on approximately 1 acre during low water periods and standing water on approximately 3 acres during the summer. The project expanded the size of the center pond to approximately 5.5 acres in size, and raised the water levels of this pond to accommodate fish populations. The southern-most pond was approximately 5 acres in size and had maintained a year-long constant water level. Prior to the reconstruction project, the sole source of water feeding into this southern-most pond was groundwater seepage. There was also a small, one-acre pond which lies generally to the northwest of the project area and is used as a beaver pond. The land surrounding the project area is managed by either the FS or the BLM.

29. The FS and BLM each contributed funding and technical assistance in conjunction with the preparation of the EA and subsequent restoration project. Both the FS and BLM agreed to make the necessary land available for the project. Likewise, both federal agencies agreed to participate in the implementation, monitoring, and maintenance of the Ponds project.

30. One of the areas of concern identified by the EA was the potential increase in groundwater elevation caused by the charging of the CCC Ponds which could cause seasonal

flooding of adjacent private property. Based on these concerns, one of the project goals was to incorporate mitigation and protective measures into the project design in order to reduce the risk of seasonal flooding. According to the EA, these mitigation and protective measures should include keeping the southern-most pond at the existing water level to minimize the risk of raising the water table and instituting a groundwater monitoring system on adjacent property to monitor water levels. If necessary, the EA envisioned tile drains would be installed next to buildings to facilitate drainage.

31. The Sublette County Soil Conservation District was charged with compiling all data on water consumption, gauging inflow and outflow volume and flow rates. Specifically, the data and research was to include any effects the project would have on the groundwater table relative to adjacent landowners. However, the federal agencies have failed to carry out the mitigation measures provided for in the EA.

32. The water flowing through and between these ponds generally flows from north to south. A headgate was installed in an existing channel to control the flow of water from the northern-most pond into the center fishing pond. In order to keep the southern-most pond at the existing water level to minimize the risk of flooding, the project envisioned keeping the fishing pond separate from the southern-most pond. Therefore, there is no channel or outlet directing water into the southern-most pond.

33. The Record of Decision for the Environmental Assessment was issued on August 8, 1994. The reconstruction and recharge of the CCC Ponds was completed in the spring of 1995.

34. At a meeting held on September 27, 1995, Dick Forsgren reported the first occurrence of water problems on the property. Meeting participants speculated whether the water problems were the result of an unusually wet spring or the result of seepage from the ponds project.

Committee members considered lowering the ponds in the winter to reduce flooding. The committee resolved to increase their monitoring efforts of the Forsgren's wells and sent a NRCS geologist out to the Forsgrens' property to inspect the situation and report back to the committee.

35. The NRCS geologist visited the Forsgren's property on October 30-31, 1995. The NRCS geologist determined that there were two possible sources of flooding on the Forsgren's property. The NRCS geologist determined that one source of flooding was caused by excess water seeping out of the stratified materials on the impoundment berm between the CCC Ponds and the Forsgren's property which was being carried across the Forsgrens' property as surface water. The NRCS geologist surmised the CCC Ponds could be the source of the seepage.

36. The second possible source of flooding was groundwater percolating and seeping from Pine Creek onto the Forsgren's property, causing water to enter the garage and crawlspace underneath the house. Pine Creek lies approximately 100 feet to the north of the Forsgren's residential foundation and constitutes the northern boundary of the Forsgren's property line.

37. However, this scenario seemed unlikely to the Forsgrens because, according to a septic system drawing dated October 8, 1971, Pine Creek is located approximately three to three and one-half feet below the Forsgrens property. Additionally, the Forsgren's home and land had been dry for approximately 34 years (from the time of purchase of the property) and 24 years (from the time the house was constructed) prior to the CCC Ponds recharge. Thus, the Forsgrens argue that if seepage from Pine Creek was causing the damage, such damage would have been apparent prior to the CCC Ponds recharge.

38. Finally, the NRCS geologist concluded that the two seepage problems were not interrelated, because the sand and/or gravel deposits in the berm causing the surface water problems

and the sand and/or gravel deposits in the fill material under the house causing the groundwater problem were not directly interconnected.

39. Based on these concerns, the Forsgrens installed a sump pump in the crawl space to combat the groundwater seepage. The Forsgrens subsequently installed two such pumps on or about May 30, 1999, once at each end of the crawl space.

40. To remedy the problem of excess surface water runoff from the stratified layer in the impoundment berm, the NRCS geologist recommended that a subsurface drain be installed above the seep area to intercept the water before it reached the surface. However, this subsurface drain would have been installed on BLM land, and the BLM opposed such a solution.

41. At a CCC Ponds committee meeting held on December 11, 1995, the minutes reflect that operation of the CCC Ponds could still be causing the Forsgrens' surface water problem. The committee recommended that a shallow, open ditch be constructed on the Forsgrens' property and contributed $1,000 towards the construction of the ditch.

42. The Forsgrens' agreed to allow the recommended ditch to be installed on the property. Throughout the spring of 1996, Dick Forsgren pursued the necessary permits from the U.S. Army Corps of Engineers to reconstruct the surface ditch and install the outlet drain. The surface ditch was constructed in the fall of 1996, and is approximately 125 feet long and 4 feet wide. The open ditch was constructed to include an outlet drain designed to carry water into adjacent Pine Creek. After Daryle Bennett, District Conservationist for the NRCS inspected the property, he informed the Wyoming State Engineer that, after the surface ditch was installed, "[t]he lawn dried up drastically . . . ."

43. However, by December of 1996, ice had accumulated in the surface ditch and outlet drain, completely blocking off the flow of water through the pipe. Daryle Bennett, District Conservationist for the NRCS inspected the property and ditch in December, 1996. Mr. Bennett suggested that an earthen plug in a subsurface drainage ditch located on BLM land be removed to act as an emergency outlet if the Forsgrens' surface ditch was still blocked off when the spring runoff began. Since this action did not occur on the Forsgren property, the Forsgrens cannot verify if this recommendation was ever followed. However, even if it was followed, water and ice continued to accumulate on the Forsgrens' property.

44. In May of 1997, Mr. Forsgren informed the CCC Ponds committee that there was a jelly-like slime accumulating in the surface ditch creating odor problems. Mr. Forsgren also stated that the frozen outlet pipe on the surface ditch caused water to move out of the ditch and infiltrate the well used for the family's drinking water. Mr. Forsgren also stated that the water line from the well into the house had frozen, and the house had been without a source of drinking water for that past winter. When the well and water line were originally installed, the water line was buried 4-5 feet below the surface of the ground to protect it against normal freezing.

45. In June of 1997, the Sublette County Assessor Janet Montgomery lowered the assessed value of the Forsgren's property citing water problems as the reason for the reduction in assessed property value.

46. In response to the concerns listed in paragraph 44, NRCS geologist Daryle Bennett visited the Forsgrens' property on August 1, 1997. Mr. Bennett stated that the jelly-like slime was a naturally occurring bacteria which was not related to the reconstruction or operation of the CCC Ponds project. Mr. Bennett also opined that the CCC Ponds were not responsible for either the

intrusion of surface water into the well or the frozen line from the well to the Forsgren's house. Rather, Mr. Bennett surmised these problems were the result of issues relating to the construction of the well and plumbing leading into the house.

47. Again, because the well and plumbing had been existing for approximately 24 years without problem prior to the recharge of the CCC Ponds, the Forsgrens did not agree with this explanation.

48. On August 29, 1997, the NRCS informed the Forsgrens that (1) the surface ditch was operating properly and effectively carrying water away, and (2) monitoring of the groundwater levels through the test wells would be discontinued. Furthermore, the Forsgrens were told that the problems they had experienced were most likely the result of higher than average snowpack in the past two consecutive years causing abnormally high runoff downstream.

49. During the winter of 1997-1998, there continued to be extensive surface water flooding in the backyard, as well as under the house.

50. Because their water well had been ruined, in 1998, Mrs. Forsgren had Gordon Williams Well Drilling drill a new, 210-foot well in order to provide drinking water to the house. The new well cost the Forsgren's approximately $10,000 to excavate and construct.

51. During the winter of 1998-1999, there continued to be extensive flooding around three sides of the house. On February 11, 1999, Mrs. Forsgren informed Ms. Leslie Theiss at the BLM that there was six inches of solid ice covering the entire rear yard from the foundation of the house to Pine Creek.

52. On February 12, 1999, Mrs. Forsgren met with several members of the CCC Ponds committee to discuss potential courses of action to solve the flooding problems. Because the

original surface ditch was unsuccessful, the BLM agreed to consider the possibility of installing a subsurface drainage ditch on its property to more effectively carry surface runoff away from the Forsgren's property.

53. Four different options were discussed in May of 1999. These alternatives ranged from offering no further assistance to assisting in the design and installation of a subsurface drain collection system. Ms. Forsgren agreed to implement alternative number 1- which entailed installing a subsurface drainage ditch on land administered by the BLM.

54. As the spring thaw progressed in 1999, more signs of damage became obvious. Additional damage included: (1) a wall to wall crack in the ceiling in the kitchen, (2) kitchen cabinet doors that no longer hung properly, (3) the kitchen sink pulled away from the wall, (4) sticking windows and sliding glass doors, and (5) audible creaking noises throughout the house.

55. On June 17, 1999, Mrs. Forsgren notified the local NRCS that the ice had undermined the structural integrity of the foundation of the house. Mrs. Forsgren stated that the foundation was currently being supported by a large jack and some cinder blocks.

56. Monitoring in September of 1999 found that (1) three test wells showed an increase in groundwater level of between 2 ½ and 3 ½ inches, (2) water from the main fish pond was overflowing the vertical drainage ditch, (3) water levels around the sump pumps in the crawl space had risen approximately two inches, and (4) beaver dams had caused the surface drainage ditch on the Forsgrens' property to back up and accumulate several feet deep.

57. On December 1, 1999, a local builder Larry Kirkpatrick inspected the Forsgren's property and determined: (1) water and ice had completely destroyed the kitchen foundation on the east side of the house, (2) the girder supports in the main living room had either heaved or buckled,

and (3) the ground beneath the main living room was so wet that it had caused the foundation to sink.

58. The subsurface drain discussed in paragraph 53 was eventually constructed in 1999. From 1999 until late fall 2005, the drain appeared to be operating properly and carrying water away from the Forsgren's property. The federal government paid the entire cost of constructing and installing the drain. Such construction also included extensive removal of the willows to the east of the Forsgren property, and bringing in truck loads of gravel as fill material. By 2006, failure by the Defendants to perform any maintenance on the drain caused the drain to stop functioning. This caused water to accumulate on the Forsgren property again.

59. The subsurface drain is currently located on BLM land, approximately twenty yards to the east of the Forsgren's property boundary.

60. During the course of installing the drain, the agency extensively used the Forsgren's private property for truck parking, moving dirt and other materials and construction. During the course of construction, significant ruts were created on the Forsgrens's property and the underground sprinkler system was destroyed. Although the agency promised to repair the damage it cause to the private property the following year, it never repaired such damage.

61. On August 13, 2000, Mrs. Forsgren had her property appraised to determine the extent of the property damage. The appraisal was prepared by Elliott-Fear Appraisal Associates. At that time, the appraiser estimated that the Forsgren's property (without considering damage to the home) was worth $295,200 without any water damage. Accounting for water damage existing at that time, the raw property alone was valued at only $203,700.

62. From the time the subsurface drain on the BLM land was installed in 1999 until 2003, the Forsgren property slowly dried out. Although there had been no additional flooding between 1999 and 2003, because the ground was so saturated with water, it took until 2003 for the ground to completely dry out. Then in late 2005, due to failure of the federal Defendants to maintain the subsurface drain, the property began to flood again.

63. In 2003, the most recent inspection of the Forsgren's residence determined that the house was in a general habitable condition, with the exception of the kitchen, where extensive damage has undermined the structural integrity of that portion of the house. Further damage is now occurring due to re-flooding of the property in late 2005 and 2006. The flooding is so extensive that water is flowing under the house and is moving to the front of the house. Defendants have the maintenance responsibility for the drain. Unless the drain is timely repaired and regularly maintained, the extensive flooding will continue.

64. Damages to the house, landscaping, and property are valued at approximately $650,000.

## CLAIM FOR RELIEF

### I. CLAIM ONE: VIOLATION OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION'S PROHIBITION ON THE TAKING OF PRIVATE PROPERTY WITHOUT JUST COMPENSATION

65. The Plaintiffs reassert and reallege the allegations in paragraphs 1 through 64 as if fully stated herein.

66. The Fifth Amendment of the U.S. Constitution provides, in part: "nor shall private property be taken for public use, without just compensation."

67. The Plaintiffs' ownership of the Forsgren property constitutes a valid property interest for purposes of compensation under the Fifth Amendment. The right of exclusion from

private property "has traditionally been considered one fo the most treasured strands in an owner's bundle of property rights." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982).

68. The government may not take an easement without compensation. United States v. Dickinson, 331 U.S. 745, 748 (1947). Similarly, government actions may not impose upon a private landowner a flowage easement without just compensation. See id. at 750-51. In reconstructing and recharging the CCC Ponds, the federal agencies have "taken" the Plaintiffs' valid property interest, by allowing its water to physically occupy portions of the Plaintiffs' real property and destroying portions of Plaintiffs' real property.

69. Even if the Defendants actions have not resulted in a physical per se invasion, the Defendants' actions have resulted in a taking through inverse condemnation, "where government actions had destroyed the owner's use and enjoyment of his property thereby depriving the owners of all or most of his interest in the property." See Yuba Natural Resources, Inc. v. United States, 821 F.2d 638, 640 (Fed.Cir. 1987).

70. Property may be taken by the invasion of water where subjected to intermittent, but inevitably recurring, inundation due to authorized Government action. See United States v. Cress, 243 U.S. 316 (1917); Ridge Line Inc. v. United States, 346 F.3d 1346, 1357(Fed. Cir. 2003). The asserted invasion must be a "direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action" to be a compensable property interest under the Fifth Amendment. Columbia Basin Orchard v. United States, 132 F.Supp. 707, 709 (1955). The invasion must also appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners right to enjoy his property for an extended period of

time, rather than merely inflict an injury that reduces its value. See Southern Pac. Co. v. United States, 58 Ct.Cl. 428 (1923).

71. The just compensation clause of the Fifth Amendment has been found likewise applicable in cases of percolation or rising ground water. United States v. Kansas City Life Ins. Co., 339 U.S. 799 (1950).

72. The usual measure of just compensation in a temporary takings case is "the value of the use of the property during the temporary taking, i.e. the amount which the owner lost as a result of the taking." Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990); see also United States v. Fuller, 409 U.S. 488, 490-91 (1973) (The essential question is "What has the owner lost?").

73. The Forsgrens' have never expressly or impliedly granted either the FS or BLM a flowage easement over the Forsgrens' private property.

74. The Forsgrens' property only began to experience excessive flooding after the CCC Ponds were recharged with water.

75. Raising the level of the ponds has created a situation where the stratified layer in the impoundment berm acts as a conduit, transporting water from the recharged ponds to the surface. Prior to the construction of the subsurface drain mentioned in paragraph 53, this water exited onto the ground on the slope of the berm, and flowed downhill onto the Forsgrens' property.

76. As evidenced by the identified concerns and mitigation measures in the EA, this flooding was "direct, natural, and probable" result of recharging the CCC Ponds. As evidenced by the temporarily improved conditions on the Forsgrens' property after the subsurface drain was installed, this flooding was the "direct, natural, and probable" result of recharging the CCC Ponds.

77. The flooding began in 1995, the year the CCC Ponds were recharged. The flooding was most extensive from the winter of 1997 through the spring of 1999. During this time, the Forsgrens' property was periodically but substantially inundated by excess surface water diversions and groundwater seepage. During both winters, there was a layer of ice several inches thick surrounding the Forsgrens' house making the house and property unusable during that time period for any purpose.

78. The reconstruction and recharging of the CCC Ponds has resulted in the temporary but physical invasion of water onto the Plaintiffs' property and into the crawlspace of the house. This constitutes a temporary per se physical taking of Plaintiffs' property and house during the time that the property and house were inundated with water.

79. Furthermore, the excessive surface runoff from the CCC Ponds onto the Forsgrens' property has caused and is causing substantial damage to the Forsgrens' house and yard, and has caused the Forsgrens' to undertake remedial measures to reduce the excessive flooding at their own expense. These costs incurred were the direct and foreseeable result of the temporary but physical per se taking of the flowage easement. As such, these damages are compensable under the Fifth Amendment and measured either by the diminution in value or the cost of repair.

80. Raising the level of the ponds has also raised the groundwater level, causing groundwater to seep into the Forsgrens' garage and crawlspace. Where the test wells indicate that the groundwater levels did not increase, the wells do show that the groundwater levels remained at high levels for longer periods of time.

81. As described in the EA and evidenced by the test wells installed on the Forsgrens' property which were monitored by federal employees on a periodic basis, this groundwater seepage was the "direct, natural, and probable" result of reconstructing and recharging the CCC Ponds.

82. During the time in which the Defendants were constructing the subsurface drain, Defendants drove heavy equipment over the Forsgrens' property to access the construction area. This has caused depressions and ruts on the surface of the property, as well as destroying the ground cover. This physical invasion of Plaintiffs' property is a per se temporary takings, compensable under the Fifth Amendment.

83. The effect of the restoration and recharging of the CCC Ponds is that the federal agencies have appropriated a benefit for the public at the expense of an individual landowner. The flooding has resulted in denying the Forsgrens all use and enjoyment of their property, including their house, for extended periods of time.

84. The Forsgrens are still unable to enjoy the use of their property due to extensive damage to the home and current flooding due to failure of the federal government to maintain the subsurface drain.

85. The government's artificial impoundment of water and subsequent alteration of natural surface drainage patterns is not reasonable in light of all the circumstances of relative advantages to the general public and relative disadvantages to the adjoining landowners.

86. The type of damages as a result of the government's appropriation of a flowage easement include, but are not limited to the following: physical damage to the house and property, lost use of both the house and property due to flooding, drilling of a new drinking well due to surface water intrusion, and forced preventative measures such as the Forsgrens' contribution to the

installation of the drains to intercept surface runoff from the impoundment berm. This taking has damaged Plaintiffs in an exact amount to be proven at trial. This amount is greater than the statutory limitation of $10,000 found in the Tucker Act.

**REQUESTS FOR RELIEF**

WHEREFORE, the Plaintiff requests that the Court:

A. Award the Plaintiff damages which include the resulting the rental value for that period of time which Plaintiffs' were denied all use and enjoyment of their property, compensation for remedial measures undertaken at Plaintiffs' expense to combat the physical invasion, and compensation for damages to the home and yard as a direct and foreseeable result of the physical invasion;

B. Award the Plaintiff the fees and costs of litigation; and

C. Grant such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 1st day of September, 2006.

/s/ Karen Budd-Falen
Karen Budd-Falen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile

Erin Sass Eastman, of counsel
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile